# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **ABBOTT LABORATORIES,** | : | |
| **an Illinois corporation,** | : | |
| | : | |
| **Plaintiff/Counterclaim-Defendant,** | : | |
| | : | |
| **v.** | : | **Civil Action No. 07-754 (GMS)** |
| | : | |
| **BANNER PHARMACAPS INC.** | : | |
| **a Delaware corporation,** | : | |
| | : | |
| **Defendant/Counterclaim-Plaintiff.** | : | |

## <u>BANNER'S BRIEF IN OPPOSITION TO ABBOTT LABS' MOTION TO DISMISS</u>

George Pazuniak (DE # 478)
Anna Martina Tyreus (DE # 4771)
WOMBLE CARLYLE SANDRIDGE & RICE, PLLC
222 Delaware Avenue, Suite 1501
Wilmington, Delaware 19801
Telephone: (302) 252- 4320
Email: GPazuniak@wcsr.com
Email: MTyreus@wcsr.com
*Attorneys for Banner Pharmacaps Inc.*

OF COUNSEL:
Charles J. Raubicheck
FROMMER LAWRENCE & HAUG, LLP
745 Fifth Avenue
New York, NY 10151
(212) 588-0800

Dated:  March 10, 2008

## TABLE OF CONTENTS

**PAGE**

I.     NATURE AND STAGE OF THE PROCEEDING.................................................. 1

II.    SUMMARY OF THE ARGUMENT ............................................................... 1

III.   STATEMENT OF FACTS ............................................................................ 2

IV.   ARGUMENT ................................................................................................ 3

      A.     Standard of Review .......................................................................... 3

      B.     Notice Pleading Requirement ........................................................... 4

      C.     Governing Law of Unfair Competition.............................................. 4

           1.     Federal Common Law Governs ............................................. 4

           2.     Alternately, North Carolina Unfair Competition Governs ......... 7

      D.     Banner's Unfair Competition Counterclaim Is Sufficiently Pled .......... 7

           1.     The Unfair Competition Pleading ............................................. 8

           2.     Well Established Law Supports Banner's Counterclaim.......... 10

           3.     North Carolina Unfair Competition Law .................................. 12

           4.     Delaware Unfair Competition Law.......................................... 13

      E.     35 U.S.C. §271(e) Does Not Entitle Plaintiffs to File Bad-Faith Litigations ....... 15

# TABLE OF AUTHORITIES

## Cases

*Abbott Laboratories v. Teva Pharmaceuticals USA, Inc.*,
  432 F. Supp.2d 408 (D. Del. 2006)..................... 1, 2, 3, 4, 5, 7, 8, 9, 10, 13, 14, 15, 16, 18

*Am. Homepatient, Inc. v. Collier*,
  2006 WL 1134170 (Del.Ch. 2006) .......................................................................... 13, 14

*Banco Nacional de Cuba v. Sabbatino*,
  376 U.S. 398 (1964)) ................................................................................................ 5

*Bavarian Nordic A/S v. Acambis, Inc.*,
  486 F. Supp. 2d 354 (D. Del. 2007)........................................................................... 7

*Belden Corp. v. Internorth, Inc.*,
  Ill. App., 413 N.E.2d 98 (1980) ........................................................................... 14, 15

*Bell Atl. Corp. v. Twombly*,
  --U.S.--, 127 S. Ct. 1955 (2007) .............................................................................. 4

*Buckman Co. v. Plaintiffs' Legal Committee*,
  531 U.S. 341 (2001)................................................................................................. 5

*Candalaus Chicago, Inc. v. Evans Mill Supply Co.*,
  Ill. App., 366 N.E.2d 319 (1977) ............................................................................ 15

*Christopher v. Harbury*,
  536 U.S. 403, 122 S. Ct. 2179 (2002) ...................................................................... 4

*Conley v. Gibson*,
  355 U.S. 41, 78 S. Ct. 99 (1957) .............................................................................. 4

*Edix Media Group, Inc. v. Mahani*,
  2006 Del. Ch. LEXIS 207 (Del. Ch. December 12,
  2006) ..................................................................................................................... 13

*Erickson v. Pardus*,
  --U.S.--, 127 S. Ct. 2197 (2007) .............................................................................. 4

*Florida Prepaid Postsecondary Educ. Expense Bd. v.*
  *College Savings Bank*,
  527 U.S. 627, 119 S.Ct. 2199 (1999).......................................................................... 6

*International Business Machines Corp. v Comdisco, Inc.*,
  Del. Super., 1993 Del. Super. LEXIS 183, C.A. No.
  91-C-07-199, Goldstein, J., (June 30, 1993).................................................................. 14

*Linder and Associates, Inc. v. Aetna Casualty and Surety*
 *Co.*, 166 F.3d 547 (3d Cir. 1999) ....................................................... 5

*Merck & Co. v. Apotex, Inc.*,
 488 F. Supp.2d 418 (D. Del. 2007) ............................................... 14, 15

*Pfizer, Inc. v. Teva Pharmaceuticals USA, Inc.*,
 ___ F.3d. ___ (Fed. Cir. March 7, 2008) ......................................... 16

*Prudential Ins. Co. v. Sipula*,
 776 F.2d 157 (7th Cir.1985) ............................................................ 15

*Rhone Poulenc Agro, S.A. v. DeKalb Genetics Corp.*,
 284 F.3d 1323 (Fed. Cir. 2002) .................................................. 5, 6, 7

*Richardson v. Bank of America, N.A.*,
 643 S.E.2d 410 (N.C.App. 2007) ................................................. 12, 13

*SmithKlineBeecham Corp. v. Apotex Corp.*,
 383 F. Supp.2d 686 (E.D. Pa. 2004) ...................................... 10, 11, 16

*Strates Shows, Inc. v. Amusements of America, Inc.*,
 646 S.E.2d 418 (N.C.App.  2007) ..................................................... 12

*Texas Industries, Inc. v. Radcliff Materials, Inc.*,
 451 U.S. 630 (1981) .......................................................................... 5

*Zenith Laboratories, Inc. v. Abbott Laboratories*,
 No. Civ.A. 96-1661, 1996 WL 33344963 (D. N.J.
 Aug. 7, 1996) ............................................................................ 11, 16

**Statutes**

N.C. Gen. Stat.§ 75-1.1 ......................................................................... 12

21 U.S.C. §355(c)(3) ............................................................................... 6

35 U.S.C. §271(e) ............................................................................. 15, 16

21 U.S.C. 355(j)(4) ................................................................................. 6

35 U.S.C. § 271(e)(2) .............................................................................. 6

**Rules**

Federal Rule of Civil Procedure 12(b)(6) .................................................. 3

**<u>Other Authorities</u>**

Coggio, Bresnick, *The Right to a Jury Trial in Actions*
    *Under the Hatch-Waxman Act*, 79 J. Pat. &
    Trademark Off. Soc'y 765, 768 (Nov. 1997)...................................................................... 6

Restatement (Second) of Torts § 768(1)(b) ............................................................................... 15

W. Page Keeton et al., Prosser and Keeton on the Law of
    Torts Torts (5th ed. 1984)] § 130, at 1013....................................................................... 14

## I.    NATURE AND STAGE OF THE PROCEEDING

Abbott Laboratories ("Abbott") filed a complaint against Banner Pharmacaps Inc. ("Banner") on November 21, 2007, alleging infringement of two patents, U.S. Patent Nos. 4,988,731 and 5,212,326. (D.I. 1).  On January 28, 2008, Banner answered the Complaint, and counterclaimed against Abbott for declaratory judgment of non-infringement and for unfair competition. (D.I. 7).  Abbott has moved to dismiss the unfair competition counterclaim, and this is Banner's brief in opposition to that motion.

## II.    SUMMARY OF THE ARGUMENT

Abbott argues that Banner's unfair competition counterclaim should be dismissed as a matter of law, because a plaintiff's sham filing of a frivolous patent litigation "could *never* give rise to a viable claim" for unfair competition.  (Abbott's Supporting Brief ("Abbott Br.") (D.I. 12 at 7) (emphasis in original)).  Clear precedent of this and other Third Circuit district courts contradicts Abbott's unsupported position.  *See Abbott Laboratories v. Teva Pharmaceuticals USA, Inc.*, 432 F. Supp.2d 408 (D. Del. 2006).

The Hatch-Waxman Act provides an avenue for alleging infringement, but nothing in the Act or any authority suggests Abbott's extreme position that a Plaintiff has the unbridled right to sue for infringement and harm competition even if the litigation is frivolous and undertaken in bad-faith for ulterior anti-competitive purposes.

Abbott also argues that Banner's counterclaim should be dismissed because it failed to plead with sufficient particularity the factual elements of a claim for unfair competition under Delaware law.  The argument fails for two reasons:  (1)  federal common law should apply here in order "to protect uniquely federal interests";  and (2) even if Delaware law were to apply, the factual allegations in Banner's unfair competition are more than sufficient to establish the factual

basis for Banner's counterclaim. Banner's counterclaim alleges: (1) Banner intended to and intends to sell the delayed-release valproic acid capsules; (2) Abbot filed a complaint against Banner without an objectively reasonable, good faith basis to allege infringement, and solely to anticompetitively invoke the 30 month statutory delay; and (3) Abbott's filing and the resulting statutory repercussions caused Banner economic harm. (Banner's Counterclaim, D.I. 7 at ¶¶ 9, 17-19).

### III.    STATEMENT OF FACTS

Abbot's brief misrepresents the factual background of the action. (Section titled "Paragraph IV Notice," Abbott Br., D.I. 12 at 5-6) Although Banner never relies on the facts in support of its arguments, the fanciful misrepresentations and omissions compel Banner to respond. The actual facts regarding Banner's Paragraph IV notice and Abbott's filing of this lawsuit are shown in the Declaration of Charles L. Cain ("Decl.") (attached hereto as Exh. 1) and the accompanying documents, and they are as follows.

Charles L. Cain, Banner's counsel, sent Abbott Banner's "Paragraph IV" letter  on October 9, 2007 (at ¶ 3). The letter explained why Banner's product would not infringe the '731 and '326 patents and attached an "Offer of Confidential Access to Banner's NDA". (Decl. at ¶ 4).

On October 24, 2007, Jason G. Winchester, counsel for Abbott, left a voice mail with Charles Cain proposing a few changes to the Offer. (Decl. at ¶ 5). Mr. Cain responded on October 26, 2007 (via e-mail), stating that he did "not have a problem with your requested changes." (Decl. at ¶ 5).

Mr. Winchester then responded a few hours later (via e-mail), proposing a few more changes and stating what portions of the NDA Abbott would like to review. (Decl. at ¶ 7). Mr.

Cain then telephoned Mr. Winchester and offered to make Banner's NDA available for review at Banner's offices in High Point, North Carolina (Decl. at ¶ 8).

In an e-mail later that day, Mr. Cain informed Mr. Winchester that Charles Raubicheck ("outside FDA counsel" for Banner) would contact Mr. Winchester "to finalize the agreement," and Mr. Winchester replied (via e-mail) that he had "communicated [Banner's] position to Abbott" and he would be "[h]appy to work with Charlie to get the OCA finalized". (Decl. at ¶ 9). Mr. Raubicheck confirmed with Mr. Winchester via email that Banner would make the NDA available to Abbott at Banner's facility in North Carolina. (Decl. at ¶ 11).  Mr. Cain then followed up with Mr. Winchester (via e-mail) on November 5, 2007, to determine whether any progress had been made on Banner's Offer. (Decl. at ¶ 12).

Having received no response, Mr. Raubicheck left two voice mail messages with Mr. Winchester, and finally sent a letter (via facsimile) on November 13, 2007, inquiring whether Abbott would agree to Banner's proposed Offer. (Decl. at ¶ 13).  The only response was this lawsuit, which was filed on November 21, 2007.

Contrary to Abbott's contrary suggestion – (1) Banner did not refuse to provide any portion of the NDA to Abbott; (2) Banner was not unreasonable in its efforts to coordinate with Abbott; and (3) Abbott never requested a sample of Banner's material, and, therefore, Banner never refused to provide the material.

## IV.    ARGUMENT

### A.    Standard of Review

Federal Rule of Civil Procedure 12(b)(6) requires a court to accept as true all material allegations of a counterclaim, and may dismiss only if, after accepting as true all of the facts alleged in the counterclaim, and drawing all reasonable inferences in the counterclaimant's favor, no relief could be granted under any set of facts consistent with the allegations of the

counterclaim. *Erickson v. Pardus*, --U.S.--, 127 S. Ct. 2197, 2200 (2007); *Christopher v. Harbury*, 536 U.S. 403, 406, 122 S. Ct. 2179 (2002); *Abbott Laboratories v. Teva Pharmaceuticals USA, Inc.*, 432 F. Supp.2d 408, 419 (D. Del. 2006). Dismissal is only appropriate when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99 (1957).

**B.    Notice Pleading Requirement**

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, --U.S.--, 127 S. Ct. 1955, 1964 (2007). A complaint does not need detailed factual allegations, although "a plaintiff's obligation to provide the 'grounds' of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id*. at 1965 (citations omitted). The "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations in the complaint are true (even if doubtful in fact)." *Id*. (citations omitted).

**C.    Governing Law of Unfair Competition**

Abbott mistakenly assumes that Delaware law governs the counterclaim. It does not. The counterclaim is governed by federal common law of unfair competition. If federal common law of unfair competition is not available, then the applicable unfair competition law is that of North Carolina.

**1.    Federal Common Law Governs**

Banner alleges that Abbott filed the present litigation in federal court, under purported federal patent law, knowing that Banner did not and could not infringe the United States patents

in suit, as bad-faith sham litigation solely to preclude the United States Food & Drug

Administration from granting marketing clearance to Banner under the federal Hatch-Waxman

Act, and thereby thwart the federal agency from granting Banner the right to compete in the

United States marketplace which Banner was otherwise entitled under federal law.

  The interests here are entirely that of federal law, and, therefore, federal common law

should apply here in order "to protect uniquely federal interests." *Texas Industries, Inc. v.*

*Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981) (federal common law is used when "a federal

rule of decision is 'necessary to protect uniquely federal interests'") (*citing Banco Nacional de*

*Cuba v. Sabbatino*, 376 U.S. 398, 426 (1964)).

  For example, ensuring that the Hatch -Waxman Act is not subverted to gain an improper

competitive advantage is surely a "uniquely federal interest." *Cf., Linder and Associates, Inc. v.*

*Aetna Casualty and Surety Co.*, 166 F.3d 547, 550 (3d Cir. 1999) (federal common law governed

the interpretation of the flood insurance policy at issue as its terms were prescribed by FEMA

regulations, and hence "neither the statutory nor decisional law of any particular state [wa]s

applicable to the case at bar"). Similarly, Abbott's actions touch FDA jurisdiction (because the

filing of the law suit prohibited the FDA from approving Banner's NDA for 30 months), and this

also requires that federal common law apply. *See Buckman Co. v. Plaintiffs' Legal Committee*,

531 U.S. 341, 347-48 (2001) (federal common law pre-empted state law regarding a cause of

action based on the FDA's approval of medical devices).

  In *Rhone Poulenc Agro, S.A. v. DeKalb Genetics Corp.*, 284 F.3d 1323 (Fed. Cir. 2002),

the Federal Circuit noted that rights arising under, or related to, the patent statutes are governed

by federal common law, rather than state common law. In that case, the issue was whether

federal or state law determined whether a patent licensee was a bona-fide purchaser.  The Federal

Circuit held that federal common law governed, analyzing:

> There is quite plainly a need for a uniform body of federal law on the bona fide
> purchaser defense.  *See Florida Prepaid Postsecondary Educ. Expense Bd. v.*
> *College Savings Bank*, 527 U.S. 627, 645, 119 S.Ct. 2199 (1999) ("The need for
> uniformity in the construction of patent law is undoubtedly important....").

> On the related question of the transferability of patent licenses, many courts have
> concluded that federal law must be applied.  In so holding, courts generally have
> acknowledged the need for a uniform national rule that patent licenses are
> personal and non-transferable in the absence of an agreement authorizing
> assignment, contrary to the state common law rule that contractual rights are
> assignable unless forbidden by an agreement.

> So too we have held that the question of whether an invention is the subject of a
> commercial offer for sale more than one year before a patent is filed is a question
> of federal rather than state law.  We noted that that rule was necessary to avoid
> the possibility of a patent's being valid in one state and invalid in another state.

> In short, because of the importance of having a uniform national rule, we hold that
> the bona fide purchaser defense to patent infringement is a matter of federal law.
> Because such a federal rule implicates an issue of patent law, the law of this
> circuit governs the rule.

*Rhone Poulenc Agro, S.A.,* 284 F.3d at 1328. (Internal citations omitted).

For much the same reasons, federal, and not state, common law, must be applied here in

resolving disputes arising under the combined force and interplay of the patent and FDA statutes.

As one commentator has observed:

> Recognizing that the FDA's approval process has important economic
> consequences such that any modifications would be best achieved by a
> systematic, rather than an ad hoc approach, Congress in 1984 amended both the
> patent and FDA laws to establish a single, interrelated system to satisfy the
> conflicting needs of the affected parties.  The Act has been hailed as the most
> important statute affecting the drug industry since the 1962 amendments.

Coggio, Bresnick, *The Right to a Jury Trial in Actions Under the Hatch-Waxman Act*, 79 J. Pat.

& Trademark Off. Soc'y 765, 768 (Nov. 1997).

As evidence of this interrelationship is the fact that "FDA and patent law provisions, in many instances, explicitly cross-reference one another:"

> Examples include FDA provisions 21 U.S.C. §§ 355(c)(3) and 355(j)(4), citing the statutory infringement action; and patent provision 35 U.S.C. § 271(e)(2), citing the related ANDA procedure. Certainly, the patent infringement action created by this section is inextricably intertwined with the ANDA-approval process.

*Id*. at 773.

As is the case with patent law, given "the importance of having a uniform national rule" whenever the 30-month stay is triggered by the filing of sham litigation, a claim (or counterclaim) based on such conduct should be governed by Federal common law. *RPA*, 284 F.3d at 1328. This avoids the very real possibility of such conduct being deemed proper in one state and improper in another state (based on differences in those state's unfair competition laws). *Id*.

### 2.    Alternately, North Carolina Unfair Competition Governs

Abbott erroneously postulates that Delaware law is the applicable law, which is incorrect because there are no allegations that any of the alleged tortious acts or particular harm took place in Delaware. *Cf*., *Bavarian Nordic A/S v. Acambis, Inc*., 486 F. Supp. 2d 354, 364 (D. Del. 2007) ("How can Delaware law be invoked when none of the alleged conduct took place in Delaware; there is no alleged injury in Delaware; and the parties had no relationship in Delaware?"). If federal common law of unfair competition is not applicable here, then the applicable unfair competition law is that of North Carolina. As pled in the Complaint and counterclaim, Banner's principal place of business is in North Carolina and is the place of injury.

### D.    Banner's Unfair Competition Counterclaim Is Sufficiently Pled

Banner's unfair competition counterclaim is properly and sufficiently pled, regardless of which law applies. As noted above, the Federal Rules require only notice pleading, and do not

require unfair competition to be pled with the specificity demanded by Abbott.  Accepting as true

all material allegations of Banner's counterclaim and drawing all reasonable inferences in

Banner's favor, it can not be concluded that "it appears beyond doubt that [Banner] can prove no

set of facts in support of [its] claim which would entitle [it] to relief."

### 1.    <u>The Unfair Competition Pleading</u>

A key pleaded fact is that Abbott knew that Banner did not infringe.  Banner specifically

pled that Banner applied to market <u>valproic acid</u> and that the "FDA advised Banner to rely on

Abbott's product as the reference listed drug for Banner's product."  (Counterclaim, D.I. 7 at ¶ 9)

The two Abbott patents in suit are attached to Abbott's Complaint, and the claims of both patents

clearly require "1:1 molar ratio of sodium valproate and valproic acid."[1]  These two facts

---

[1]  The claims of Abbott's Patent 4,988,731 are as follows:

> 1.  An oligomer having a 1:1 molar ratio of sodium valproate and valproic acid of
> the unit formula, $(CH_3\,CH_2\,CH_2)_2\,CHCO_2\,Na/(CH_3\,CH_2\,CH_2)_2\,CHCO_2\,H$, and
> containing about 4 such units.

> 2. An oral pharmaceutical dosage form for treating the symptoms of epileptic
> seizures or convulsions, containing as the active principal an oligomer having a
> 1:1 molar ratio of sodium valproate and valproic acid of the unit formula, $(CH_3\,CH_2\,CH_2)_2\,CHCO_2\,Na/(CH_3\,CH_2\,CH_2)_2\,CHCO_2\,H$, and containing about 4 such
> units.

The claims of Abbot's Patent 5,212,326 are as follows:

> 1. An oligomer having a 1:1 molar ratio of sodium valproate and valproic acid of
> the unit formula, $(CH_3\,CH_2\,CH_2)_2\,CHCO_2\,Na/(CH_3\,CH_2\,CH_2)_2\,CHCO_2\,H$, and
> containing about 4 to 6 such units.

> 2. An oral pharmaceutical dosage form for treating the symptoms of epileptic
> seizures or convulsions, containing as the active principal an oligomer having a
> 1:1 molar ratio of sodium valproate and valproic acid of the unit formula, $(CH_3\,CH_2\,CH_2)_2\,CHCO_2\,Na/(CH_3\,CH_2\,CH_2)_2\,CHCO_2\,H$, and containing about 4 to 6
> such units.

establish that Abbot knew, as a matter of plain patent law, that Banner's proposed product did

not infringe the '731 or '326 patent claims.

Banner further alleged that its "Paragraph IV" certification advised Abbott that Banner's

product does not infringe the '731 patent or the '326 patent, and explained why it is impossible

for Banner to have infringed "either literally or under the doctrine of equivalents."

(Counterclaim, D.I. 7 at ¶¶ 10-12).

Abbott does not even attempt to justify how an application to market valproic acid can

infringe claims that plainly require "1:1 molar ratio of sodium valproate and valproic acid," and,

thus, effectively concedes that it had no basis to allege infringement in this case.

Banner further alleged in its counterclaim that Abbott "filed this action without

substantial justification . . . in order to prevent the FDA from issuing final approval to Banner's

NDA 22-152," which would compete with Abbott's product. (Counterclaim, D.I. 7 ¶ 18).  Sham

litigation to invoke statutory roadblocks constitutes unfair competition under any law.  An NDA

is a request that the FDA approve the marketing of a certain drug.  (D.I. 7 at ¶ 9).  The mere

---

3. An oligomer having a 1:1 molar ratio of sodium valproate and valproic acid of the unit formula, $(CH_3\,CH_2\,CH_2)_2\,CHCO_2\,Na/(CH_3\,CH_2\,CH_2)_2\,CHCO_2\,H$, and containing about 6 such units.

4. An oral pharmaceutical dosage form for treating the symptoms of epileptic seizures or convulsions, containing as the active principal an oligomer having a 1:1 molar ratio of sodium valproate and valproic acid of the unit formula, $(CH_3\,CH_2\,CH_2)_2\,CHCO_2\,Na/(CH_3\,CH_2\,CH_2)_2\,CHCO_2\,H$, and containing about 6 such units.

5. An oligomer having a 1:1 molar ratio of sodium valproate and valproic acid of the unit formula, $(CH_3\,CH_2\,CH_2)_2\,CHCO_2\,Na/(CH_3\,CH_2\,CH_2)_2\,CHCO_2\,H$, and having physical/chemical properties as follows:
a. stable, white crystalline powder;
b. melting point of 98°-100° C.; and
c. an infrared spectrum having strong absorption bands at about 2957, 2872, 2932, 1685, 1555 and 1370 $cm^{-1}$.

filing of an NDA inherently states that the applicant is "prepared to market or sell its generic product."

## 2.    Well Established Law Supports Banner's Counterclaim

Abbott has not argued that Banner has not stated a cause of action for unfair competition under federal common law, as, indeed, it could not.

The factual allegations in Banner's counterclaim, namely that Abbott brought this sham patent infringement lawsuit against Banner for the sole purpose of illegitimately precluding Banner from marketing generic valproic acid by filing a baseless lawsuit, coupled with Abbott's knowledge that the illegitimate filing would automatically invoke a statutory delay in Banner's ability to compete, are more than sufficient to establish all of the elements of an unfair competition claim.  Indeed, numerous courts in the Third Circuit expressly contradict Abbott's argument that the factual allegations in Banner's unfair competition counterclaim "could *never* give rise to a viable claim against Abbott." (Abbott Br., D.I. 12 at 7) (emphasis in original).

In *Abbott Laboratories v. Teva Pharmaceuticals USA, Inc.*, 432 F. Supp.2d 408 (D. Del. 2006), the Defendant alleged that Abbott and others brought an objectively baseless "sham" infringement litigation solely for the purpose of triggering the 30-month stay (under the Hatch-Waxman Act), thereby improperly blocking approval of Teva's ANDA application.  Those factual allegations formed the basis for both antitrust and tortious interference counterclaims.

In denying a motion to dismiss the tortious interference counterclaims, this Court relied on *SmithKlineBeecham Corp. v. Apotex Corp.*, 383 F. Supp.2d 686 (E.D. Pa. 2004) to hold that "the allegation that the defendant brought a sham patent infringement suit against the plaintiff with the purpose of keeping it out of the generic drug market [is] sufficient to state a claim for tortious interference with prospective business advantage." *Teva*, 432 F. Supp.2d at 433 (citing *SmithKlineBeecham*, 383 F. Supp. 2d at 704).

10

In *SmithKlineBeecham*, the court denied a motion to dismiss a counterclaim, holding that the "allegation that [Plaintiff] brought a sham patent infringement suit against [counterclaimant] with the purpose of keeping it out of the generic Paxil market is sufficient to state a claim for tortuous interference with prospective economic advantages." *SmithKlineBeecham*, 383 F. Supp.2d at 704. The court went on to state that "[s]uch conduct, being wrongful and independently actionable, is not protected by the competitor's privilege." *Id.*

Similarly, in *Zenith Laboratories, Inc. v. Abbott Laboratories*, No. Civ.A. 96-1661, 1996 WL 33344963 (D. N.J. Aug. 7, 1996) (attached hereto as Exh. 2), plaintiff alleged that defendant Abbott brought a sham patent infringement suit solely for the purpose of improperly invoking the 30-month "Hatch-Waxman" stay, and those actions constituted unfair competition, abuse of process and tortious interference. The Court denied Abbott's motion to dismiss, holding that if the allegations were true plaintiff "ha[d] articulated a claim of unfair competition against Abbott." *Id.* at *6.

Considering that Abbott was a party in two of the three above cited decisions, including a decision from this Court, it is disingenuous for Abbott to reargue the same failed contentions that have been repeatedly rejected by the courts – without even advising the Court of the prior negative decisions. It remains unclear how Abbot can represent to the Court that "Banner's sham litigation counterclaim can "*never* give rise to a viable claim" (Abbott Br., D.I. 12 at 7) in view the prior decisions directly to the contrary. In any event, as the above cited case law makes clear, Banner's unfair competition claim can not simply be dismissed as a matter of law.

3.    <u>**North Carolina Unfair Competition Law**</u>

If a single state law were to be applicable, rather than federal common law, then only

North Carolina law would be relevant.  North Carolina law, § 75-1.1, "Methods Of Competition,

Acts And Practices Regulated; Legislative Policy" provides in relevant part:

> (a)  Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful.

> (b)  For purposes of this section, "commerce" includes all business activities, however denominated, but does not include professional services rendered by a member of a learned profession.

N.C. Gen.Stat. § 75-1.1(a) (2005).  In *Strates Shows, Inc. v. Amusements of America, Inc.*, 646

S.E.2d 418 (N.C.App.  2007), the Court most recently interpreted this statute as follows:

> Our State's Unfair and Deceptive Practices Act ("UDP"), found in North Carolina General Statutes, section 75-1 et seq., provides that "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." N.C. Gen.Stat. § 75-1.1(a) (2005). Section 75-16 of the Act "creates a cause of action to redress injuries resulting from violations of Chapter 75 of the General Statutes and provides that any damages recovered shall be trebled." . . .  "An unfair and deceptive trade practice claim requires plaintiffs to show: (1) that defendants committed an unfair or deceptive act or practice; (2) in or affecting commerce; and (3) plaintiffs were injured thereby.  Plaintiffs must also establish they 'suffered actual injury as a proximate result of defendants' [unfair or deceptive act].'"

*Strates Shows,* 646 S.E.2d at 424 (internal citations omitted).

In *Richardson v. Bank of America, N.A.*, 643 S.E.2d 410 (N.C.App. 2007), the court

stated:

> "To prevail on a claim of unfair and deceptive trade practices, a plaintiff must show: (1) [the] defendants committed an unfair or deceptive act or practice; (2) in or affecting commerce; and (3) that [the] plaintiff was injured thereby."  "A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers."  "[A] practice is deceptive if it has the capacity or tendency to deceive; proof of actual deception is not required."  "[U]nder N.C.G.S. § 75-1.1, it is a question for the jury as to whether [a party] committed the alleged acts, and then it is a question of law for the court as to whether these proven facts constitute an unfair or deceptive trade practice."

. . . "[W]here a party engages in conduct manifesting an inequitable assertion of power or position, such conduct constitutes an unfair act or practice."

*Richardson*, 643 S.E.2d at 416-17 (internal citations omitted).

The pleaded conduct clearly meets the North Carolina statutory standard of unfair competition.

### 4.    Delaware Unfair Competition Law

Abbott's motion to dismiss does not fare well, even if Delaware state law were to be applicable. Abbott relies on only one case, *Am. Homepatient, Inc. v. Collier*, 2006 WL 1134170 (Del.Ch. 2006), and argues that Banner had to plead the "legitimate expectancy of a business relationship . . . between Banner and a prospective customer for its unapproved generic drug, or with the FDA itself" which Abbott thwarted by this sham litigation. (Abbott Br., D.I. 12 at 7). Abbott is entirely in error, because *Am. Homepatient* was a decision after trial directed to interference with prospective contractual relationships, and the opinion neither set forth any pleading requirements nor even the elements of unfair competition in all contexts. Contrary to Abbott's argument, the court never suggested that unfair competition is limited solely to interference with contractual relationships. Indeed, after deciding *Am. Homepatient*, Chancellor Chandler stated that:

> Plaintiff maintains that defendant has engaged in and will continue to engage in unfair competition. . . . Delaware courts have struggled to precisely define the boundaries of the common law in this area. The essential element separating unfair competition from legitimate market participation, however, is an unfair action on the part of defendant by which he prevents plaintiff from legitimately earning revenue.

*Edix Media Group, Inc. v. Mahani*, 2006 Del. Ch. LEXIS 207, 61-62 (Del. Ch. December 12, 2006) (attached as Exhibit 3). Thus, Chancellor Chandler's decision in *Am. Homepatient* plainly does not restrict Delaware unfair competition common law.

Abbott's subsequent citation to this Court's decision in *Merck & Co. v. Apotex, Inc.*, 488
F. Supp.2d 418 (D. Del. 2007) (Abbott Br., D.I. 12 at 7-8) similarly fails, because the Court did
not address unfair competition in that decision. However, the Court specifically stated in *Merck*
that

> The court is by no means discharging the requirements of Rule 11. . . . In this
> case, however, there are no alleged facts from which the court can conclude that,
> in fact, Merck knew that Apotex's generic version . . . did not infringe . . . .

*Merck*, 488 F. Supp.2d at 428 n.7. Here, the alleged and undisputed facts are that Banner sought
regulatory approval to market only <u>valproic acid,</u> and that all the claims of both Abbott patents
clearly require "1:1 molar ratio of sodium valproate and valproic acid." These two facts are at
least sufficiently plead, and establish that Abbot knew that, as a matter of plain patent law,
Banner's proposed product did not infringe the '731 or '326 patent claims. Thus, Banner meets
the *Merck* rule.

Even in the *Am. Homepatient* context, Abbott errs in limiting the law. In a leading case,
*International Business Machines Corp. v Comdisco, Inc*., Del. Super., 1993 Del. Super. LEXIS
183, C.A. No. 91-C-07-199, Goldstein, J., (June 30, 1993) (attached as Exhibit 4), the court
suggested that unfair competition may be found where a party engages in any conduct that
amounts to a recognized tort and when that tort deprives the plaintiff of customers or other
prospects:

> Unfair competition is a form of tortious interference with prospective economic
> advantage. See *Belden Corp. v. Internorth, Inc*., Ill. App., [] 413 N.E.2d 98, 102
> (1980); [W. Page Keeton et al., Prosser and Keeton on the Law of Torts (5th ed.
> 1984)] § 130, at 1013.
>
> > The elements of the tort of interference with prospective advantage are
> > similar [to those of the tort of interference with contractual relations], but
> > not identical. The plaintiff must have a reasonable expectancy of entering a
> > valid business relationship, and defendant must purposely interfere and
> > defeat this legitimate expectancy, thereby causing harm to the plaintiff.

*Belden*, 413 N.E.2d at 101, quoted in *Prudential Ins. Co. v. Sipula*, 776 F.2d 157, 162-63 (7th Cir. 1985).

Only wrongful interferences will satisfy the tort, as some interferences are seen as justified or privileged under the aegis of competition. *Candalaus Chicago, Inc. v. Evans Mill Supply Co.*, Ill. App., [] 366 N.E.2d 319, 326-27 (1977). See also Restatement (Second) of Torts § 768(1)(b). "Unfair competition, which is not privileged, includes fraud, intimidation, or disparagement." *Belden*, 413 N.E.2d at 103. * * * Another authority states, "Quite apart from any improper motive, unfair competition, or for that matter other interferences with prospects, can be found when the defendant engages in any conduct that amounts to a recognized tort and when that tort deprives the plaintiff of customers or other prospects." Keeton et al., supra, § 130, at 1014.

Id. at *63-65.

Abbott's filing of a sham litigation to preclude Banner from entering the market to compete with Abbott in entering into prospective business relations with customers meets even the most narrow standard of Delaware unfair competition law.

To the extent that Delaware law were applicable and required an existing contractual arrangement, Abbott's motion is still unfounded, because the Declaration of Charles Cain establishes that Banner has entered into a contractual arrangement that is being precluded by Abbott's sham litigation. (Decl. at ¶ 2) Indeed, Abbott even plead in its Complaint that Banner has a "business partner" which is "responsible for marketing and distributing Banner's proposed product upon FDA approval." (Complaint, D.I. 1 at ¶ 16) Abbott's suggestion to the contrary is blatantly misleading.

### E.    35 U.S.C. §271(e) Does Not Entitle Plaintiffs to File Bad-Faith Litigations

Abbott finally cites *Merck* for the proposition that 35 U.S.C. §271(e) exempts it from liability, regardless of how malicious and sham the present litigation, based solely on the fact that Banner filed its NDA. (Abbott Br., D.I. 12 at 8-10). Abbott's interpretation of *Merck* is plainly erroneous, given the Court's plain warning that it was "by no means discharging the

requirements of Rule 11 in the context of Hatch Waxman litigation." *Merck*, 488 F. Supp.2d at

428 n.7.  If the Federal Rules authorize Courts to sanction Plaintiffs who file frivolous patent

infringement actions under 35 U.S.C. §271(e), then clearly Plaintiffs do not have free reign to

assert sham limitations to unfairly compete.

Indeed, Abbott misreads the law.  That the filing of an "NDA is an act of infringement"

(Abbott Br., D.I. 12 at 9) does not shield bad faith suits from liability for unfair competition.

*Teva*, 432 F. Supp.2d at 433-34;  *SmithKlineBeecham*, 383 F. Supp.2d at 704;  *Zenith*, 1996 WL

33344963 at *6.

The cited 35 U.S.C. §271(e) statutory language merely defines actionable infringement

for which an action may be brought as a procedural device for establishing jurisdiction by the

Courts.  A Plaintiff must still act in good faith in filing the action.  Cf., *Pfizer, Inc. v. Teva*

*Pharmaceuticals USA, Inc.*, ___ F.3d. ___ (Fed. Cir. March 7, 2008) where the Court noted that:

> Pfizer alleged that Teva's ANDA filing was an act of patent infringement <u>because</u>
> the ANDA sought approval to manufacture, use or sell a drug <u>claimed in a patent</u>
> or the use of which is claimed in a patent.

Op. cit. at page 3 (emphasis added).  The statute permits a Plaintiff to sue for infringement under

35 U.S.C. §271(e) only if the ANDA application reflects a product that Plaintiff in good-faith,

upon reasonable investigation, believes infringes the claims of its patent, and not otherwise.  If,

as Abbott's argument necessarily implies, the patentee's motivation and basis for filing that suit

is entirely inconsequential, then surely Congress would have dispensed with that requirement,

and simply legislated that the 30-month stay was automatically triggered whenever a paragraph

IV certification was filed.

## V.     CONCLUSION

For the aforementioned reasons, Abbott's motion to dismiss should be denied.

Respectfully Submitted,

Dated:  March 10, 2008                    By: /s/ *George Pazuniak*_____

                                         George Pazuniak (DE # 478)
                                         Anna Martina Tyreus (DE # 4771)
                                         Womble Carlyle Sandridge & Rice, PLLC
                                         222 Delaware Avenue, Suite 1501
                                         Wilmington, Delaware 19801
                                         Telephone: (302) 252- 4320
                                         Email: GPazuniak@wcsr.com
                                       Email: MTyreus@wcsr.com

                                         *Attorneys for Banner Pharmacaps Inc.*

OF COUNSEL:
Charles J. Raubicheck
Frommer Lawrence & Haug, LLP
745 Fifth Avenue
New York, NY 10151
(212) 588-0800

**CERTIFICATE OF SERVICE**

I hereby certify that on March 10, 2008, I caused a true copy of the foregoing Banner's

Brief in Opposition to Abbott Labs' Motion to Dismiss to be served on the following by hand

delivery and by e-mail, and was electronically filed with the Clerk of the Court using CM/ECF,

which will send notification of such filing to the following:

> Paul E. Crawford, Esquire
> Connolly, Bove, Lodge & Hutz
> The Nemours Building
> 1007 North Orange Street
> P.O. Box 2207
> Wilmington, DE 19899
> (302) 658-9141
> pcrawford@cblh.com
> Attorney for Plaintiff

> /s/ *George Pazuniak*_____
> George Pazuniak

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ABBOTT LABORATORIES,<br>an Illinois corporation, | : | |
| | : | |
| | : | |
| Plaintiff/Counterclaim-Defendant, | : | |
| | : | |
| v. | : | Civil Action No. 07-754 (GMS) |
| | : | |
| BANNER PHARMACAPS INC. | : | |
| a Delaware corporation, | : | |
| | : | |
| Defendant/Counterclaim-Plaintiff. | : | |

### DECLARATION OF CHARLES L. CAIN

I, CHARLES L. CAIN, hereby declare under penalty of perjury that the facts set forth herein are true and correct to the best of my knowledge, and, if called as a witness, I could and would testify competently as I set out below:

1.    I am Global Vice President, Legal & Public Affairs, of Banner Pharmacaps Inc. ("Banner"), a party to this litigation.

2.    Banner is a party to an agreement to provide Banner's valproic acid product to a third-party, which would be performed upon FDA approval of Banner's valproic acid product

3.    On October 9, 2007, I sent a "Paragraph IV" letter, by FedEx overnight delivery and also by certified U.S. mail, to Richard A. Gonzalez, President and Chief Operating Officer of Abbott Laboratories ("Abbott").  A copy of that letter, without the attachments, is attached as Exhibit A.

4.      The Paragraph IV letter included a "Paragraph IV certification," which, in accordance with §505(b)(2)(A)(iv) of the Federal Food, Drug, and Cosmetic Act, explained why Banner's valproic acid product, the subject of Banner's New Drug Application 22-152 ("NDA"), did not infringe U.S. Patent Nos. 4,988,731 and 5,212,326. Also attached to the letter was an Offer of Confidential Access to Banner's NDA ("Offer"). To the best of my knowledge, Abbot received the letter via FedEx overnight delivery on October 10, 2007, and via certified U.S. mail on October 15, 2007.

5.      On October 24, 2007, Mr. Jason G. Winchester, Esq., who identified himself as counsel for Abbott, left me a voice mail message, proposing a few changes to the Offer. I returned that call that same day, and left Mr. Winchester a voice mail message stating that I did not have any problems with the requested changes.

6.      On October 26, 2007, I sent Mr. Winchester an e-mail repeating my voice mail message that Banner was agreeable to his proposed changes, and offered Mr. Winchester the option of providing the language to address those changes, or asking Banner to do so. A copy of that e-mail is Exhibit B.

7.      Less than two hours later on that same day, October 26, 2007, Mr. Winchester replied, via e-mail, proposing a few more changes to the Offer and also stating what portions of the NDA Abbott would like to review. A copy of that e-mail is Exhibit C.

8.      I then telephoned Mr. Winchester, and advised him that Banner would make its NDA available for review by Abbott at Banner's offices in High Point, North Carolina. In Banner's experience this is accepted procedure. Mr. Winchester indicated he would discuss our

2

proposal with Abbott, although we also discussed Banner copying the NDA and sending it to Abbott.

9.    In an e-mail later that same day, October 26, 2007, I informed Mr. Winchester that Mr. Charles Raubicheck, outside counsel for Banner, would respond to Mr. Winchester's comments regarding the Offer, and once again confirmed that Banner would make the relevant NDA's sections available for Abbott's review. A copy of that e-mail is part of Exhibit D.

10.    Mr. Winchester responded by e-mail approximately one hour later, stating that he had communicated Banner's position to Abbott and that he would be happy to work with Mr. Raubicheck to get the Offer finalized. A copy of that e-mail is part of Exhibit D.

11.    I am advised that on October 29, 2007, Mr. Raubicheck sent an email to Mr. Winchester further confirming that Banner will make available to Abbott the relevant NDA's sections, at Banner's corporate facility in High Point, North Carolina. A copy of that e-mail is Exhibit E.

12.    Even though Abbott did not respond, I followed up with Mr. Winchester by e-mail on November 5, 2007 (copying Mr. Raubicheck), to determine whether any progress had been made on Banner's Offer. A copy of that e-mail is Exhibit F.

13.    I am advised that Mr. Raubicheck also attempted to contact Mr. Winchester, and left two voice mail messages requesting Abbott response to Banner's Offer. Mr. Raubicheck also faxed and mailed a letter on November 13, 2007, in a further attempt to resolve the wording of the Offer. A copy of that letter is Exhibit G.

3

14.    During the entirety of these negotiations, neither Mr. Winchester nor any other Abbott representative ever asked for a sample of Banner's valproic acid product (the subject of the NDA).

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.  This Declaration is executed this 10th day of March, 2008.

_____
Charles L. Cain

4

# EXHIBIT A



October 9, 2007

<div style="text-align:right">CONFIDENTIAL</div>

Banner Pharmacaps Inc.
4100 Mendenhall Oaks Parkway
Suite 301
High Point, NC 27265

PHONE  336.812.3442
FAX      336.812.7030

Asia/Pacific

Canada

Europe

Mexico/Latin America

United States

**VIA REGISTERED EXPRESS MAIL**
**RETURN RECEIPT REQUESTED**
**CONFIRMATION COPY BY FEDERAL EXPRESS**

Richard A. Gonzalez
President and Chief Operating Officer
Abbott Laboratories
100 Abbott Park Road
Abbott Park, IL, 60064-6400

Re:   Banner Pharmacaps Inc. 505(b)(2) New Drug Application 22-152
       Valproic Acid Delayed Release Capsules 125, 250 and 500 mg

Dear Sir:

Banner Pharmacaps has submitted an application to the United States
Food and Drug Administration ("FDA") under section 505(b)(2) of the
Federal Food, Drug, and Cosmetic Act ("the Act") requesting approval to
market 125, 250 and 500 mg delayed release valproic acid capsules.
Banner's proposed product contains valproic acid in an enteric soft
gelatin capsule.

The active ingredient in Abbott's Depakote® delayed release tablets is
divalproex sodium, a related but distinct chemical entity from valproic
acid.  Abbott has two patents in the Orange Book for Depakote® tablets:
U.S. Patent Nos. 4,988,731 and 5,212,326.  All the claims of the '731
patent and '326 patents require divalproex sodium, an oligomer having a
ratio of both sodium valproate and valproic acid.  *Abbott Labs. v.
TorPharm, Inc., Apotex Inc., and Apotex Corp.*, Fed.Cir. 02-1014 decided
08/13/02.

Accordingly, pursuant to Sections 505(b)(2)(A)(iv) and 505(b)(3) of the
Federal Food, Drug, and Cosmetic Act ("the Act") and §
314.50(i)(1)(i)(A)(4) of Title 21 of the Code of Federal Regulations, we
provide the following information to Abbott Laboratories ("Abbott"),

<div style="text-align:center">ideas · answers · life™</div>



Richard A. Gonzalez                              CONFIDENTIAL
Abbott Laboratories
Page 2 of 3

who on information and belief is the record owner of the above-identified
patents and the holder of the new drug application for Depakote®
(divalproex sodium) (hereafter "Abbott"):

1.  To obtain regulatory approval to engage in the commercial
    manufacture, use or sale of valproic acid delayed release
    capsules 125 mg, 250 mg and 500 mg, Banner Pharmacaps
    Inc. ("Banner") submitted to the U.S. Food and Drug
    Administration ("FDA") New Drug Application 22-152,
    under §505(b)(2) of the Act ("Banner's NDA").

2.  Banner's proposed drug product is valproic acid delayed
    release capsules 125 mg, 250 mg and 500 mg, for oral
    administration ("Banner's proposed product").

3.  Abbott markets divalproex sodium delayed release tablets
    125 mg, 250 mg and 500 mg (eq valproic acid 125, 250
    and 500 mg, respectively) for oral administration, under
    the proprietary name Depakote®.

4.  Banner's 505(b)(2) NDA contains a certification pursuant
    to Section 505(b)(2)(iv) of the Act that, in Banner's
    opinion and to the best of its knowledge, Banner's
    proposed product will not infringe U.S. Patent 4,988,731
    (the "'731 patent"), or U.S. Patent 5,212,326 (the "'326
    patent"), each of which is listed in FDA's publication
    entitled "Approved Drug Products with Therapeutic
    Equivalence Evaluations" (known as the "Orange Book")
    for Depakote® divalproex sodium delayed release
    capsules 125 mg, 250 mg and 500 mg.

We note valproic acid is the active ingredient in Abbott's Depakene®
capsule and syrup. Valproic acid is not covered by any unexpired United
States patents, and Abbott has not listed any unexpired patents relative to
Depakene® in the Orange Book. The valproic acid in Banner's soft gel
capsules complies with standards of identity and purity published in the
United States Pharmacopaeia.



Richard A. Gonzalez                                    CONFIDENTIAL
Abbott Laboratories
Page 3 of 3

We also note Banner has not requested an AB rating from FDA for its
soft gel capsules relative to Depakote® tablets, and does not expect an
AB rating given the difference in active ingredients between the two
products.

Attached is a detailed statement of the factual and legal bases of Banner's
above-noted patent certification.  This information is supplied for the sole
purpose of complying with the above-referenced statutes and regulations.
Neither Banner nor its attorneys waive any confidentiality, attorney-client
privilege or work-product immunity concerning the subject matter of this
communication.

Also attached is an Offer of Confidential Access to Banner's NDA,
pursuant to Section 505(c)(3)(D)(III) of the Act.

Very truly yours,

Charles L. Cain
Global Vice President, Legal & Public Affairs
Banner Pharmacaps Inc.


Enclosure

# EXHIBIT B

| Charles L Cain/Banpharm | To | jgwinchester@jonesday.com |
| 10/26/2007 08:44 AM | cc | |
| | bcc | |
| | Subject | Offer of Confidential Access Agreement |

Jason,

I received your voice mail and do not anticipate a problem with your requested changes.  Would you like to forward me language to address them, or would you prefer me to revise?

Charles

Charles L. Cain
Global Vice President, Legal and Public Affairs
Banner Pharmacaps Inc.
4100 Mendenhall Oaks Parkway, Suite 301
High Point, NC  27265
336.812.7010/ Fax 336.812.7054
clcain@banpharm.com

NOTICE: This email (including attachments) is CONFIDENTIAL, may be legally privileged, and is legally protected from disclosure. If you are not the intended recipient, any retention, dissemination, distribution, or copying of this email or attachments is strictly prohibited. Please REPLY to the sender that you have received the email or attachments in error, then delete it and all attachments. Thank you.

# EXHIBIT C



"Jason G. Winchester"
&lt;jgwinchester@JonesDay.co
m&gt;

10/26/2007 10:07 AM

To  CLCain@banpharm.com

cc

bcc

Subject  Re: Offer of Confidential Access Agreement

History:            🖂 This message has been replied to and forwarded.


Charles -

Thanks for getting back to me.  Here are Abbott's proposed changes to the
Offer of Confidential Access:

1.  Paragraph 5(a).  In the fifth line, insert "or destroy" after "Banner"
and before "(a) all Information . . ."  Also, at the end of subparagraph
5(a), add the following sentence:  "Notwithstanding the foregoing, Abbott's
outside counsel shall be permitted to retain one copy of all Information
that Banner has provided under this Agreement and all associated notes,
analyses, studies or other documents relating to Banner's NDA."

2.  Paragraph 5(b)(2).  In the first line, add "to Banner or destroy" after
"return" and before "the"

3.  In paragraph 10, Abbott designates Perry C. Siatis, Senior Counsel,
Abbott Laboratories, 100 Abbott Park Road., Dept. 324, Bldg. AP6A, Abbott
Park, IL 60064.


If these changes are acceptable, we would like to obtain relevant portions
of Banner's NDA for review under the terms of the OCA.  Specifically,
Abbott requests:

1.  The Chemistry Manufacturing and Controls section of the ANDA, and any
other portions sufficient to show the precise details about the proposed
formulation, manufacturing instructions, batch records, and composition
statements.

2.  The proposed labeling and package insert.

3.  Any information describing the physical, chemical, or structural
properties of the active ingredient, including any statements regarding
whether the active ingredient is an oligomer.

4.  Any comparisons in the NDA of Banner's proposed product to Depakote,
other than the actual BA/BE studies, which we are not asking for at this
time.

I am available today to discuss any of these issues.  Thanks.  JGW



Jason G. Winchester
Jones Day
77 W. Wacker Dr., Suite 3500
Chicago, Illinois  60601-1692
312.269.4373 (direct)
312.782.3939 (main)

# EXHIBIT D



"Jason G. Winchester"
<jgwinchester@JonesDay.com>

10/26/2007 05:02 PM

To    CLCain@banpharm.com

cc    "Charles Raubicheck" <craubicheck@flhlaw.com>, Melissa B Hirst <mbhirst@JonesDay.com>

bcc

Subject    Re: Offer of Confidential Access Agreement

History:         🖅 This message has been replied to.

Thanks, Charles.  I have communicated your position to Abbott.  Happy to work with Charlie to get the OCA finalized.  I will be away from the office most of next week as well, so would ask that Charlie also include my colleague Melissa Hirst on any correspondence.  Safe travels, JGW.

Jason G. Winchester
Jones Day
77 W. Wacker Dr., Suite 3500
Chicago, Illinois  60601-1692
312.269.4373 (direct)
312.782.3939 (main)
312.782.8585 (fax)

CLCain@banpharm.com

10/26/2007 03:58 PM

To    "Jason G. Winchester" <jgwinchester@JonesDay.com>

cc    "Charles Raubicheck" <craubicheck@flhlaw.com>

Subject    Re: Offer of Confidential Access Agreement

Jason,

I will be out of the office Monday through Wednesday (10/31) next week.  In order to keep things moving forward, I have asked our outside FDA counsel, Charlie Raubicheck, to respond to your points and to finalize the agreement with you.  Charlie is at Frommer, Lawrence in NY and his phone number is 212-588-0800.  Charlie is aware of our discussion today, and that you are communicating to your client that our offer is to make the NDA CMC section available at our corporate facility here in High Point.

Thanks,

# EXHIBIT E

----- Original Message -----
From: "Raubicheck, Charles" [CRaubicheck@flhlaw.com]
Sent: 10/29/2007 06:19 PM
To: "Jason G. Winchester"
<jgwinchester@JonesDay.com>;<CLCain@banpharm.com>
Cc: "Melissa B Hirst" <mbhirst@JonesDay.com>
Subject: RE: Offer of Confidential Access Agreement


Jason,

Confirming Charles Cain's e-mail message below, Banner offers to provide Abbott with
confidential access to the Chemistry, Manufacturing and Controls (CMC) section of its
Section 505(b)(2) NDA for delayed release valproic acid capsules, at Banner's place of
business in High Point, North Carolina.

Banner believes that the CMC section contains the data and information that are
relevant to Abbot's assessment of Banner's Paragraph IV notice letter.

The Confidential Access agreement can be amended accordingly.

Please let Charles or me know if Abbott accepts this offer, and arrangements can be
made for the review.


Regards,

Charles Raubicheck



Frommer Lawrence & Haug LLP
745 Fifth Avenue
New York, New York 10151
Tel. (212) 588-0800
Fax (212) 588-0500
craubicheck@flhlaw.com

# EXHIBIT F

Charles L Cain/Banpharm
11/05/2007 04:08 PM

To  "Jason G. Winchester" <jgwinchester@JonesDay.com>

cc  "Charles Raubicheck" <craubicheck@flhlaw.com>, Melissa B Hirst <mbhirst@JonesDay.com>

bcc

Subject  Re: Offer of Confidential Access Agreement

Jason,

As you know, Charlie has been out for a few days unexpectedly and unavoidably. Have you two been able to make progress on the Offer of Confidential Access? I know we are on a tight timetable. Please advise.

Regards,

Charles

"Jason G. Winchester" <jgwinchester@JonesDay.com>



"Jason G. Winchester"
<jgwinchester@JonesDay.com>

10/26/2007 05:02 PM

To  CLCain@banpharm.com

cc  "Charles Raubicheck" <craubicheck@flhlaw.com>, Melissa B Hirst <mbhirst@JonesDay.com>

Subject  Re: Offer of Confidential Access Agreement

```
Thanks, Charles.  I have communicated your position to Abbott.  Happy to
work with Charlie to get the OCA finalized.  I will be away from the office
most of next week as well, so would ask that Charlie also include my
colleague Melissa Hirst on any correspondence.  Safe travels, JGW.

Jason G. Winchester
Jones Day
77 W. Wacker Dr., Suite 3500
Chicago, Illinois  60601-1692
312.269.4373 (direct)
312.782.3939 (main)
312.782.8585 (fax)
```

```
        CLCain@banpharm.c
        om

        10/26/2007 03:58
        PM
```
```
                                                To
        "Jason G. Winchester"
        <jgwinchester@JonesDay.com>
                                                cc
        "Charles Raubicheck"
        <craubicheck@flhlaw.com>
                                           Subject
        Re: Offer of Confidential Access
        Agreement
```

# EXHIBIT G

**FLH**  FROMMER LAWRENCE & HAUG LLP

New York                          www.flhlaw.com
745 Fifth Avenue
New York, NY 10151                Washington, DC
Telephone: (212) 588-0800         Tokyo
Fax: (212) 588-0500

Charles J. Raubicheck
craubicheck@flhlaw.com

November 13, 2007

BY FAX AND FIRST CLASS MAIL

Jason G. Winchester, Esq.
Jones Day
77 West Wacker Drive, Suite 3500
Chicago, Illinois 60601-1692

     Re:    Banner Pharmacaps Inc.; Valproic Acid Delayed Release Capsules

Dear Jason:

     Within the last week, I have left you two voice mail messages and spoken with your colleague Melissa Hirst, inquiring whether Abbott Laboratories will agree to Banner's proposed Offer of Confidential Access regarding Banner's Section 505(b)(2) NDA for valproic acid. To date, I have not received a response.

     Please call me promptly concerning Abbott's position, since the 45-day clock has substantially run.

               Sincerely yours,

               Charles J. Raubicheck

CJR:bav

cc:    Charles L. Cain

00498812

# EXHIBIT 2

Westlaw.

Not Reported in F.Supp.                                                                                    Page 1
Not Reported in F.Supp., 1996 WL 33344963 (D.N.J.)
**(Cite as: Not Reported in F.Supp.)**

C
Zenith Laboratories, Inc. v. Abbott Laboratories
D.N.J.,1996.
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.
ZENITH LABORATORIES, INC., Plaintiff,
v.
ABBOTT LABORATORIES, Defendant.
**No. Civ.A. 96-1661.**

Aug. 7, 1996.

Lerner, David, Littenberg, Krumholz & Mentlik,
By: William L. Mentlik, Arnold H. Krumholz, Roy
H. Wepner, Jeffrey S. Dickey, Westfield, New Jer-
sey, for Plaintiff.
Riker, Danzig, Scherer, Hyland & Perretti, By:
Anne M. Paterson, Morristown, New Jersey, for
Defendant.
Jones, Day, Reavis & Pogue, By: Daniel E. Reidy,
James A. White, Chicago, Illinois, for Defendant,
of-counsel.
Kenneth D. Greisman, Legal Division, Abbott
Laboratories, Abbott Park, Illinois, for Defendant,
of counsel.
Fox, Bennett & Turner, By: J. Daniel Kiser, Wash-
ington, D.C., for Defendant, of counsel.

*OPINION*

BISSELL, J.
    **\*1** This matter comes before the Court on a
motion to dismiss and a motion for partial summary
judgment. On April 15, 1996, plaintiff Zenith
Laboratories, Inc. filed the instant complaint
against defendant Abbott Laboratories. The com-
plaint charges the defendant with unfair competi-
tion, abuse of process, tortious interference and
fraud. It also seeks a declaratory judgment that
plaintiff is not infringing defendant's relevant pat-
ents.

    This Court has jurisdiction pursuant to 28
U.S.C. § 1331.

*FACTS AND BACKGROUND*

    The pharmaceutical industry is regulated by the
Food and Drug Administration ("FDA"). The Fed-
eral Food, Drug and Cosmetic Act ("FFDCA") is
the statute addressed to the manufacture and distri-
bution of drugs and medical devices. *See* 21 U.S.C.
§ 301, *etseq.* New drug products, methods for em-
ploying those products and variations of the origin-
al drug may all receive individual patents. Once a
drug is patented, it must receive FDA approval be-
fore it may be marketed in the United States. (*Id.*)
The FFDCA sets out the specific requirements for
obtaining marketing approval by the FDA. (*Id.*)
However, in 1984, the FFDCA was amended by the
Drug Price Competition and Patent Term Restora-
tion Act, otherwise known as the "Hatch-Waxman
Act," which modifies the necessary approval pro-
cedures. (Codified as amended at 21 U.S.C. § 355
(1994) and 35 U.S.C. § 271(d)-(h) (1995)).

    The Hatch-Waxman Act provides for an abbre-
viated approval process for generic forms of previ-
ously approved pioneer drug products whose pat-
ents have or will soon expire or are proven invalid.
A pharmaceutical company seeking approval to
market a generic product must complete an Abbre-
viated New Drug Application ("ANDA"). The gen-
eric producer is excused from conducting the ex-
tensive clinical tests required for a New Drug Ap-
plication ("NDA"). The ANDA applicant may rely
upon the pioneer company's tests. It need only
prove that the generic contains the same active in-
gredient as, and is bioequivalent to, the patented
drug.

    Another significant difference made by the
Hatch-Waxman Act is that the generic applicant
may now use the patented drug to perform certain
research and development without infringing the
patent of the pioneer manufacturer. Prior to the
amendment, the FFDCA provided:
[W]hoever without authority makes, uses or
sells any patented invention, within the United

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 33344963 (D.N.J.)
(Cite as: Not Reported in F.Supp.)

States during the term of the patent therefor, infringes the patent.

Accordingly, prior to the Hatch-Waxman Act, a producer of a generic product was required to wait until the pioneer drug went off patent before that producer could conduct the research and development necessary for FDA approval of a generic product. As a result, the patent owner was entitled to a *defacto* extension of the term of the patent, the duration of which was equivalent to the time the generic producer needed to research its proposed product and obtain FDA approval. The FFDCA now reads:**2** It shall not be an act of infringement to make, use, or sell a patented invention ... solely for uses reasonably related to the development and submission of information under a Federal law which regulates the manufacture, use, or sale of drugs....

35 U.S.C. § 271(e)(1). This provision is widely known as the "safe harbor" provision in that it permits otherwise infringing activity as long as it is reasonably related to obtaining regulatory approval for the generic drug product.

In the event the generic producer wishes to seek FDA approval during the term of the pioneer patent, the generic applicant must address each patent that claims the pioneer drug by including one of the following four certifications in its application:
1. that the pioneer has not filed patent information with the FDA,
2. that the patent has expired.
3. that the patent expires on a date before which the generic manufacturer is seeking to market its infringing equivalent, or
4. that the patent claiming the marketed pioneer drug is invalid or will not be infringed.

21 U.S.C. § 355(j)(2)(vii). If the generic applicant makes the fourth certification, it must provide notice of the certification to the patent owner and explain why the patent is invalid or will not be infringed. 21 U.S.C. § 355(j)(2)(B). The Hatch-Waxman Act permits the patent owner to file

a patent infringement action within 45 days of receipt of such notice. Prior to the Hatch-Waxman Act, preapproval patent infringement litigation was not available to the patent owner. The Act provides that infringement occurs if a generic manufacturer submits:an application under section 505(j) of the Federal Food, Drug and Cosmetic Act or described in section 505(b)(2) of such Act for a drug claimed in a patent or the use of which is claimed in a patent.

35 U.S.C. § 271(e)(2). Such a suit delays the approval of the generic product up to 30 months or until a judicial resolution of the infringement issues, whichever comes first. 21 U.S.C. § 355(j)(4)(B)(iii). Once a "paragraph IV" certification is made and an infringement action filed, the issues of the validity and accuracy of the patent are resolved by the court, not the FDA.

The Hatch-Waxman Act benefits only those patent owners whose patents have been approved by the FDA for marketing. For approval, a patent owner is required to:
file with the FDA the patent number and expiration date of any patent which claims the drug for which the applicant submitted the application or which claims a method of using such drug and with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug.

21 U.S.C. § 355(b)(1). Once this information is received and the patent approved, it is published in a volume known as "Approved Drug Products With Therapeutic Equivalence Evaluations," which is commonly referred to as the "Orange Book." A patent is properly listed in the Orange Book if it claims an FDA-approved drug product and is a patent with respect to which a claim of infringement could reasonably be asserted. Zenith argues that Abbott has improperly listed patents in the Orange Book by purporting that these patents claim the drug which is the subject of a pioneer patent with the purpose of invoking the Hatch-Waxman Act in or-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 33344963 (D.N.J.)
**(Cite as: Not Reported in F.Supp.)**

der to keep Zenith out of the relevant market for up to 30 months and to subject it to sham patent infringement litigation.

**\*3** Abbott discovered and patented terazosin hydrochloride, which is used for the treatment of hypertension and benign prostatic hyperplasia. The '894 patent covers the compound itself and the '097 patent covers a specific composition and the method for treating hypertension with terazosin hydrochloride. Both of these patents have expired. The '532 patent covers a dihydrate form of terazosin hydrochloride, which is marketed by Abbott as "Hytrin." The '532 patent expires in May 1998. At the time they were issued, the above patents were listed in the FDA Orange Book. Other patents issued to Abbott, which Abbott claims are covered by the '532 patent, include the '176 patent, the '617 patent, the '095 patent and the '207 patent. These patents are all for anhydrous polymorphs of terazosin hydrochloride and differ from Hytrin only in their specific crystalline forms. They are all bioequivalent to Hytrin. These patents were listed in the Orange Book in 1994 and 1995.

Zenith intends to market a polymorph of terazosin hydrochloride, which is bioequivalent to "Hytrin." Zenith claims that its product has a different crystalline structure and therefore does not infringe the patent on Hytrin. On or about August 1, 1994, Zenith filed an ANDA with the FDA seeking permission to market its generic version of an anhydrous form of terazosin hydrochloride. At the time, Zenith made the required certifications, including one with respect to the '894 patent, which had expired, one with respect to the '097 patent which would expire prior to the date Zenith sought approval, and one with respect to the '532 patent, alleging that Zenith's product would not infringe that patent. Abbott did not file a patent infringement suit in response.

However, Abbott contends that Zenith's product infringes not the '532 patent, but its '615 patent which covers an anhydrous polymorph of terazosin hydrochloride. In 1994, Abbott filed a

patent infringement suit, pursuant to the Hatch-Waxman Act, asserting that Zenith was infringing the '615 patent. At the time, the '615 patent was not listed in the FDA Orange Book and the suit was therefore dismissed for failure to state a claim. Shortly thereafter, Abbott listed the '615 patent in the Orange Book, claiming that it covered Hytrin, the subject of Abbott's '532 patent, and refiled its complaint. However, that action was also dismissed, this time on the grounds that the listing was untimely. The issue of whether the '615 patent was improperly listed or infringed has not yet been addressed.

In its complaint, Zenith contends that Abbott's listing of the '615, '176, '095 and '207 patents was improper. Specifically, Zenith argues that none of these patents are covered by Hytrin, an approved drug product, as they claim. Because the listing of a patent entitles a patent owner to the protections of the Hatch-Waxman Act, Zenith claims that Abbott, knowing the relevant patents are not covered by Hytrin, had them listed anyway for the purpose of forcing Zenith to make a paragraph IV certification, which then entitles Abbott to have delayed FDA approval of Zenith's generic product for up to 30 months by instituting a patent infringement suit against Zenith. The complaint asserts counts of unfair competition, abuse of process, tortious interference and fraud. It also seeks a declaration that its generic product does not infringe any of Abbott's patents.

*ANALYSIS*

*I. Abbott's Motion to Dismiss is Denied*

*A. Standard for a Motion to Dismiss*

**\*4** Fed.R.Civ.P. 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law. *Neitzke v. Williams,* 490 U.S. 319, 326 (1989) (citing *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984); *Conley v. Gibson,* 355 U.S. 41, 45-46

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 33344963 (D.N.J.)
**(Cite as: Not Reported in F.Supp.)**

(1957). In disposing of a motion to dismiss, the court operates on the assumption that the factual allegations in the complaint or counterclaim are true. *Neitzke,* 490 U.S. at 326-27. A motion to dismiss may be granted if the opposing party would not be entitled to relief under any set of facts consistent with the allegations in the complaint or counterclaim. As the Supreme Court stated in *Neitzke:*

[n]othing in Rule 12(b)(6) confines its sweep to claims of law which are obviously insupportable. On the contrary, if as a matter of law "it is clear that no relief could be proved consistent with the allegations,"*Hishon,supra* at 73, 104 S.Ct. 2229, a claim must be dismissed, without regard to whether it is based on an outlandish legal theory or on a close but ultimately unavailing one. What Rule 23(b)(6) does not countenance are dismissals based on a judge's disbelief of a complaint's factual allega- tions.

(*Id.* at 327).

*B. Zenith's Claims Arising Under State Law are not Preempted by the FFDCA.*

Zenith's complaint charges Abbott with state law claims of unfair competition, abuse of process, tortious interference with prospective economic advantage and fraud. It also seeks a declaration of noninfringement. The conduct from which these claims arose is the alleged improper listing of Abbott's patents in the FDA Orange Book which, as Zenith claims, precipitated sham patent infringement litigation. Abbott contends these claims are preempted by the FFDCA and moves to dismiss the action.

Certain claims are expressly preempted by the FFDCA. However, the parties agree that the state law claims at issue are not among those expressly preempted. In the absence of an express statutory provision, state law is preempted only when the state law "actually conflicts with federal law" or "federal law so thoroughly occupies a legislative

field as to make reasonable the inference that Congress left no room for the States to supplement it."*Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 523 (1992).

As an initial matter, it is persuasive that Congress expressly preempted state law claims pertaining to the safety of medical devices but did not expressly preempt any other claims. 21 U.S.C. § 360k(a). Such limited preemption leads to a reasonable inference that Congress intended to preempt only those claims specifically enumerated within the statute and for those not listed to remain viable. *Cipollone,* 505 U.S. at 517.

That the FFDCA is a comprehensive piece of legislation does not imply that it entirely occupies the regulated field.

Preemption does not follow immediately from the comprehensive federal regulation of prescription biological products. Every subject that merits congressional legislation is, by definition, a subject of national concern. That cannot mean, however, that every federal statute ousts all related state law.

**\*5** *Abbot by Abbot v. American Cyanamid,* 844 F.2d 1108, 1112 (4th Cir.1988). Furthermore, the state laws that regulate competition in the marketplace and the FFDCA are not in conflict and easily coexist. The goal of the FFDCA is the protection of public health. Common law claims such as those asserted here address wrongful business practices. It simply cannot be said that such state laws "stand[ ] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."*Freightliner Corp. v. Myrick,* 514 U.S. 280, 115 S.Ct. 1483, 1487 (1995). In addition, state claims of unfair competition and the like provide a remedy for conduct not addressed by the FFDCA which is the alleged improper listing of patents with the FDA.

Numerous courts considering the issue of preemption of those state laws that regulate the conduct of competitors in the marketplace have found that state law claims similar to those asserted in the un-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                         Page 5
Not Reported in F.Supp., 1996 WL 33344963 (D.N.J.)
**(Cite as: Not Reported in F.Supp.)**

derlying complaint are not preempted. *Michael v. Shiley, Inc.,* 46 F.3d 1316, 1329 (3d Cir.1995) (common law fraud claim asserted against a competitor not preempted); *Spychala v. G.D. Searle & Co.,* 705 F.Supp. 1024, 1029 (D.N.J.1988) (claims involving medical devices preempted, claims involving prescription drugs not preempted); *Hawkins v. Upjohn Co.,* 890 F.Supp. 609, 612 (E.D.Tex.1994) (fraud "and other general torts" not preempted by the FFDCA). Furthermore, a violation of the FFDCA that gives rise to a separate cause of action does not necessarily lead to the conclusion that such a claim is preempted. *Reese v. Payless Drug Stores Northwest, Inc.,* 40 Cal.Rptr.2d 75 (Ct.App.1995) (unfair competition not preempted). State law claims that do not hinge upon the validity or infringement of a patent are not preempted. *Cover v. Hydramatic Packing Co.,* 89 F.3d 1390 (Fed.Cir.1996). The instant state law claims involve the question of whether the defendant has attempted to invoke the provisions of the Hatch-Waxman Act to gain an unfair competitive advantage. For the reasons stated above, this Court concludes that the FFDCA does not preempt plaintiff's state law claims relating to alleged unlawful business practices.

*C. Zenith's State Law claims are Sufficient to Withstand a 12(b)(6) Motion.*

It must be remembered that on a motion to dismiss the complaint, "the plaintiff is afforded the safeguard of having all its allegations taken as true and all inferences favorable to plaintiff will be drawn."*Westinghouse Elec. Corp. v. Franklin,* 789 F.Supp. 1313, 1317 (D.N.J.1992)*rev'donothergrounds,* 993 F.2d 349 (3d Cir.1993). A claim of unfair competition is one directed toward an entity that does not play fair, one who disparages or wrongfully captures the trade of another. *American Shops, Inc. v. American Fashion Shops of Journal Square, Inc.,* 13 N.J.Super. 416, 420-21 (App.Div.1951). Unfair competition encompasses an actionable infringement of a property right, "i.e., the right to pursue

one's business, calling or occupation free from undue interference or molestation."*Kamm v. Flink,* 113 N.J.L. 582, 586 (E. & A.1934).

**\*6** In Count One, Zenith claims that Abbott has unfairly and unlawfully sought to obstruct competition in the market for terazosin hydrochloride by causing allegedly improper listings in the FDA Orange Book and instituting sham litigations against Zenith. New Jersey law provides:

> If a competitor ... engages in fraud ... or misrepresents, or threatens civil ... actions, or violates the law, then the competition is considered to be outside of permissible parameters, and liability will ensue.

*C.R. Bard v. Wordtronics Corp.,* 235 N.J.Super. 168, 174 (Law Div.1989). Assuming the allegations in the complaint are true and considering that federal law does not preempt this claim, this Court determines that Zenith has articulated a claim of unfair competition against Abbott.[FN1]However, whether Zenith will ultimately prevail on such a claim is, at this time, far from clear.

> FN1. This Court notes that Abbott's contention that the claim of unfair competition should be dismissed on the grounds that Zenith has not suffered any injury is unfounded. In the event that Abbott's conduct is ultimately determined to constitute unfair competition, Zenith has already had to defend against two "bogus" lawsuits for patent infringement. That money damages are not yet quantifiable is irrelevant.

*2. Abuse of Process*

In Count Two, Zenith claims that the two prior lawsuits initiated by Abbott for patent infringement were improper and therefore an abuse of process. To prevail on a claim for abuse of process, the plaintiff must demonstrate an existence of an ulterior motive or purpose and some act in the use of legal process not proper in the regular prosecution of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                            Page 6
Not Reported in F.Supp., 1996 WL 33344963 (D.N.J.)
**(Cite as: Not Reported in F.Supp.)**

the proceedings. *Harris Custom Builders, Inc. v. Hoffmeyer,* 834 F.Supp. 256, 263 (N.D.Ill.1993). Zenith claims that Abbott has filed patent infringement actions against it, knowing that those actions were meritless and with the purpose of attempting to keep Zenith out of the terazosin hydrochloride market for 30 months when Abbott knew it was not entitled to such an extension on its exclusive position in the pharmaceutical industry. Like Zenith's claim for unfair competition, the claim for abuse of process claim is sufficiently stated to withstand a motion to dismiss.

*3. Tortious Interference with Prospective Economic Advantage*

Count Three charges Abbott with tortious interference with Zenith's prospective economic advantage. The claimed economic advantage is that which Zenith expected to gain from the approval and marketing of its generic product. To prevail on such a claim, Zenith must establish that it had a reasonable expectation of economic benefit and that the defendant knowingly interfered with a benefit that had a reasonable likelihood of accruing to the plaintiff.*Fineman v. Armstrong World Indus., Inc.,* 980 F.2d 171, 186 (3d Cir.1992). The complaint charges Abbott with the knowledge that its '615 patent was improperly listed and the meritless pursuit of a patent infringement action with the purpose of keeping Zenith out of the terazosin hydrochloride market. Had Abbott's patent not been improperly listed, assuming for the instant purposes that it was, Zenith's generic product had a reasonable likelihood of approval without the statutory 30 month waiting period. Accordingly, Zenith has stated a claim for tortious interference with prospective economic advantage.

*4. Fraud*

**\*7** Count Four charges Abbott with common law fraud. In order to state such a claim, plaintiff must allege: (1) defendant made a material factual

misrepresentation to plaintiff; (2) with the knowledge or belief of its falsity; (3) with the intention that plaintiff rely upon the representation; and (4) that plaintiff justifiably relied on the misrepresentation to its detriment. *Agathos v. Starlite Motel,* 977 F.2d 1500, 1508 (3d Cir.1992). The fraud alleged to have occurred is Abbott's representation that it would use the samples of Zenith's generic product submitted to it by Zenith for the sole purpose of characterizing and identifying the terazosin hydrochloride in the generic product. (Letter dated Sept. 15, 1994, Exh. A). Zenith argues that Abbott received the samples, knowing the product could not infringe its '532 patent, with the intent of using those samples for the separate purpose of subjecting the compound to x-ray diffraction tests, which purpose was vastly beyond the scope of what was necessary to determine whether the '532 patent was infringed. (Letter dated Sept. 22, 1994). Even if these promises of Abbott are considered half-truths. New Jersey courts hold:

A half-truth may be as misleading as a statement which is wholly false. A fraudulent misrepresentation may inhere in a statement which is truthful so far as it goes but which is materially misleading because of the failure to recite qualifying matters. The intentional concealment of material information is tantamount to an affirmative misrepresentation of the nonexistence of such information.

*Medivox Productions, Inc. v. Hoffman-LaRoche, Inc.,* 107 N.J.Super. 47, 69-70 (Law Div.1969). Accordingly, this Court concludes that Zenith has adequately alleged a claim of common law fraud.

*C. Zenith has Adequately Pled a Claim for a Declaratory Judgment.*

Zenith's fifth count seeks a declaratory judgment that its generic form of terazosin hydrochloride does not infringe any of Abbott's relevant terazosin hydrochloride patents. Zenith also seeks a declaration that the '615, '176, '095 and '207 patents are improperly listed in the FDA Orange Book in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                     Page 7
Not Reported in F.Supp., 1996 WL 33344963 (D.N.J.)
(Cite as: Not Reported in F.Supp.)

that none of those patents are covered by Abbott's Hytrin product and an order requiring Abbott to delist those patents.

For this Court to assert jurisdiction over Zenith's declaratory judgment claim, Zenith must have a reasonable apprehension of suit and have made meaningful preparation to commit acts Abbott would likely contest as infringing of its patents. *DuPont Merck Pharmaceutical v. Bristol-Myers Squibb,* 62 F.3d 1397, 1401 (Fed.Cir.1995). Both elements are satisfied. Zenith is in a position to begin marketing immediately its generic product after FDA approval. In addition, Abbott has twice filed patent infringement suits against Zenith with respect to its generic of terazosin hydrochloride and has also filed similar suits against other potential marketers of terazosin hydrochloride. (Rocco Del., ¶¶ 3, 8, 14). This history of litigation regarding alleged infringement of Abbott's terazosin hydrochloride patents is a clear indication that, should Zenith seek approval of its generic product and make a "paragraph IV" certification that Abbott's patent is invalid, Zenith will be sued by Abbott for patent infringement, which suit would delay the marketing of the generic product for up to 30 months. *DuPont,* 62 F.3d at 1400-1401 (holding the fear of an infringement suit in response to a "paragraph IV" certification was within that required to establish jurisdiction over a claim for a declaratory judgment); *Infinitech, Inc. v. Vitrophage, Inc.,* 842 F.Supp. 332, 337-38 (N.D.Ill.1994) (public interest in the development and marketing of new medical products favors the adjudication of a declaratory judgment action prior to the expiration of a patent in the event the patent may be invalid and undeserving of a full term). As Zenith has demonstrated that a controversy exists and that a declaratory judgment of noninfringement would not conflict with the purposes of the statutory system, this Court concludes that it has jurisdiction over Zenith's claim for a declaratory judgment. This Court also concludes that, having met the requirements for a declaratory judgment, plaintiff has satisfied the necessary jurisdictional

showing regardless of the fact that the FFDCA does not expressly provide for a private right of action. it is not an action under the FFDCA plaintiff seeks to pursue but under the Declaratory Judgment and All Writs Acts and state law.[FN2]

> FN2. In fact, the Northern District of Illinois, in considering other listings of Abbott in the FDA Orange Book, entertained a request for a declaratory judgment and, having found those listings to be improper, ordered Abbott to remove those listed patents from the Orange Book. *Abbott Lab. v. Geneva Pharms.,* Civ. No. 95 C 6657 (N.D.Ill. Apr. 9, 1996) (Mentlik Decl., Exh. 20).

*II. Zenith's Motion for Partial Summary Judgment is Denied.*

*A. Standard for a Motion for Summary Judgment*

**\*8** Federal Rule of Civil Procedure 56(c) provides that summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."Fed.R.Civ.P. 56(c); *seealsoChipollini v. Spencer Gifts, Inc.,* 814 F.2d 893, 896 (3d Cir.) (*enbanc* ), *cert.dismissed,*483 U.S. 1052 (1987). In deciding a motion for summary judgment, a court must view the facts in the light most favorable to the nonmoving party and must resolve any reasonable doubt as to the existence of a genuine issue of fact against the moving party. *Continental Insurance Co. v. Bodie,* 682 F.2d 436, 438 (3d Cir.1982). The moving party has the burden of establishing that there exists no genuine issue of material fact. See*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986).

The Supreme Court has stated that, in applying the criteria for granting summary judgment,

the judge must ask ... not whether ... the evidence unmistakably favors one side or the other but

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                 Page 8
Not Reported in F.Supp., 1996 WL 33344963 (D.N.J.)
**(Cite as: Not Reported in F.Supp.)**

whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented. The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the [non-movant] is entitled to a verdict....

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986). A fact is "material" only if it will affect the outcome of a lawsuit under the applicable law, and a dispute over a material fact is "genuine" if the evidence is such that a reasonable fact finder could return a verdict for the nonmoving party.(*Id.*)

In order to survive a motion for summary judgment, an opposing party must present "more than a mere scintilla of evidence" in his favor. He "cannot simply reallege factually unsupported allegations contained in his pleadings."*Anderson v. Liberty Lobby,* 477 U.S. 242, 249, 325 (1986); *seealsoMaguire v. Hughes Aircraft Corp.,* 912 F.2d 67, 72 (3d Cir.1990). Only evidence that would be admissible at trial may be used to test a summary judgment motion. Evidence with a deficient foundation must be excluded from consideration. *Williams v. Borough of West Chester, PA,* 891 F.2d 458, 466 (3d Cir.1989); *seealsoTrap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs,* 982 F.2d 884, 890-91 (3d Cir.1992).

*B. The Instant Case*

Zenith moves for summary judgment on the issue of whether the listing of Abbott's '176, '615, '095 and '207 patents was improper. In the event this Court were to make such a finding, Zenith asks for the entry of an order directing Abbott to delist those patents. Zenith argues that those patents are improperly listed because, although they claim Hytrin, none of them is actually covered by the Hytrin patent. Abbott disputes this and contends

that its patents are covered by Hytrin. As Hytrin covers a dihydrate form of terazosin hydrochloride and the subsequent patents were issued for different anhydrous polymorphs of terazosin hydrochloride, which for the FDA's purposes are allegedly the same, Abbott submits that the contested patents properly claim Hytrin and that the listing of those patents in the FDA Orange Book was correct.

**\*9** Title 21 U.S.C. § 355 sets out the requirements for the listing of drug patents in the FDA Orange Book:

The applicant shall file with the application the patent number and the expiration date of any patent which claims the drug for which the applicant submitted the application or which claims a method of using such drug and with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug.

21 U.S.C. § 335(b)(1). The following regulation has been implemented by the FDA to facilitate compliance with § 355:For patents that claim a drug substance or a drug product, the applicant shall submit information only on those patents that claim a drug product that is the subject of a pending or approved application, or that claim a drug substance that is a component of such a product.

21 C.F.R. § 314.53(b). A listed drug is that which is also defined as approved for safety and effectiveness under § 355(c).21 U.S.C. §§ 355(j)(2)(A) and (6)(A)(ii). Accordingly, the FDA approves for listing only those patents covered by an approved drug product. Therefore, if Abbott's patents are covered by Hytrin, which is an approved drug product, listing is appropriate.

As an initial matter, the FDA approved Abbott's '176, '615, '095 and '207 patents for listing. Such approval demonstrates that the FDA believed that those patents are covered by an approved drug product. The drug product that the FDA agreed covered the contested patents is, as those patents claim and Abbott submits, Hytrin. Both parties cite

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 33344963 (D.N.J.)
(Cite as: Not Reported in F.Supp.)

*Pfizer, Inc. v. FDA* in support of their arguments. 753 F.Supp. 171 (D.Md.1990). In *Pfizer*, the FDA refused to list a patent that failed to claim an approved drug product. Specifically, Pfizer had an approved patent which claimed nifedipine solution in an oral release capsule. It then sought to have approved a patent on a tablet formulation of nifedipine. As the tablet patent did not claim the FDA-approved oral release capsule, the FDA refused to approve the tablet formulation of nifedipine.[FN3]However, the patents at issue in the instant case do not claim an unapproved drug product, they claim the FDA-approved drug product of Hytrin.

> FN3. Although not discussed in the papers, it would seem that the purpose behind the requirement that a patent for which approval is sought must claim an approved drug product is that it allows the FDA to rely on the testing results of the previously-approved drug product in approving the patent that is the subject of the second application. In other words, if a patent for which approval is sought claims an approved drug product, the later patent may be approved on a more expedited basis because the FDA can rely on the tests performed on the previously-approved patent. This is essential because, where the later patent claims an approved drug product, it is considered the bioequivalent of that product. If a patent for which approval is sought fails to claim an approved drug product, it would likely be required to submit to lengthy and stringent safety and efficacy tests.

Zenith argues that, although the FDA found that the patents are covered by Hytrin, which must be undisputed as the FDA approved and listed each of the contested patents, this does not necessarily mean that the patents are actually covered by, or claim, Hytrin.[FN4]Hytrin and the four patents at issue all have different crystalline formulations. As

such, Zenith contends that one anhydrous polymorph is not covered by a different anhydrous polymorph. If this argument is correct, one anhydrous polymorph would not be covered by a different yet FDA-approved, anhydrous polymorph, and could therefore not be listed without its own safety and efficacy testing.

> FN4. The FDA admits that it does not have the resources to examine whether a patent is properly listed after listing takes place. If a listing is contested, the FDA requires the patent owner to certify that the listing is appropriate or to voluntarily cause the patent to be delisted. 21 C.F.R. § 314.53(f). Unless the patent owner changes the information submitted to the FDA, the FDA will not amend the Orange Book listing.(*Id.*) Abbott has certified that the listings are valid and refuses to delist its patents.

The crux of this motion for partial summary judgment on the issue of improperly listed patents is what a subsequent patent must claim to be appropriate for listing. Must the patent claim only an approved drug product or must it claim both the approved drug product and, in the case of an anhydrous polymorph, its exact crystalline structure. Abbott argues that, because Hytrin, a dihydrate form of terazosin hydrochloride, is the drug product covered in the relevant patent, the subsequent patents need only claim the drug substance claimed in Hytrin. As the relevant patents were issued with respect to anhydrous polymorph of Hytrin, which differ only in crystalline structure, Abbott submits that they are covered by Hytrin.

**\*10** The C.F.R. provides:
For patents that claim a drug substance or a drug product, *the applicant shall submit information only on those patents* that claim a drug product that is the subject of a[n] ... approved application, or *that claim a drug substance that is a component of such a product.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 33344963 (D.N.J.)
(Cite as: Not Reported in F.Supp.)

21 C.F.R. § 314.53(b). This Court reads this section to mean that if a patent claims the drug substance, or active ingredient, of an approved drug product, that patent is covered by the approved drug product and may be approved for marketing by the FDA and listed in the Orange Book.

The issue then becomes what is the relevant drug substance claimed by Hytrin and do the later Abbott patents claim that substance so that listing would be appropriate. Zenith argues that the relevant drug substance is the specific dihydrate form of terazosin hydrochloride, which is an anhydrous polymorph of terazosin hydrochloride. It argues that other crystalline forms of terazosin hydrochloride Abbott has patented do not claim the specific polymorph found in Hytrin. However, Abbott contends that the relevant drug substance is a general hydrated form of terazosin hydrochloride, and not the specific dihydrate formulation of that drug. In other words, Abbott argues that any patent on an anhydrous polymorph is covered by Hytrin as Hytrin claims a hydrated form, of the active ingredient and not the chemical make-up of that formulation.

The FDA provides that "anhydrous and hydrated entities are considered pharmaceutical equivalents."(Orange Book at xii, Coleman Decl., Exh. B). Pharmaceutical equivalents contain the same active ingredient. (Id., at vii). They differ in "shape, scoring configuration, packaging, excipients (including colors, flavors, preservatives), expiration time, and, within certain limits, labeling."(Id.) The FDA has indicated that, as a general matter, "different polymorphic forms of the same drug substance (are the same) drug substances unless the differences in physical structure found in the polymorphs result in inequivalent safety and efficacy profiles."(FDA Response to Citizen Petition of Janssen Pharmaceuticals, Coleman Decl., Exh. C at 4). The FDA also considers "differences in waters of hydration resulting in polymorphic crystal forms of the same active moiety (i.e., different forms of the same active ingredient) to be the same when

dissolution, solubility, and absorption are shown to be equivalent."(Letter from the Center for Drug Evaluation and Research, Coleman Decl., Exh. D at 4).

The contested patents are for different anhydrous polymorphs of terazosin hydrochloride. As stated above, different polymorphic forms containing the same active ingredient may be considered by the FDA as equivalents. However, this is the case only if the dissolution, solubility and absorption of the polymorphs are the same. It is not clear that these factors are consistent as between Hytrin and the later patents. Accordingly, a question of fact exists as to whether the later Abbott polymorphs are covered by Hytrin. There is simply not enough undisputed information before this Court for it to decide under the summary judgment standard whether a dihydrate version of terazosin hydrochloride covers anhydrous polymorphs that differ only in crystalline structure. In the event these polymorphs do have the same dissolution, solubility and absorption as that found within the drug substance in Hytrin, their patents would likely be construed as properly claiming the drug substance in Hytrin and the listing of those patents would be correct. However, if these polymorphs are found not to claim the drug substance in Hytrin, they could not likely claim to be covered by that drug substance and would then not be entitled to listing in the Orange Book. Those issues cannot presently be resolved summarily. Accordingly, Zenith's motion for partial summary judgment is denied.

*CONCLUSION*

**11* For the foregoing reasons, defendant's motion to dismiss is denied, and plaintiff's motion for partial summary judgment is also denied.

*ORDER*

For the reasons set forth in the Court's Opinion filed herewith,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 33344963 (D.N.J.)
**(Cite as: Not Reported in F.Supp.)**

It is on this 5th day of August, 1996

ORDERED that defendant's motion to dismiss plaintiff's complaint be, and it hereby is, denied; and it is further

ORDERED that plaintiff's motion for partial summary judgment be, and it hereby is, denied.

D.N.J.,1996.
Zenith Laboratories, Inc. v. Abbott Laboratories
Not Reported in F.Supp., 1996 WL 33344963 (D.N.J.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 3

3 of 3 DOCUMENTS

**EDIX MEDIA GROUP, INC., a Delaware corporation, Plaintiff, v. PARHAM MAHANI, Defendant.**

**Civil Action No. 2186-N**

**COURT OF CHANCERY OF DELAWARE, NEW CASTLE**

*2006 Del. Ch. LEXIS 207*

**November 27, 2006, Submitted**
**December 12, 2006, Decided**

**SUBSEQUENT HISTORY:** Costs and fees proceeding at *EDIX Media Group, Inc. v. Mahani*, 2007 Del. Ch. LEXIS 17 (Del. Ch., Jan. 25, 2007)

**COUNSEL:** [*1] Matthew F. Boyer and Timothy M. Holly, of CONNOLLY BOVE LODGE & HUTZ, LLP, Wilmington, Delaware, Attorney for Plaintiff.

Joseph M. Bernstein, Wilmington, Delaware, Attorney for Defendant.

**OPINION BY:** CHANDLER

**OPINION**

**MEMORANDUM OPINION**

CHANDLER, Chancellor

Before me is a seemingly ordinary dispute in an unusual industry. Plaintiff EDIX Media Group and defendant Parham Mahani both operate within a multi-billion dollar "niche" industry concerning after-market modifications to the vehicles of automotive enthusiasts. These hobbyists spend great amounts of time, effort, and money "pimping their rides" or "tricking out" their cars through such alterations as vertically-opening doors, bass-heavy audio systems, or highly-customized paint work. Like any group of aficionados, custom car fans employ their own colorful argot, gather to compete or display their achievements, seek the newest, greatest or most stylish customizations in order to stand out, and most importantly pay attention to events and people active in their hobby. The world of "whips" is a small one in which reputation matters greatly. [1]

1 "Whip," as used in the name of defendant's company SponsoredWhips, is a slang term for an automobile. *See, e.g.,* 50 Cent, *Poor Lil Rich,* on *Get Rich or Die Tryin'* (Shady Records/Aftermath Records/Interscope Records, 2003) ("I let my watch talk for me, my whip talk for me, my gat [gun] talk for me, BOW!").

[*2] Personal reputation plays a significant role in this dispute. Plaintiff hired defendant first as an employee and then as an independent contractor to sell advertising space in its magazine and on its website. After two years of working together, the relationship between the parties began to deteriorate, and plaintiff terminated defendant's contract. From that moment starts a story of recriminations and revenge, accusation and counter-accusation, and pointed language hurled back and forth in a very public manner.

Plaintiff comes before this Court seeking both damages and injunctive relief, listing ten different theories under which defendant has violated his duties as an employee or independent contractor, breached his contractual obligations of confidentiality and non-competition, or otherwise revealed EDIX's secrets and caused it to lose face in the community. Plaintiff asks this Court to enjoin defendant from working with plaintiff's clients or customers within its territory, from revealing any further confidential information, and from making any further damaging statements.

The parties disagree upon both legal and factual issues. The provenance of three anonymous emails, two [*3] of them sent from accounts controlled by EDIX, remains contested. The parties dispute plaintiff's motivation in terminating defendant's relationship. Over three days of trial testimony, it became clear that plaintiff and defendant even disagree upon the factual scope of plaintiff's operations within the industry, let alone what activities constitute competition with EDIX's business.

Before I may address the legal issues, I must pull from the evidence submitted by both parties a set of facts to which I may apply the law. In disputes such as this, in

2006 Del. Ch. LEXIS 207, *

which passions run high and there is no particular concealment of the parties' distaste for one another, a finder of fact is challenged to separate reliable testimony from inevitable overstatement. This case presents no exception. The two chief witnesses--Lance Burris, the CEO of EDIX, and the defendant himself--both provided testimony that concerns this Court and raises questions as to their credibility. The evidence overwhelmingly indicates that defendant accessed plaintiff's computer systems and fraudulently contacted dozens, if not hundreds, of customers while purporting to be an "insider" still employed by the firm. On the other hand, [*4] evidence strongly suggests that plaintiff recharacterized defendant's employment relationship as one of an independent contractor not because his duties and activities fairly merited the description but in order to avoid withholding taxes and providing other benefits. Further, some of Burris's testimony, both on the stand and in depositions, seemed overly cunning and calculated, designed to obfuscate rather than enlighten. Such responses, whatever their intended purpose, do not provide comfort to a finder of fact in considering other testimony from the same witness.

For this reason, I rely very heavily upon the paper record in my findings of fact, and assign little weight to the testimonial evidence of either Mahani or Burris. Where I credit the testimony of one party or another, I make specific mention of it, bearing in mind the burdens of proof and production borne by each party.

## I. FINDINGS OF FACT

### A. EDIX employs Mahani

Plaintiff is a Delaware corporation that serves a demographic, mostly consisting of young men, who enjoy modifying and tuning automobiles. Plaintiff describes its business in the broadest possible manner, but evidence presented at trial suggests that [*5] the bulk of EDIX operations involve selling memberships to automotive enthusiasts and advertising space to industry players. Members receive certain exclusive discounts on parts and accessories and a one-year subscription to *StreetTrenz,* EDIX's glossy magazine full of the latest news on car shows, how-to modification guides, comely female models, and ever-present advertisements. Manufacturers, resellers, and car shows provide the bulk of EDIX's revenue by paying for placement in either *StreetTrenz* magazine or on its accompanying website. [2] While plaintiff's internet presence theoretically gives it world-wide reach, its main business markets are eastern Pennsylvania, Delaware, Maryland, and southern New Jersey. Lance Burris is EDIX's majority owner and President.

2 Two websites, http://www.streettrenz.com and http://www.myspace.com/streettrenz, were mentioned at trial as belonging to plaintiff. The latter website, hosted on the community portal MySpace.com, provided an additional channel for EDIX to market to enthusiasts, many of whom were also MySpace users.

[*6] Burris hired defendant Parham Mahani, a Delaware resident, in the summer of 2004 primarily to sell advertising for *StreetTrenz* magazine and banner advertisements on related websites, although testimony suggested that his duties occasionally extended beyond these two roles. As a condition of his employment, defendant executed a non-competition and confidentiality agreement, pursuant to which he would: keep confidential any non-public information provided to him during his period of employment; refrain from soliciting "any Customer for the purpose of transacting business with [EDIX's] Customers in the products or services provided by [EDIX];" make no attempt to interfere with any contractual relationship between EDIX and any independent contractor or employee; and enter into no business relationship with an entity "conducting any business which is in competition with respect to [EDIX's] Business or is substantially similar to Corporation's Business" within the same territory. [3] The agreement also specified that defendant would indemnify plaintiff for any attorney's fees arising from enforcement of the agreement.

3 Pl. Ex. 2. The agreement defines Customer as "those readers of [EDIX's] publications, vendors, advertisers, and/or show facility owners and operators who have contracted with the Corporation at any time before or during the term of [Mahani's] engagement, or who have contacted [EDIX] or be contacted or solicited by [EDIX] with respect to [EDIX's] Business during the 24 months before or at any time during the term of [Mahani's] employment or engagement, as well as any such person's or entity's subsidiaries and affiliates."

[*7] By all accounts, defendant enjoys modifying cars, attends car shows regularly, and is well-connected with other enthusiasts. Plaintiff credits him with developing the *StreetTrenz* web-presence on MySpace.com, a strategy that led to several new memberships, and plaintiff raises no doubts as to defendant's enthusiasm for or experience with the after-market modification industry. Indeed, Mahani brought more to the table than merely marketing expertise and technical acumen. His family had a long-standing and personal friendship with one of EDIX's customers, a friendship that Mahani quickly put to use. His personal relationship with model Kerry Acteson allowed him to introduce to EDIX several models

2006 Del. Ch. LEXIS 207, *

who could grace the pages of *StreetTrenz* magazine or distribute literature at car shows for EDIX or their clients.

Nevertheless, the relationship began to sour in early 2006, although the parties disagree as to the sources of discontent. [4] On May 14, plaintiff terminated its relationship with its "independent contractor," [5] and although it did listen to an appeal, eventually told defendant that its decision was final.

> 4    According to plaintiff, Mahani contacted Sony Electronic, Inc. in April 2006, requesting a digital camera and various accessories in order to write a product review. The next month, EDIX learned that Sony had received an empty box instead of its camera and had been told by defendant that they should file an insurance claim for the missing item. EDIX conducted an investigation and concluded that digital photos taken by Mahani after the return date on the box contained digital imprints matching the missing equipment. On May 14, after confronting defendant with this evidence, plaintiff terminated his contract. Mahani requested reinstatement and wrote a letter asking for forgiveness from EDIX's partners, but they denied him any leniency and refused to reconsider.

> At trial, Mahani disavowed his letter and protested his innocence in the Sony matter, suggesting a different motive for his termination. On April 3, 2005, EDIX required Mahani--who at that point was working as an independent contractor--to submit to a new commission structure. Purportedly addressing a problem with rising receivables, the new structure provides for a sliding commission based upon collected revenue and penalizes Mahani if Burris "writes" one of his accounts. This agreement provided plaintiff with the potential for a substantial windfall if defendant were to be terminated, as no commission would be required on revenues that had been booked but not collected.

> No legal question requires me to make a factual finding as to the actual motivation behind Mahani's dismissal, nor are the two alternatives mutually exclusive: EDIX may have been quite pleased to be free of a duplicitous "contractor" while happily pocketing the resulting profits. I describe the dispute in detail to highlight the degree to which the parties differ as to each other's motivations.

[*8]

> 5    Although plaintiff insists upon characterizing its relationship with defendant in its legal filings

as one of contractor/customer, the April 3, 2006 agreement renegotiating defendant's commissions certainly seems inconsistent with this assertion. The document, a letter from Burns with a signature by Mahani to show his consent, states, "You [Mahani] have presented some very good ideas and I do like where *we* are going *as a company and a team.*" (Emphasis added). Mahani's title and company affiliation are given as "Account Executive" and "StreetTrenz Magazine," respectively, as opposed to any reference to a position in an external entity.

*B. Mahani's campaign to discredit EDIX*

Mahani did not go quietly. By May 19, plaintiff had already heard from customers that Mahani was contacting them in efforts to solicit business for a competing magazine, [6] and instructed its attorneys to issue Mahani a shot across the bow in the form of a cease and desist letter. Rather than complying, Mahani took this as a sign that he should resort to skullduggery.

> 6    Mr. Alfred Vega, owner of a customization business that advertises with EDIX, testified that Mahani offered him a quarter page advertisement in a to-be-published magazine on May 17. Plaintiff offered no evidence, however, that plans for such a magazine ever left the drawing board.

[*9] Shortly after 6:00 a.m. on May 21, Mahani entered a copy center in Wilmington, Delaware and rented time on a computer terminal connected to the interne. From here he gained access to EDIX's mail server using a username and password he had acquired during his employment. Within the next hour, over sixty of plaintiff's largest customers received an email, claiming to be from an insider in the *StreetTrenz* billing department, that contained allegations of inflated membership numbers and web traffic statistics. The letter provided details of advertising rates paid by various customers, information which EDIX obviously would not wish other advertisers to know. Even worse, a second email followed only a few minutes later, supposedly releasing all advertisers from their contracts and any payments still due on their accounts. [7] Almost immediately after receiving these emails, customers began to call and email plaintiff and defendant asking for explanations. Advertisers began cancelling their contracts.

> 7    Mahani seems to have been unaware that the server logs on computers at EDIX and the copy center could be used to verify the location from which he sent the email, or that the video cameras at the copy center would capture him at the scene.

[*10]  From this point onward, Mahani began a continual and underhanded campaign to discredit EDIX, refusing to cease his activities even after agreeing to a stipulated restraining order entered by this Court. [8] In emails carrying his own name, Mahani's temperate prose merely referred customers to Burris for further information. He reserved his venom for messages sent under various aliases. Advertisers received at least one anonymous email from "Tuner Mag Fan" encouraging them to "get the diverted dollars" back from EDIX and to contact defendant directly. On June 6, Mahani donned yet another mask, and as "*StreetTrenz* Insider" distributed a mass mailing from a computer at his local YMCA. [9] This last email not only disparaged *StreetTrenz's* ability to provide value for an advertising dollar and revealed rates that EDIX supposedly had charged to different customers, but also described the membership program as a "scam" and made various none-too-veiled insinuations about Burris's private life. To distract attention from himself, Mahani left as a signature only the initials "JB."

8   On June 1, 2006, this Court issued a Stipulated Temporary Restraining Order supposedly acceptable to both parties. I enjoined Mahani from making any further disclosures of confidential information, from operating a business that competes with EDIX, from working with or for EDIX customers, and from engaging in certain specific communications.

[*11]
9   Analysis of server logs demonstrates that the message was sent from a YMCA where Mahani is a member. Membership records show that Mahani entered the YMCA shortly before the June 6 email was distributed. Nevertheless, Mahani denied having written the email at a hearing to show cause why he should not be found in contempt of the temporary restraining order.

While it is not entirely impossible that the protestations of innocence in defendant's deposition are sincere, and that his presence at the YMCA that morning is an incredibly unfortunate coincidence, the strong preponderance of the evidence suggests that he is the author of the June 6 email. He has certainly presented nothing credible to suggest otherwise.

Shortly after the June 6 email, Burris notified EDIX customers that Delaware State Police were investigating defendant. Mahani then distributed a response, entitled "My Side," to those same customers. (Mahani considered this to be a merely "technical violation" of the restraining order issued by this Court.) For this infraction, as well as for posting the question "Did you get screwed, [*12] or scammed, by 'Sport Compact Pro', *'StreetTrenz'* or

'CarSponsorship.com'?" on a website under his control, Mahani was found in contempt on June 27, 2006 and ordered to pay plaintiff $ 5,000.

*C. Sponsored Whips*

Disparaging a former employer, however satisfying it may have been for Mahani, does not pay the bills. While keeping the pressure on EDIX in his spare time, Mahani sought a way to make money within the industry. He kept his contacts current: when Shawn Ramsey of TunerAction asked if he knew someone who could sit at a car show booth for him, Mahani recommended a personal friend. [10] When he heard that Sound of Tri-State or 10 other firms might need models, he suggested that his girlfriend and her associates work for them. And on June 14, he registered SponsoredWhips.com, a website he would use to pursue his own business. [11]

10   An unclear relationship exists between plaintiff, defendant and TunerAction, a company owned by Shawn Ramsey. Ramsey's deposition testimony suggests, as an initial matter, that TunerAction exists as little more than a website with a few members that never grew into a business. Plaintiff accuses Mahani of helping Ramsey start a membership program in competition with EDIX, while Ramsey suggests that the program was his own idea. Similarly, Ramsey accuses Mahani of starting a MySpace.com site for TunerAction without his authorization and stealing from him the idea to start a company that writes sponsorship proposals.

[*13]
11   Mahani also registered a MySpace account for SponsoredWhips.com.

The parties dispute whether SponsoredWhips competes with EDIX and whether Mahani's business violates the terms of the restraining order. Both companies seek to attract the same types of auto enthusiasts wishing to improve their vehicles. SponsoredWhips' principle customers and main source of revenue, however, are enthusiasts who want free (or heavily discounted) parts from major manufacturers in exchange for displaying products (and "vinyls") [12] at car shows. Mahani's firm offers to evaluate a prospective owner's case for sponsorship and write proposals that can be sent to manufacturers. SponsoredWhips receives no revenue from manufacturers themselves. EDIX, on the other hand, receives most of its revenue from advertisers--who may be manufacturers, resellers, car shows, or other industry players--in order to put their message before members of EDIX's car club.

12   A vinyl is a sticker that may be affixed to an automobile, often displaying a company's logo.

Vinyls are particularly useful to manufacturers or retailers whose products are installed in places where their logos are otherwise hidden, *e.g.,* a subwoofer mounted in a trunk.

[*14] EDIX does offer "a sponsorship" to one member per year. This member is chosen by the EDIX editorial staff and receives free parts from EDIX advertisers. Plaintiff spent considerable time at trial attempting to convince this Court that SponsoredWhips assistance as a scrivener was "substantially similar" to EDIX's offer of what is, essentially, a membership prize. [13] I cannot agree.

> 13 Burns also testified that he had made several "verbal" offers to help with sponsorships, but EDIX provided no evidence that it had ever offered such a service commercially or that writing sponsorship proposals was a regular part of EDIX's business. Nor was any written evidence presented to suggest that EDIX had ever consummated such an offer.

Although both businesses appeal to the same automotive enthusiasts, manufacturers and trade shows, they do so in very different ways. Only in an attenuated sense does SponsoredWhips provide advertising services for manufacturers. This is at best a tertiary part of its business, from which [*15] it derives no revenue. Plaintiff also complains that SponsoredWhips competes by "advertising" for car shows, in that it lists dates for events on a specific web page. This stretches the concept of advertising beyond its logical limit: defendant has placed a calendar of events useful to its members on a website, having received no compensation from the organizers themselves. This is a far cry from the promotions for which EDIX is paid.

## II. CONTENTIONS

Although plaintiff's complaint weighs in with ten distinct legal theories, they can be usefully grouped into three categories. The first category involves disclosures of plaintiff's proprietary information that constitute violations of defendant's contract (Count I), the unlawful use of plaintiff's trade secrets (Count V), and the breach of common law duties to an employer (Count VI). The second category focuses on breaches of the covenant not to compete with EDIX, including unlawful competition (Count II), unlawful solicitation of customers (Count III), and unlawful solicitation of workers (Count IV). The last category encompasses three common law claims, unfair competition (Count VII), tortious interference with business relationships [*16] (Count VIII), and defamation (Count IX), and a statutory cause of action under the Deceptive Trade Practices Act (Count X). In addition to denying all allegations, defendant requests that this Court

determine SponsoredWhips to be outside the reach of the parties' non-competition agreement.

## III. ANALYSIS

### A. Claims involving breaches of confidentiality, non-disclosure and trade secrets

Counts I, V and VI all turn upon defendant's unlawful disclosure of information belonging to EDIX. Given the facts recited above, there can be no doubt that defendant violated both his contractual duties and the common law through his series of antagonistic messages. Indeed, the addresses contained in the May 21 and June 6 emails themselves revealed confidential information. When EDIX sent emails to multiple customers, its general practice was to hide the list of distributees using a 'blind carbon copy' function, both to safeguard the privacy of individual recipients' email addresses and to keep the list from falling into competitor's hands. Mahani made no attempt to follow standard corporate practice, thus exposing this list to the world.

Even had Mahani concealed the address list, his emails [*17] flagrantly violated his duty to keep information confidential. To the extent that the information therein was true, both messages purported to disclose membership numbers, employee salaries, rates charged for advertising, in-kind deals and other information never given to the general public. [14] Mahani's liability for these actions is certain. It remains necessary to consider plaintiff's three counts only because they differ in appropriate legal and equitable remedies available to plaintiff.

> 14 To attempt to weave a list of truths and untruths from the snarled allegations penned by defendant would be inappropriate. If the emails damaged EDIX's reputation among its customers, no good can come from this Court affirming their content. Thankfully, I need make no determination as to their truth. To the extent that any statement in the May 21 or June 6 emails were confidential and true, Mahani's liability devolves from his breach of duties of confidentiality. To the extent that they were false and misleading, he is similarly liable for defamation under Count IX.

[*18] The breach of contract claim contained in Count I presents the most straightforward issue. Plaintiff has proven that defendant breached his agreement and that the breach led to damages. Mahani agreed to keep confidential "information not in the public domain ... including ... financial data, ... invoices and other financial statements, ... any and all information concerning Customers, Corporation employee salaries, ... names, addresses or any other compilation of information, written or unwritten, which is used in the Corporation's busi-

ness." [15] His emails contained information concerning all of these. To the extent that such revelations damaged plaintiff, defendant stands responsible for the harm.

15    Pl. Ex. 1.

Count V, involving the unlawful use of trade secrets, requires more consideration. To prove the misappropriation of a trade secret, plaintiff must show first that a trade secret actually existed; second, that it was communicated by plaintiff to defendant; third, that it was accompanied by an express [*19] or implied understanding that secrecy would be respected; and fourth, that the secret has been improperly used or disclosed by plaintiff to defendant's injury. [16] Plaintiff has met the last three of these four requirements, but it remains to be determined which, if any, disclosures qualify as a trade secret.

16    *Delaware Express Shuttle, Inc. v. Older, 2002 Del. Ch. LEXIS 124, 2002 WL 31458243, at *16 (Del. Ch. Oct. 23, 2002).*

Not all confidential information is a trade secret. The Delaware Trade Secrets Act provides three prerequisites for trade secret protection. [17] First, the Act protects only information, including but not limited to formulae, compilations, patterns, programs, devices, methods, techniques, and processes. Second, this information must derive independent economic value from not generally being known or readily accessible by proper means by other people. Third, reasonable steps must be taken to protect the information. Of the data revealed in the May 21 and June 6 emails, only the customer list [*20] and listing of prices could colorably constitute trade secrets as opposed to simply confidential information. [18]

17    *6 Del. C. § 2001(4).*

18    The distribution numbers mentioned in the email might arguably constitute trade secrets were they true. Plaintiff attests that the numbers are false, however, and if false they would not constitute information *given* to the defendant.

In determining whether a customer list qualifies as a trade secret, this Court places great weight upon whether competitors could assemble a similar list through information in the public domain without a similar expenditure of time and money. Where such assembly would be difficult or impossible, trade secret protection may be appropriate, but "[w]here customers in a particular industry can be easily identified, their identity is less likely to be a trade secret ...." [19] The May 21 and June 6 emails were sent primarily to advertisers, and the bulk of the list could be compiled simply by paging [*21] through an issue of *StreetTrenz* magazine and listing the customers found there. To the extent that the list contained ad-

dresses from advertising agencies, rather than advertisers themselves, I am not convinced by plaintiff's assertion that compiling this list would require considerable efforts on the part of a determined competitor. Nor does the fact that the list contained personal email addresses of account representatives elevate it to the status of a trade secret. [20] The information may be personal, but marketing executives by their very nature want to be in contact with potential advertising services. Given the small market plaintiff described at trial, it seems unlikely that considerable expenditure would be necessary to compile plaintiff's list from public sources. [21] Nor did plaintiff convincingly demonstrate that the list has independent economic value. It is doubtful, for instance, that EDIX's competitors would pay for a copy.

19    *Delaware Express Shuttle, Inc., 2002 Del. Ch. LEXIS 124, 2002 WL 31458243, at *18* (quoting *Franklin Fibre-Lamitex Corp. v. Marvec Mfg., Inc., 1997 Del. Ch. LEXIS 42, 1997 WL 153825, at *2 (Del. Ch. Mar. 26, 1997)).*

[*22]

20    Mahani used some personal addresses containing the name of specific customer contacts in his mailing lists, but he also included several generic mailboxes (akin to "billing@streettrenz.com," the supposed sender). Such addresses are often listed on company websites.

21    A list of subscribers to StreetTrenz, on the other hand, might qualify for trade secret protection. To the extent that EDIX has alleged that Mahani took such a list, it has not proven that Mahani used it to either his advantage or the detriment of EDIX.

On the other hand, the rates that advertisers pay to EDIX would constitute a trade secret. A magazine such as *StreetTrenz* derives substantial value by concealing any deviations from published rates given to large or favored advertisers, as this secrecy helps them to enforce the rate card with respect to other firms. Mahani willfully and maliciously revealed this information to the world, and as such must pay EDIX any actual damages arising from his conduct and exemplary damages up to twice that value. [22]

22    *6 Del. C. § 2003.*

[*23]    Finally, Count VI, concerning Mahani's breach of common law duties of confidentiality to an employer, either fails to state a claim or is wholly redundant and need not be considered. To the extent that plaintiff complains that defendant disclosed trade secrets, the Uniform Trade Secrets Act bars any common law claim.

2006 Del. Ch. LEXIS 207, *

[23] Plaintiff makes no attempt to identify confidential information disclosed by defendant not covered by the breach of his confidentiality agreement. Thus, even if Count VI somehow states a claim, its damages are entirely coterminous with those of Count I.

> 23   6 Del. C. § 2007(a) (displacing conflicting common or statutory law involving trade secrets).

## B. Claims involving the agreement not to compete with EDIX

Plaintiff's reliance upon its covenant not to compete presents two difficult issues. As an initial matter, I must determine to what degree and in what manner a covenant not to compete is enforceable. Only then should I decide the extent to which Mahani's [*24] actions breached the enforceable aspects of the covenant.

Covenants not to compete are not subject to mechanical enforcement. [24] As a policy matter, such covenants concern both the legitimate interests of commercial enterprises and restrictions on the ability of individuals to support themselves and their families. When considering such agreements, the Court must carefully consider the factual circumstances surrounding both the contract and the parties. [25] The analysis requires two steps. This Court must determine whether the contract may be enforced at all, taking into account both standard concerns of contract formation such as consideration, agreement, or excuse of performance, and two specific limitations on covenants not to compete. First, a covenant must be reasonably limited in geography and time. Second, the covenant must advance a legitimate interest of the employer. [26] This Court traditionally exercises discretion in specifically enforcing a covenant's terms, balancing the equities and refusing enforcement where the benefit to the employer is ephemeral or the harm to the employee would be grave. [27] This Court does not enforce an agreement "that is more restrictive than [*25] an employer's legitimate interests justify or that is oppressive to an employee." [28]

> 24   Delaware Express Shuttle, Inc., 2002 Del. Ch. LEXIS 124, 2002 WL 31458243, at * 11 (quoting McCann Surveyors Inc. v. Evans, 611 A.2d 1, 3 (Del. Ch. 1987)).

> 25   Id.

> 26   Id.

> 27   Id.

> 28   See Elite Cleaning Co., Inc. v. Capel, 2006 Del. Ch. LEXIS 105, 2006 WL 1565161, at *8

(Del. Ch. June 2, 2006) (quoting RHIS, Inc. v. Boyce, 2001 Del. Ch. LEXIS 118, 2001 WL 1192203, at *6-7 (Del. Ch. Sept. 26, 2001)).

### 1. May the covenant not to compete be enforced as written?

Defendant fails to show a breach of plaintiff's own contractual duties that might excuse performance. At trial, defendant suggested that plaintiff failed to pay commissions due to him during his last period of employment. Although both parties' testimony raises suspicions that Mahani should have received some payment in May, such doubts do not constitute a preponderance of the evidence demonstrating a prior material breach [*26] on the part of plaintiff. [29] Nor are there any concerns that the covenant is overbroad in time or geography: the text of the agreement limits its scope to plaintiff's primary operating areas for a period of two years.

> 29   Plaintiff's estimate of damages discloses significant revenue billed in the month of May, and suggests that many of the clients who cancelled their advertising were similarly billed in the months of March and April. Plaintiff explained that Mahani did not receive a draw for his commissions within his terminal period because of low call volume. Given this fact, plaintiff would seem to owe defendant commissions unless (a) draws from prior months had not been earned by defendant or (b) plaintiff collected absolutely no revenue on defendant's accounts during that time or (c) none of these accounts were, in fact, Mahani's.
>
> Defendant did not present any documentary evidence to suggest that plaintiff in fact collected revenues on these accounts in April or May, and plaintiff's damages claim alone is insufficient to prove the existence of such revenues. Thus, defendant does not meet the burden required to show a breach of contract. On the other hand, plaintiff's assertion that Mahani was owed no money under his April 31, 2006 commission agreement casts great suspicion upon the plaintiff's claims for damages, a matter that I will revisit in my discussion of remedies.

[*27] Nevertheless, the covenant not to compete may not be enforced against defendant as rigidly as plaintiff desires because it exceeds EDIX's legitimate interests in restricting the "substantially similar" operations of an independent contractor. On its face, the Non-Compete and Confidentiality Agreement applies equally to employees and independent contractors, but courts traditionally treat the two relationships distinctly. [30] Although the Court is unaware of a prior Delaware decision

directly addressing covenants not to compete in the context of employees and independent contractors, there are strong reasons to recognize the distinction. [31]

> 30   See, e.g., Rypac Packaging Mach. Inc. v. Coakley, 2000 Del. Ch. LEXIS 64, 2000 WL 567895, at *13 (Del. Ch. May 1, 2000) (differentiating between employees and contractors for purposes of Wage Act); In re McKelvey v. Manley, 1997 Del. Super. LEXIS 83, 1997 WL 528001, at *2-3 (Del. Super. Feb. 20, 1997) (describing the difference between employee and contractor as a matter for the fact-finder, unbound by parties' own self-description); RESTATEMENT (SECOND) OF AGENCY § 220(2) (providing factors for consideration in determining whether one acting for another is a servant or an independent contractor, including extent to which the master may oversee details of the work and extent to which one is engaged in a distinct occupation or business).

[*28]

> 31
>
> Few jurisdictions have directly addressed the effect of independent contracting status on the enforceability of covenants not to compete. Most jurisdictions allow such agreements with an independent contractor, subject to limitations similar to those on employees. See, e.g., Eichmann v. Nat'l Hosp. and Health Care Services, Inc., 308 Ill. App. 3d 337, 719 N.E.2d 1141, 1146, 241 Ill. Dec. 738 (Ill. App. 1999) (finding no less scrutiny appropriate to covenants of independent contractors than employees); Bristol Window and Door, Inc. v. Hoogenstyn, 250 Mich. App. 478, 650 N.W.2d 670 (Mich. App. 2002); Quaker City Engine Rebuilders, Inc. v. Toscano, 369 Pa. Super. 573, 535 A.2d 1083, 1087-9 (Pa. Super. 1987). Other jurisdictions have taken this Court's position that the nature of the relationship constitutes one factor in considering the enforceable scope of a non-compete agreement. See, e.g., Hope Found, Inc., v. Edwards, 2006 U.S. Dist. LEXIS 84244, 2006 WL 3247141, at *9 (S.D. Ind. Apr. 12, 2006) ("If a person is an independent contractor, that fact may signal a greater likelihood that he has brought his own strengths and abilities to the joint enterprise, such that the party seeking to enforce a covenant not to compete may have a more limited protectable interest."); Starkings Court Reporting Services, Inc. v. Collins, 67 N.C. App. 540, 313 S.E.2d 614 (N.C. App. 1984) (finding covenant not to compete to exceed legitimate interests of employer where employee was independent contractor).

[*29]   The traditional employee/employer relationship usually involves a much more intimate relationship than that of an independent contractor. Independent contractors maintain a greater degree of control over how they accomplish tasks; remain engaged to a much greater extent in a distinct occupation or business (as opposed to an employee, who may be asked to perform other reasonable tasks as required); and traditionally work with a lesser degree of supervision. [32] Independent contractors are not protected under the Wage Act [33] (and thus accept a greater risk of non-payment) and are responsible for paying their own income taxes. Both the traditional and statutory relationships between employers and employees reflect a closer bond: the employer pays a percentage of the employee's social cost (through tax contributions or social security payments), must accept greater legal duties, and is responsible for the employees' torts in negligence. [34] Firms will in general invest a greater amount of firm-specific know-how in employees than in contractors who are engaged in a "distinct occupation." [35]

> 32   RESTATEMENT (SECOND) OF AGENCY § 220(c).

[*30]

> 33   See Rypac Packaging Mach. Inc., 2000 Del. Ch. LEXIS 64, 2000 WL 567895, at *13.

> 34   See Fisher v. Townsend, 695 A.2d 53, 58 (Del. 1997).

> 35   RESTATEMENT (SECOND) OF AGENCY § 220(2)(b).

The legitimate economic interests of an employer in restricting the substantially similar activities of an independent contractor will be more limited than they would be with respect to an employee. A firm like EDIX that hires a salesman as an independent contractor may very well have a legitimate interest in preventing the contractor from engaging in activities that "directly compete" with the firm after the contract is terminated. Preventing such a contractor from engaging in any activities "substantially similar" to plaintiff's activities, however, raises the risk that a contractor in an independent business may be forced entirely from employment in a given industry. This implicates the traditional concern of this Court for the preservation of competition, and suggests strongly that enforcement of "substantially similar" provisions in [*31] non-competition clauses will be both inequitable to the contractor and against public policy. [36]

> 36
>
> To the extent that plaintiff relies upon Delaware Express Shuttle, Inc. v. Older, 2002 Del. Ch. LEXIS 124, 2002 WL 31458243 (Del. Ch.

*Apr. 20, 2002)*, the distinction between competing with a former employer and being involved in a substantially similar business should be familiar. When interpreting a non-competition clause without a geographic limitation in *Delaware Express,* this Court declined to enforce the "substantially similar" clause on the grounds that no workable geographic limitation emerged from the text, but held that a defendant could be prevented from "competing with" his former firm because the phrase was self-limiting geographically. *Id. 2002 Del. Ch. LEXIS 124, [WL] at 13.*

This case presents just such an injustice. Defendant's relationship to the after-market modification industry is more than ephemeral: he is romantically attached to an industry model, has personal friendships with industry participants, and is himself [*32] an auto enthusiast. Plaintiff insists that its non-compete agreement must be read so broadly that defendant breaches it by publishing a calendar of upcoming automotive events, merely because *some* of those car shows advertise in their magazine, or that a collage of logos on a webpage, only *some* of which include EDIX advertisers, compete with advertisements in their magazine, despite a lack of evidence to suggest that the manufacturers ever paid anything to SponsoredWhips, or indeed were aware of the use of their trademarks. [37] Indeed, plaintiff suggests that Mahani would violate his non-compete agreement by the simple act of showing up at a car show in his truck, opening the tailgate, and revealing the manufacturer's vinyl for the speakers in his own car. Certainly EDIX's interests in an independent contractor cannot be so broad as to drive defendant not only from his livelihood, but also from his hobbies. Plaintiff asks this Court to deny Mr. Mahani--supposedly an independent contractor--virtually any opportunity to work in his chosen industry in the area in which he lives. [38] This requested relief is unenforceable as a matter of policy.

[37] The idea that the logo collage is competitive flies in the face of common sense. Given SponsoredWhips' size and customer base, the logo collage exists to provide credibility to Mahani's company, not as promotional advertising for manufacturers.

[*33]

[38] All evidence before the Court suggests that plaintiff converted Mahani from employee to independent contractor status solely because EDIX desired to avoid withholding taxes on Mahani's income. Whether this recharacterization of Mahani's role would survive scrutiny by the Internal Revenue Service is beyond the jurisdiction of this Court. Certainly the expectation that Mahani would work fixed hours, meet a particular target for daily phone calls (irrespective of whether he felt this technique would in fact earn him fees), and was given the title "Account Executive," leaves this Court unconvinced that for any other purpose it would actually consider Mahani to be a contractor rather than an employee. Plaintiff has insisted upon the form of the relationship, however, and should be estopped from considering defendant an employee for purposes of its non-compete agreement.

The non-competiton agreement is therefore limited to actions that are the same as, and compete directly with, EDIX's own business activities. There is evidence that such competition did occur. EDIX provides models for its advertisers, [*34] and Mahani connected EDIX advertisers with the modeling services of his girlfriend and their associates. Similarly, defendant used pictures paid for by EDIX as images on his own websites. If not enjoined, SponsoredWhips could, in the future, feature paid-for banner advertisements on its website, and this too would constitute a competing service. Plaintiff's claims of unlawful competition, however, must be constrained to this *limited* scope. I evaluate each Count in turn.

2. Count II: Breach of contract resulting from unlawful competition

Neither SponsoredWhips nor TunerAction engage primarily in activities directly in competition with EDIX's business. First, according to Shawn Ramsey's deposition testimony, TunerAction is barely a going concern, at most operating a website and having no paid-for members at present. Its business model is entirely different, deriving what profits it may eventually achieve by forwarding customers to a single automotive reseller. Overall, however, TunerAction appears to be a shell company waiting for a purpose.

I find Shawn Ramsey's deposition testimony claiming to have written the advertising copy for TunerAction's membership plan to be [*35] credible. The appearance of this text on TunerAction's website cannot be attributed to Mahani and, thus, does not violate his covenant. Though Mahani may have engaged in unlawful competition by collaborating with TunerAction in other ways, I do not find the evidence before me sufficient to conclude that either plaintiff suffered damage or defendant received profits that he might disgorge. [39]

[39] I do find that defendant unlawfully solicited customers from EDIX, as discussed in Count III below.

Nor does SponsoredWhips, for the most part, directly compete with EDIX. Plaintiff has not shown that the *writing* of sponsorship proposals is a significant part

of its business, nor has it shown revenues or activities undertaken by SponsoredWhips that directly compete with EDIX. It is not enough that the same customers might seek out both firms for different purposes, even though ultimately the customer's goal is to receive parts. Nor is it enough, as plaintiff alleges, that an enthusiast who gains a sponsorship [*36] through the assistance of defendant will be less likely to buy parts through EDIX in the future. [40] Such activities may be substantially similar to EDIX business, but they are not directly competitive.

40  Plaintiff's repeated assertion that selling parts at a discount to their members constituted the same act of "sponsorship" as would be undertaken by a company solicited by SponsoredWhips strikes this Court as particularly fanciful. Plaintiff insists that the term "sponsorship" or "partial sponsorship" is used in the industry to describe what in ordinary language would be considered a membership discount. Whatever the industry terminology, however, this Court looks to the substance of the transaction, not its label. SponsoredWhips does not offer memberships, let alone membership discounts, while EDIX does not write proposals.

EDIX also compares its sponsorship of a vehicle with defendant's business activities. When EDIX "sponsors" a car they are determining which end user will receive free or discounted goods, essentially *providing* a sponsorship. SponsoredWhips does no such thing, but rather helps customers *solicit*. Far from being competitors, these services compliment each other. In an ideal world, EDIX might even accept sponsorship proposals from their former employee.

[*37]  SponsoredWhips might eventually compete with EDIX in the area of paid-for banner advertisements, or by expanding into provision of modeling services. To avoid this risk, Mahani shall for an appropriate time be enjoined as I describe below. Under Count II, EDIX failed to prove that Mahani has engaged in unfair competition within the enforceable scope of his contract and, thus, states no claim for damages.

3. Count III: Breach of contract arising from unlawful solicitation of customers

Plaintiff presented testimony clearly showing that Mahani unlawfully solicited customers in two ways. First, he contacted a *StreetTrenz* customer and offered him a TunerAction membership as a replacement for *StreetTrenz* services. This customer, however, remains a *StreetTrenz* customer, and it is not clear that he ever actually joined TunerAction. [41] More importantly, Mr.

Ramsey no longer seems to be running TunerAction as a going concern. To the extent that this was a violation, plaintiff has proven very little in the way of damages.

41  According to Shawn Ramsey's deposition, TunerAction has eight or nine members, and although there is a nominal membership fee of $ 99 that would entitle these individuals to additional benefits, no member has actually paid.

[*38]  Second, Mahani also unlawfully solicited customers by greeting visitors to the SponsoredWhips website with the question, "Did you get screwed, or scammed, by ... 'StreetTrenz' ...?" Such a question is always rhetorical, asserting that a scam exists. Once again, however, plaintiff has failed to show any particularly concrete damages arising from the incident. Nor has it shown that these statements--a few lines on a website--motivated customers to leave EDIX, unsubscribe from *StreetTrenz*, or even request a sponsorship proposal. Without such evidence, Mahani should not be required to disgorge any profits he may have made from his otherwise non-competing enterprise.

Finally, plaintiff suggests that Mahani solicited customers by offering them the use of models for the Ocean City car show. The evidence consists of a single email to an EDIX customer (who is also a close personal friend of the Mahani family), reading almost in its entirety: "[Acteson and Kirchman] used to work for me at [*StreetTrenz*], but don't want to if I am not there. [Another EDIX Customer] was going to hire them, now isn't sure. I didn't want to wait for his answer. They really love the OC show and [*39]  they def. want to come, do you think [you] can use them?" [42]

42  On its own, the email is subject to two interpretations. It might represent an attempt by defendant to intrude upon plaintiff's activities as a provider of models. On the other hand, it may simply be read as a recommendation letter for two models searching for work. While it would no doubt have been better for the two models to contact a potential employer directly, there is no indication that defendant was paid for any services rendered by the models. Nor is there any indication that SponsoredWhips gained any customer goodwill by providing a model, as its customers are end users, not retailers.

It is likely that defendant breached his contract through his email. On the other hand, plaintiff's only suggestion that its customer actually *did* use either model is Burris's belief that they worked the Ocean City show. And even if the models did work, there is no testimony that allows me to conclude that (a) plaintiff would have been paid by [*40]  their advertiser in the absence of the

offer, or (b) that this client didn't desire the services of Acteson or Kirchman in particular.

I find that plaintiff has failed to show any actual damages arose with respect to TunerAction and *Street-Trenz,* or in solicitation for the use of models. Some of these actions were breaches of the covenant not to compete, however, and I award plaintiff nominal damages in an amount in accordance with our common law tradition, six cents. [43] Additionally, Mr. Mahani will be enjoined from similar activities for the remaining duration of the non-competition agreement.

> 43  *See Standard Distrib. Co. v. NKS Distribs., Inc.,* 1996 Del. Super. LEXIS 125, 1996 WL 944898, at * 11 (Del. Super. Jan. 3, 1996).

### 4. Count IV: Breach of contract by unlawfully soliciting workers

The complaint alleges that defendant urged three individuals to cease working with plaintiff: Kelly Acteson, Jessie Kirchman and Mark Hernandez. I must consider whether, in violation of his agreement, Mahani induced [*41] or attempted to induce any employee or contractor to quit "employment or any contractual relationship." The trial transcript says remarkably little about Hernandez's role at EDIX, and only one series of emails suggests a contract ever existed. [44] In this document, Mr. Hernandez first agrees to participate in the OC Car show on May 29, and subsequently backs down from his agreement on June 1. He gives as one reason among many the fact that he has been talking to TunerAction, and specifically Mahani, about a car sponsorship. Phone records indicate that defendant spoke to Hernandez on May 30. Plaintiff wishes me to infer from this that Hernandez's change of heart stemmed from his conversation with defendant. Defendant, on the other hand, denies knowing that Hernandez had ever been paid or employed by plaintiff prior to his dismissal. Plaintiff submits not a single cancelled check to that effect.

> 44  Plaintiff wishes me to find that the following conversation via email constitutes a contractual relationship frustrated by defendant:
>
> > BURRIS: "Please let me know which shows you can attend and I will let you know how much space we have." HERNANDEZ: "You can for sure put me down for the OC Car Show. I know, I really want to go to that and I will be up there .... The OC Car Show is a go for me."

> > BURRIS: "OK, we will be getting down there on Friday and staying thru Sunday."

> The bare bones of a contractual relationship can be inferred from this conversation: an offer ("You can for sure put me down for the OC Car Show"); an acceptance ("OK"); and through prior relationships, the implication of consideration (a percentage of any sponsorships sold).

[*42] Burris at trial described Hernandez as a contractor, not an employee, whose job was to speak to potential members at car shows and try to sell memberships. Plaintiff has presented no evidence that Hernandez had an ongoing contractual relationship with EDIX. Even assuming the existence of a contract, plaintiff's only admissible evidence suggesting Mahani's interference is a phone call between defendant and a personal friend. [45] This is thin soup indeed.

> 45  Plaintiff also relies upon a portion of the June 1, 2006 email exchange between Burris and Hernandez, where in response to Burris's question, "Who have you been talking to over there?" Hernandez replies, "I am pretty sure it has been [Mahani] and [Acteson]." I allowed, over defendant's objection, emails from third parties not present to be admitted into evidence *solely* for the purpose of proving the motivation of those parties. Del. R. Evid. 803(3). Mahani testified that he did not recall speaking to Hernandez about TunerAction. If plaintiff wished to rebut that statement with Hernandez's words, then he should have been put on the stand, where defendant would have had an opportunity for cross-examination. To prove that Hernandez *thought* he was speaking to defendant, the email suffices. To prove that a prohibited conversation actually took place, or that Mahani actually made an offer of sponsorship, such evidence is hearsay.

[*43] It is clear from the evidence that Mahani did solicit work for his girlfriend and some of her friends. Plaintiff does not suggest that either model was under an exclusive contract, nor that they were contracted to work at the Ocean City show. Further, plaintiff strains the imagination of the Court in asking me to believe that after firing Ms. Acteson's boyfriend and proceeding into a very acrimonious lawsuit, it is in any way likely that the models were going to work for EDIX in the future, whether or not Mahani attempted to induce such refusal. In the absence of such evidence, it is difficult to see how plaintiff has established a contractual relationship with

which defendant interfered, let alone what damages might plausibly be considered.

*C. Common law and statutory claims not concerning confidentiality or non-competition*

Plaintiff also demands compensation for three claims at common law and one statutory violation. Two of the three common law claims are redundant and need be given only cursory consideration. Plaintiff's allegations of defamation require slightly more discussion, particularly as to appropriate damages. Finally, plaintiff requests treble damages for violation [*44] of the Deceptive Trade Practices Act.

1. Count VII: Unfair competition and Count VIII: Tortious interference with business relationships

Plaintiff maintains that defendant has engaged in and will continue to engage in unfair competition. The complaint provides no detail as to precisely what actions constitute unfair competition, and I note as an initial matter that Delaware courts have struggled to precisely define the boundaries of the common law in this area. [46] The essential element separating unfair competition from legitimate market participation, however, is an unfair action on the part of defendant by which he prevents plaintiff from legitimately earning revenue. [47]

> 46  *See, e.g., State ex rel. Brady v. Wellington Homes, Inc., 2003 Del. Super. LEXIS 304, 2003 WL 22048231 (Del. Super. Aug. 20, 2003)* ("Deceptive conduct constituting unreasonable interference with another's promotion and conduct of business is part of a heterogeneous collection of legal wrongs known as 'unfair trade practices.' This type of conduct is notoriously undefined. Commonly referred to as 'unfair competition,' its metes and bounds have not been charted.")

[*45]

> 47

In *Total Care Physicians, P.A. v. O'Hara*, the Superior Court held that to succeed in a claim for unfair competition, a plaintiff must show (a) a reasonable expectancy of entering into a valid business relationship, (b) interference with that relationship by defendant, and (c) consequent defeat of plaintiff's legitimate expectancy. *Total Care Physicians, P.A. v. O'Hara, 798 A.2d 1043, 1057 (Del. Super. 2001)*. There are other definitions used in differing factual situations, as befits this rather amorphous cause of action. *See, e.g., State ex rel. Brady v. Wellington Homes, Inc., 2003 Del. Super. LEXIS 304, 2003 WL 22048231, at *2* ("The essence of unfair competition is the fraudulently seeking to sell one's goods for those

of another, and the true test is whether the defendant's acts are reasonably calculated to deceive the average buyer under the ordinary conditions prevailing in the particular trade." (quoting *Coca-Cola Co. v. Nehi Corp., 27 Del. Ch. 318, 36 A.2d 156, 165 (Del. 1944))).*

Count VII thus becomes completely redundant in light of plaintiff's other claims. Unfair [*46] competition affords plaintiff no relief at common law from breaches of confidentiality that its claim in contract does not. Nor does it expand upon damages derived from the non-competition agreement: if defendant's post-employment activities do not breach his contractual duties, they are not in some other way wrongful. No additional damages may stem from this Count.

Likewise, plaintiff's claim for tortious interference with business relationships makes no case for any additional liability. Tortious interference requires that plaintiff demonstrate that (1) a contract existed, (2) the defendant knew of the contract, (3) defendant's intentional actions played a significant role in causing the breach of such contract, (4) defendant acted without justification, and (5) the breach caused injury. [48] Mahani's emails no doubt qualify as a tortious interference in EDIX contractual relationships, being intentional, unexcused and the cause of cancellation for some contracts. The scope of Count VII compliments that of Count I in only one respect: where a customer cancelled their contract with EDIX on the basis of information in Mahani's emails, their motivation becomes irrelevant. If the customer [*47] reacted to information that was *not* confidential but otherwise wrongful, damages are appropriate under Count VII but not necessarily Count I. [49] I find, however, that where EDIX suffered damages from lost contracts, such damages arose primarily on the basis of confidential disclosure of information and, thus, Count VII does little additional work. Unfair competition and tortious interference are thus almost entirely redundant, and need not be considered in calculating damages.

> 48  *Irwin & Leighton, Inc. v. W.M. Anderson Co., 532 A.2d 983 (Del. Ch. 1987).*

> 49  For instance, a hypothetical customer might have cancelled his contract because of defamatory statements concerning Burris, but not because of confidential disclosures.

2. Count IX: Defamation

In Delaware, defamation requires (a) a defamatory communication, (b) publication, (c) communication that refers to the plaintiff, such that (d) a third party understands the communication's defamatory character, and (e) there [*48] is an injury. [50] Four types of defamatory

statement do not require plaintiff to show any special damages: maligning a person in his trade or business, imputing a crime of moral turpitude, implying a person suffers from a loathsome disease, or imputing the unchastity of a woman. [51] Additionally, for the letter to be defamatory to plaintiff, as opposed to plaintiff's employees, it must contain statements that "reflect discredit upon the method by which the corporation conducts its business." [52]

50   *Delaware Express Shuttle, 2002 Del. Ch. LEXIS 124, 2002 WL 31458243, at \*21.*

51   *Id.*

52   *Id.*

There can be no doubt that defendant defamed EDIX in his June 6 email, to say nothing of any other communication. Plaintiff deserves nominal damages in the amount of six cents, as well as compensatory damages. Once again, however, compensatory damages will be largely the same as those implicated by Count I.

3. Count X: Deceptive Trade Practices

Finally, plaintiff seeks the protection of *6 Del. C. § 2532(a)* [*49] , which forbids deceptive trade practices, in order to justify an award of treble damages and attorney's fees. The facts proven at trial do not justify such relief.

The Deceptive Trade Practices Act forbids "disparage[ment]" of the goods, services or business of another by false or misleading representations of fact," [53] acts that defendant committed, but requires such activity to be conducted "in the course of a business, vocation, or occupation." [54] The 37 DTPA was designed to prevent "patterns of deceptive conduct," not isolated incidents. [55]

53   *6 Del. C. § 2532(a)(8).*

54   *6 Del. C. § 2532(a).*

55

*Grand Ventures, Inc. v. Whaley, 622 A.2d 655 (Del. Super. 1992).* ("Treble damages are available only in conjunction with injunctive relief under *6 Del. C. § 2533(a).* The association of the treble damage remedy with injunctive relief indicates that the Act is directed at patterns of deceptive conduct, not isolated incidents of consumer fraud.")

[*50] Mahani's deceptive acts were the emails of May 21 and June 6, both of which made disparaging accusations about EDIX. I am not convinced that defen-

dant wrote these emails, as suggested in plaintiff's complaint, in an effort to "destroy and eliminate competition from EDIX." [56] At the point that Mahani wrote these emails, he had neither a magazine nor an auto club with which he might benefit were EDIX to go out of business, and to the extent that he might have plans for such an operation in mind, there is no evidence that he had the financing, experience or other required wherewithal to start one. Mahani's motivation for writing the emails was almost certainly the simplest and most old-fashioned of all: revenge. For this he is liable under both defamation and breach of contract theories, and in addition will quite possibly suffer criminal penalties. But I do not believe that the Legislature adopted the Deceptive Trade Practices Act in order to convert acts of passion into acts of corporate malfeasance resulting in treble damages.

56   Supplemental Verified Compl. at 17.

[*51] **IV. DAMAGES AND INJUNCTIVE RELIEF**

*A. Compensatory damages*

Having woven a path through plaintiff's various theories, it remains only to determine the amount of damages to which plaintiff is entitled. Compensatory damages, arising primarily from breaches of the confidentiality agreement, are warranted by Counts I, III, V, and IX. Both parties have briefed this issue, debating in detail each and every contested and cancelled contract.

The law "does not require certainty in the award of damages where a wrong has been proven and injury established." [57] Nevertheless, the law does require that plaintiff show not only an injury, but also that the injury was caused by defendant. I am not convinced that Mahani's actions were the root cause of each and every cancelled payment that EDIX suffered. After all, plaintiff itself forced a revision in the payment structure for independent contractors in part to encourage collection of a mountain of over $ 60,000 worth of uncollected receivables that had accrued over a month before any conflict arose. This suggests considerable uncertainty as to whether some of these revenues were ever to be collected. Mahani should pay for his sins, but [*52] not the obstinacy of others.

57   *Total Care Physicians, P.A. v. O'Hara 2003 Del. Super. LEXIS 261, 2003 WL 21733023, at \*3 n.16 (citing Delaware Express Shuttle, 2002 Del. Ch. LEXIS 124, 2002 WL 31458243, at \* 13).*

In making a client-by-client listing of damages, plaintiff has presented a melange of differing agreements (including signed contracts, unsigned contracts, and testimony involving verbal contracts) and various proofs of

cancellation. As already mentioned, I have given considerable weight to documentary evidence provided by third parties. Having found the testimony of Burris to be not much more credible than that of defendant, I do not consider plaintiff to have proven causation by a preponderance of the evidence when the sole sign that a contract existed is trial testimony. On the other hand, I do not believe (as defendant suggests) that plaintiff must put forward a signed contract in order to prove that a contractual relationship existed. Where plaintiff has shown that a client placed advertisements in the magazine consistent [*53] with the claimed contract, and defendant has put forth no evidence to rebut the existence of a contract, plaintiff has met its burden.

The same general rule applies to causation. Plaintiff and defendant both spoke at trial regarding reasons that advertisers *might* have cancelled contracts, and not all evidence points towards defendant. Plaintiff's own evidence suggests that some customers were irregular in their payments. There are indications in the record that some customers' loyalty was to Mahani, and that they would have withdrawn their support after his firing without further provocation. [58] It is not unusual for clients to leave when a favored salesperson is dismissed. In order to provide a preponderance of evidence, plaintiff needs to produce some non-hearsay evidence in addition to Burris's testimony to indicate that a customer ceased their relationship due to defendant's actions. [59] Where no such evidence is available, and there are many possible reasons the contract might have been cancelled, plaintiff has not shown that it is more likely than not that the cancellation was caused by Mahani. With these rules in mind, it is easy to identify several categories of advertisers. [*54]

> 58    The one advertiser upon which both parties agree that defendant is liable, Aamp of America, actually gives the Court considerable pause. Aamp's detailed explanation of their reasons for canceling their contract includes confusion as to the reasons behind the dismissal of Mahani. Other advertisers may have felt the same way, irrespective of Mahani's emails.

> 59    I allowed considerable testimony by Burris, over defendant's objections, as to the motivations of EDIX advertisers. As I explained at trial, the testimony was properly admitted as it was offered to show motivation rather than truth of the statements themselves. In the absence of other evidence, however, I have given this little weight.

The first category consists of advertisers for which plaintiff has provided either no independent proof of motive or causation, or where that proof is insufficient to

show that Mahani's emails led to plaintiff's loss. I have only conflicting trial testimony with regard to the motivations of Texas Heat Wave, [*55] Mobil Spec, the Installer Institute or Apollo America in cancelling their contracts. For some advertisers, the emails introduced by plaintiff as evidence of motive simply do not allow me to make a confident inference as to the advertiser's state of mind. For instance, JGY Customs simply notes that there was a "lot of drama" after Mahani was fired. Elevation Audio gripes that "this is getting to be a nonsense situation," and asks for a phone call from Burris, but gives no indication that Mahani's emails provide the impetus for cancelling their advertisements. Finally, plaintiff complains that Absolute USA refused to pay for advertisements run in April, May, and June, although two months of bills would have been payable *before* Mahani sent any messages. It is possible that they refused to pay at defendant's urging, but it is equally possible that they simply continued in their delinquency. Plaintiff has failed to meet the burden of proof necessary to show damages with regard to any of these accounts.

Two other accounts merit special consideration: O2 and Dual Electronics. Plaintiff presents no signed contract with O2, nor any non-testimonial evidence that they ever intended to renew [*56] their contract. [60] As for Dual Electronics, plaintiff submits a written contract and evidence that Dual advertised for their first month as planned and, thus, it is reasonable to conclude that a contract existed. On the other hand, the email submitted by plaintiff to show Dual's motivation in cancelling their advertisements lists a number of concerns, some of which implicate Mahani's actions and some of which do not.

> 60    Defendant, on the other hand, submits an email from O2 stating that the company cancelled its contract due to the receipt of a better offer for advertising from an EDIX competitor. Once again, the letter is inadmissible for purposes of proving the truth of the matter--that an offer was received--but is admissible as evidence of O2's motivation.

I conclude that no damages can be awarded with regard to O2, as plaintiff has not shown the existence of a contract. Dual Electronics is a more difficult matter. The email provided by plaintiff shows that Dual was motivated in part by Mahani's actions, [*57] and in part by other concerns. For this reason, I find that plaintiff should be awarded nothing for this claim. Because of the mixture of motives underlying Dual's decision to end its advertising relationship with EDIX, I cannot find that plaintiff has proved any damages attributable to Mahani.

Defendant's liability for the other customers is hardly in doubt. Plaintiff has presented either written

contracts or shown that advertisers actually ran advertisements. Emails plaintiff has submitted from these advertisers unambiguously indicate that Mahani's actions motivated their cancellations or non-payments. Therefore, plaintiff is awarded the full amount requested with regards to HD Wheels ($ 5,000), Metra ($ 3,600), Monkey Video ($ 2,400), and Aamp of America ($ 3,500), for actual damages arising from lost advertisers in the amount of $ 14,500.

*B. Plaintiffs' motions for contempt of court and leave to file lis pendens* Plaintiff also asks that I award damages for defendant's alleged violations of the stipulated restraining order. Penalties for civil contempt of a restraining order are appropriate when the Court seeks to achieve compliance with its order and preserve the rights of [*58] an aggrieved party. [61] Even an imperfect or erroneous order of this Court must still be followed, and a court may punish disobedience with penalties for contempt so long as the order was not issued in excess of the Court's jurisdiction. [62] Nevertheless, I find that further damages for contempt would be inappropriate.

61

    *See City of Wilmington v. Gen. Teamsters Local Union 326, 321 A.2d 123, 125 (Del. 1974).* The Court of Chancery possesses both common law and statutory contempt powers that may be used to enforce its judgments. See *id.; 10 Del. C. §§ 370-71.*

62   *See Mayer v. Mayer, 36 Del. Ch. 457, 132 A.2d 617, 621 (Del. 1957).*

First, the damages delineated above are adequate recompense for the actual harm suffered by plaintiff, especially when coupled with the $ 5,000 already paid by defendant as a result of plaintiff's first motion for contempt. Second, evidence offered at trial has convinced me that the initial temporary restraining order, despite [*59] having been stipulated to by both parties, was nonetheless more expansive than appropriate, preventing defendant from many reasonable and appropriate activities. Although plaintiff complains of several violations, most of them are either *de minimus* or not matters for which damages are awarded in this final judgment. Nor is the final permanent injunction to be as broad as the temporary restraining order. Thus damages for these infractions seem neither equitable nor necessary.

On the other hand, given defendant's less than exemplary record in following orders of this Court, I note here that failure to abide by any further orders will be met with punitive sanctions. Further, plaintiff's leave to file *lis pendens* on property purportedly transferred from Mahani to his father is granted pending either satisfaction of this judgment in full or plaintiff's prosecution of a fraudulent conveyance action.

*C. Other damages*

Besides compensatory damages arising from plaintiff's claims or from contempt of court, plaintiff is also entitled to exemplary damages for willful and malicious misappropriation of trade secrets, and nominal damages for breach of contract arising from unlawful [*60] solicitation and defamation. Nominal damages on all counts that merit them are awarded in the amount of six cents. In addition, I find that $ 2,000 should be awarded to plaintiff in exemplary damages under the Delaware Trade Secrets Act. [63]

    63  *6 Del. C. § 2003(b)* (exemplary damages not to exceed twice any award made for compensatory damages). It is difficult to divine with precision how much of the $ 14,500 in compensatory damages derive from defendant's misappropriation of advertising rates, but $ 1,000 would be a reasonable, if conservative, estimate.

*D. Attorney's fees, costs of litigation, and other costs*

As part of the Non-Compete and Confidentiality Agreement, defendant agreed to indemnify plaintiff for any legal fees incurred by plaintiff in attempting to enforce this agreement, and such agreements are enforceable. [64] I do not hesitate to award fees in this case, as defendant has done very little at any stage of this litigation to mitigate plaintiff's costs in pursuing [*61] its rights under the employment agreement. Plaintiff is also entitled to reasonable reimbursement of expenses paid to third parties in investigating the source of defendant's malicious emails. Plaintiff shall submit affidavits detailing these expenses for reimbursement.

    64  *Delaware Express Shuttle, 2002 Del. Ch. LEXIS 124, 2002 WL 31458243, at *23.*

*E. Injunctive relief*

Finally, plaintiff should enjoy the protection of both the confidentiality agreement and, to the degree it is enforceable, the non-competition agreement. Therefore, defendant shall be enjoined from the following activities until May 13, 2008: (a) directly or indirectly using or disclosing to any person or other entity any of plaintiff's confidential or proprietary information; (b) directly or indirectly owning, managing, operating, joining, being employed by, controlling or managing any automotive club or other membership-based subscription business involving the after-market automotive parts industry; (c) directly or indirectly providing paid-for [*62] or otherwise compensated advertising, either in print or online,

2006 Del. Ch. LEXIS 207, *

for any EDIX advertiser, as limited by the non-competition agreement; or (d) directly or indirectly providing modeling services.

## V. CONCLUSION

Plaintiff is awarded monetary damages in the amount of $ 16,500.06, the total of $ 14,500 in compensatory damages, $ 2,000 in exemplary damages and six cents in nominal damages. Defendant shall be enjoined from revealing confidential information and engaging in activities that directly compete with EDIX operations as defined above.

Counsel shall confer and submit within twenty days a proposed form of final order to implement this Memorandum Opinion. The order shall make provision for attorney's fees and costs, as described herein.

# EXHIBIT 4

LEXSEE 1993 DEL. SUPER. LEXIS 183

**INTERNATIONAL BUSINESS MACHINES CORPORATION, a New York Corporation, IBM CREDIT CORPORATION, a Delaware corporation, BLUE DIAMOND LIMITED PARTNERSHIP, a Delaware limited partnership, and GREENWICH GMP LIMITED PARTNERSHIP, a Delaware limited partnership, Plaintiffs, v. COMDISCO, INC., a Delaware corporation, Defendant.**

NON-ARBITRATION C.A. NO. 91C-07-199

**SUPERIOR COURT OF DELAWARE, NEW CASTLE**

*1993 Del. Super. LEXIS 183*

**February 9, 1993, Submitted
June 30, 1993, Decided**

**DISPOSITION:**     [*1] UPON PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT. GRANTED IN PART, AND DENIED IN PART.

**COUNSEL:** R. Franklin Balotti, Esquire, John A. Parkins, Jr., Esquire, and Anne C. Foster, Esquire, of Richards, Layton & Finger, Wilmington, Delaware, Paul C. Saunders, Esquire, Evan R. Chesler, Esquire, and Richard W. Clary, Esquire, of Cravath, Swaine & Moore, New York, New York, and Howard Weber, Esquire, of Davis, Markel & Edwards, New York, New York, Attorneys for Plaintiffs.

Donald F. Parsons, Jr., Esquire, and Donald E. Reid, Esquire, of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware, and Jerold S. Solovy, Esquire, Donald R. Harris, Esquire, Barbara S. Steiner, Esquire, Laura A. Kaster, Esquire, and Sidney I. Schenkier, Esquire, of Jenner & Block, Chicago, Illinois, Attorneys for Defendant.

**JUDGES:** GOLDSTEIN

**OPINION BY:** CARL GOLDSTEIN

**OPINION**

   OPINION AND ORDER

   GOLDSTEIN, Judge.

   *INTRODUCTION*

   Plaintiffs have filed a Motion for Summary Judgment under Superior Court Civil Rule 56(c) on the liability theories of conversion (Count Three), unfair competition (Count Eight), and unjust enrichment (Count Nine) contained in the Second Amended Complaint in this action filed on September 4, 1991 (Complaint). As explained [*2] hereunder, Plaintiffs' Motion is granted in part, and denied in part.

   For the purposes of this opinion, a relatively brief summary of the factual and procedural contexts is helpful. The procedural history and facts of the case are stated in some detail in the Court's decision on Comdisco's motion to dismiss in *IBM v. Comdisco, Inc.,* Del. Super., C.A. No. 91-C-07-199, Goldstein, J. (Dec. 4, 1991), Mem. Op. at 1-11 *(IBM I).*

   *STATEMENT OF THE CASE*

   Plaintiffs     International     Business     Machines Corporation (IBM), IBM Credit Corporation (ICC), and Greenwich Liberty 1985 Limited Partnership (GLLP) [1] originally filed an action concerning the subject matter herein in the Delaware Chancery Court against Comdisco, Inc. (Comdisco) and Computer Associates International, Inc. (CAI). Following Vice Chancellor Chandler's decision that equity jurisdiction did not lie, *see IBM v. Comdisco, Inc., Del. Ch., 602 A.2d 74, 85 (1991),* the case was split and transferred to this Court in two parts, one of which has been stayed pending the resolution of the case at bar. *See IBM v. Comdisco, Inc.,* Del. Super., C.A. No. 92C-05-226, Goldstein, J. (July 6, [*3] 1992) (Order). The parties subsequently stipulated

to the dismissal of CAI from the case at bar.

1  "Plaintiffs" shall hereinafter refer to one or all of these parties.

Plaintiff IBM manufactured an IBM 3090 model 400 computer system with the serial number 70263 (System No. 70263). This system was owned by Plaintiff ICC and later by Plaintiff GLLP. ICC leased the system on behalf of owner GLLP to Applied Data Research, a New Jersey firm subsequently acquired by CAI under a Term Lease Master Agreement dated May 4, 1984 (Compl. Ex. A, hereinafter "TLMA"). The original base term of the TLMA expired in February of 1992. The TLMA provided that CAI had the right to renew the lease or exercise a purchase option at that time if it was not in default.

IBM's 3090 model series of computers has a modular design, and its various components may be combined or configured in literally thousands of ways to comprise systems of varying speeds, capacities, and capabilities. CAI subleased System No. 70263 in July of 1990 to Comdisco, [*4] which is in the business of purchasing, selling, and leasing computer equipment. Pursuant to three Equipment Sublease Agreements (Compl. Ex. B, C, D, hereinafter "E.S.A."), CAI received Plaintiffs' approval to sublease the 3090 processor, a 3092 processor controller, and two 3097 coolant distribution units to the First National Bank of Omaha in Nebraska (FNBO); two 3089 power units to United Technologies in California; and two 3089 power units to Brylane, Inc. in Indiana. Comdisco subleased these components for terms extending beyond the original base term of the TLMA, or "overleased" them. Plaintiffs contend that their consent to the sublease of these components only encompassed the original base term of the TLMA and that overleasing violated their agreement with CAI.

Before sending these components to their respective recipients, Comdisco reconfigured System No. 70263 and removed additional components, including 128 megabytes of expanded storage, two thermal conduction modules (TCMs) and two expanded storage gates with boards. Comdisco subleased the downgraded System No. 70263 to FBNO pursuant to Comdisco's own Master Lease Agreement, which contained different terms than the [*5] TLMA. Comdisco sold 64 megabytes of expanded storage memory and one gate with boards to PacifiCorp Capital, Inc. (PacifiCorp), which subsequently sold or leased these components in competition with

Plaintiffs to Clark County D.P. in Nevada. Comdisco transferred the other gate with boards to Comdisco Deutschland GMBH in Germany (Comdisco Germany), and placed the other 64 megabytes of expanded storage memory and two TCMs into its inventory. Plaintiffs claim that these additional components were removed without their knowledge or consent, in violation of the TLMA. Comdisco claims that Plaintiffs' consent was properly obtained for the sublease of "Equipment" as required under the TLMA, that the TLMA places no restrictions on their use of "parts" removed during a reconfiguration, and that industry custom or usage of trade, which Plaintiffs not only are aware of but also participate in, permit all of Comdisco's activities.

Plaintiffs brought a number of claims against Comdisco in connection with System No. 70263. Those claims which survived Comdisco's motion to dismiss are Count Three, wherein Plaintiff GLLP, the owner of System No. 70263, claims conversion; Count Four, wherein GLLP [*6] claims trespass to chattels; Count Five, wherein Plaintiff ICC claims tortious interference with contractual rights; Count Six, wherein Plaintiffs IBM and ICC claim "tortious interference with business relations;" Count Eight, wherein Plaintiffs IBM and ICC claim "unfair competition;" and Count Nine, wherein Plaintiff GLLP claims unjust enrichment.

The Court has ruled that Connecticut law shall govern the interpretation of the TLMA, consistent with the choice-of-law provision therein. *IBM I, supra,* at 12 n.6. Plaintiffs' legal claims are governed by Illinois law. *Id.* at 11-12. On their motion for summary judgment under Superior Court Civil Rule 56(c), plaintiffs must show that, "on unquestioned facts, [they are] entitled to a judgment as a matter of law." *Oliver B. Cannon & Sons, Inc. v. Dorr-Oliver, Inc., Del. Super., 312 A.2d 322, 325 (1973)* (Quillen, C.). *See also Moore v. Sizemore, Del. Supr., 405 A.2d 679, 680 (1979).* The non-moving party is entitled to have all reasonable factual inferences resolved in its favor. *Merrill v. Crothall-American, Inc., Del. Supr., 606 A.2d 96, 99-100 (1992).* [*7] "The role of a trial court when faced with a motion for summary judgment is to identify disputed factual issues whose resolution is necessary to decide the case, but not to decide such issues." *Id. at 99.* The parties filed a Joint Case Statement on December 8, 1992 (J.C.S.) which assisted the Court in this task.

### PLAINTIFFS' LIABILITY THEORIES

## I. CONVERSION

In their Motion, Plaintiffs argue that Plaintiff GLLP, the owner of System No. 70263, is entitled to summary judgment on the liability issue of conversion: [2]

> There is no dispute that Comdisco (a) took possession of System No. 70263 in August 1990; (b) removed 128 megabytes of expanded storage memory, two TCMs and two storage gates from that system; (c) sold 64 megabytes of the expanded storage memory and one gate from 70263 to PacifiCorp; (d) sold another gate and four boards removed from 70623 to Comdisco Germany; (e) placed 64 megabytes and two TCMs from 70263 in its inventory; (f) leased the downgraded 70263 to FNBO under Comdisco's Master Lease Agreement for a term extending beyond the term of the TLMA; and (g) leased the 3089[] [power units] associated with 70263 to United [*8] Technologies and Brylane under Comdisco's Master Lease Agreements for terms extending well beyond the term of the TLMA. Neither GLLP, the owner of the equipment, nor [ICC] authorized Comdisco to engage in any of this conduct.

(Pl. Mem. Supp. Summ. J. at 22-23 (emphasis added).) While Comdisco admits to this conduct (except in contending that it did not sell but rather "transferred" the gate with boards to Comdisco Germany), Comdisco disputes Plaintiffs' legal conclusion that it amounts to conversion.

> 2    While the conversion claim was originally brought by all three Plaintiffs, the Court, ruling on Comdisco's motion to dismiss, found that IBM and ICC have no standing to pursue a claim for conversion as neither have an ownership interest in the equipment. *IBM I, supra,* at 30-31.

Plaintiffs' repeated conclusions that Comdisco's actions constitute conversion include little case analysis to aid the Court's understanding of precisely how the conversion of System No. 70263 is alleged to have occurred under Illinois [*9] law. Therefore, some examination of the law of conversion is necessary:

> The modern action for the tort of conversion always has been colored by its descent from the ancient common law form of action of trover, which originated as a remedy against the finder of lost goods who refused to return them. Until comparatively recently, the fiction of losing and finding persisted in the pleading of the action. However, the basis of the tort was considered to be an interference with possession of a chattel, or with the right to immediate possession.

*General Motors Corp. v. Douglass,* Ill. App., 206 Ill. App. 3d 881, 151 Ill. Dec. 822, 565 N.E.2d 93, 96 (1990) (citations omitted) (citing *Restatement (Second) of Torts § 242 cmt. d, § 222A cmt. a* (1965)). At one time, conversion would not lie absent a showing of a right of possession or immediate possession, but today "'conversion' is used by many courts to describe an interference with the rights of one who is not in possession of the chattel, and who has no right to immediate possession, but has only a right of future possession. . . . Trover would not lie in such a case . . . ." *Restatement (Second) of Torts § 222A cmt. b.*

Illinois courts [*10] customarily include an immediate right to possession among the elements of the tort of conversion:

> A complaint for conversion must allege plaintiff's right in the property and to immediate possession; a demand by plaintiff for possession; and unauthorized assumption of control or ownership by defendant over the property of plaintiff.

*Katz v. Belmont Nat'l Bank,* Ill. Supr., 112 Ill. 2d 64, 96 Ill. Dec. 697, 491 N.E.2d 1157, 1159 (1986); *see, e.g., Wasleff v. Dever,* Ill. App., 194 Ill. App. 3d 147, 141 Ill. Dec. 86, 550 N.E.2d 1132, 1139 (1990); *Mid-America Fire and Marine Ins. Co. v. Middleton,* Ill. App., 127 Ill. App. 3d 887, 82 Ill. Dec. 555, 468 N.E.2d 1335, at 1338, 1339 (1984). However, this old common law rule does not apply where an "independent act of conversion" is alleged.

Thus, in analyzing the Plaintiffs' Motion on the conversion claim, the Court must first examine Plaintiffs' manifold assertions under the general rule that GLLP did in fact have a right to immediate possession with respect to System No. 70263 with which Comdisco interfered. Then, if the Court does not find such a right, the Court must address the question of whether this is an "independent act of conversion" which [*11] would fall within the exception to the general rule.

### A. Immediate Right To Possession

As this Court has already recognized, possession or an immediate right to possession has traditionally been an element of the tort of conversion under Illinois law. *See IBM I, supra,* at 30. Plaintiffs begin their conversion argument by stating that while an immediate right to possession is an element of conversion, Comdisco's tortious conversion of the system gave GLLP an immediate right to possession. This reasoning is circular, and functions to eliminate an element of the tort.

Plaintiffs no doubt take their cue from the decision in *Jensen v. Chicago & W. Ill. R.R.,* which, without explicit distinction, uses the word "conversion" in its definition of "conversion": "One claiming conversion must show a tortious conversion of the chattel, a right to property in it, and a right to immediate possession . . . ." *Ill. App., 419 N.E.2d 578, 593 (1981).* The *Jensen* court uses "conversion" both to describe a deed, whereby one person exercises dominion over the property of another, and to describe a legal conclusion, that because one has exercised dominion of [*12] a particular nature over the property of another, and because the other is entitled to the possession of that property, it is fair and just to require the forced judicial sale of the property to the intermeddler, *see People v. Sergey, Ill. App., 137 Ill. App. 3d 971, 92 Ill. Dec. 695, 485 N.E.2d 506, 508 (1985).* A more recent Illinois decision clarified the elements of the tort by avoiding one of the two different uses of the word conversion: "The essence of conversion is the wrongful deprivation of one who has a right to the immediate possession of the object unlawfully held." *Bender v. Consolidated Mink Ranch, Inc., Ill. App., 110 Ill. App. 3d 207, 65 Ill. Dec. 801, 441 N.E.2d 1315, 1320 (1982)* (citing *Jensen,* 419 N.E.2d at 593).

Conversion does not require that this deprivation of another's right of possession be accompanied by a subjectively wrongful intent:

Malice, culpability or conscious wrongdoing is not a necessary element to establish a conversion for which trover will lie. All that is required is the exercise upon or control over the chattel inconsistent with the plaintiff's right of possession.

*Associates Discount Corp. v. Walker, Ill. App., 39 Ill. App. 2d 148, 188 N.E.2d 54, 56 (1963).* [*13] "It is also not necessary to show an intent to interfere with the rights of others[;] however, an act which is merely negligent is not sufficient to establish conversion." *Martel Enters. v. City of Chicago, Ill. App., 584 N.E.2d 157, 161 (1991)* (citing *Restatement (Second) of Torts § 223 cmt. b, § 224 cmts. b, c).* [3]

> 3   Conversion is always an intentional exercise of dominion or control over the chattel. Mere nonfeasance or negligence, without such an intent, is not sufficient for conversion. . . . If the actor has the intent to do the act exercising dominion or control, however, he is not relieved from liability by his mistaken belief that he has possession of the chattel or the right to possession, or that he is privileged to act.
>
>    *Restatement (Second) of Torts § 223 cmt. b.* See also id. § 244 & cmts. c, d.

Plaintiffs argue that:

> Comdisco's Seventh Defense is premised upon the senseless proposition that GLLP must have already provided notice and an opportunity to cure [*14] [under the TLMA], and thus have the right to immediate possession, "at the time the conversion, trespass and unjust enrichment allegedly occurred". [sic] Such a condition could never be fulfilled. If conversion is the event which causes a breach, and thus provides the basis for the written notification, the written notification and opportunity to cure cannot precede the conversion.

(Pl. Mem. Supp. Summ. J. at 38 (footnote omitted).) The Court does not understand Comdisco's defense to state that Plaintiffs were required to give notice of the alleged

breaches of the TLMA before they occurred. Rather, Comdisco argues that a simple showing that Comdisco exercised dominion over System No. 70263 which was inconsistent with the terms of the TLMA is inadequate to show a conversion in the conclusive sense of the word, as it is used by the Court hereunder; that Plaintiffs must also show that they had a current or immediate right of possession with which Comdisco interfered at the time the conversion is alleged to have occurred, and Plaintiffs have failed to do so.

Plaintiffs claim that because "CAI had breached the terms of the TLMA and the Equipment Sublease Agreements, GLLP had the [*15] right to terminate or rescind those Agreements and seek to obtain immediate possession of the equipment subject thereto." (Pl. Mem. Supp. Summ. J. at 25.) But, in fact, GLLP did not seek to terminate or rescind the agreements or to take immediate possession of the equipment subject thereto. Therefore, Plaintiffs' claim that they had an immediate right of possession of System No. 70263 by virtue of the alleged breaches of these agreements is not technically correct.

The Court finds that the "immediate right of possession" which the Illinois cases require is not an abstract right which may be invoked by reference to boilerplate contract language whenever a default occurs. Rather, the specific language of the decisions indicate that, absent an independent act of conversion, a party must have a practical and specific immediate right to possession with which the alleged converter's actions are inconsistent, *see, e.g., Farns Assoc., Inc. v. Sternback, Ill. App., 395 N.E.2d 1103, 1106 (1979)* (describing this right as one "to the immediate possession of the property, absolute and unconditional"), *quoted in Katz v. Belmont Nat'l Bank of Chicago, Ill. Supr., 112 Ill. 2d 64, 96 Ill. Dec. 697, 491 N.E.2d 1157, 1159 (1986)* [*16] (emphasizing the words *"absolute and unconditional"*).

Plaintiffs argue that because Comdisco's actions constitute a default under the TLMA, and because the TLMA gives Plaintiffs the right to repossess System No. 70263 in the event of default under paragraph 37, or to "pursue any other remedy available at law or in equity" under paragraph 38, Plaintiffs had the right to immediate possession of the system at the time of the breach, or, in the alternative, after giving the notice and opportunity to cure as required. Plaintiffs do not allege that a demand for possession of System No. 70263 was made.

Illinois cases have been characterized as "divided"

on the issue of whether "demand and refusal" are required in an action for conversion. *See IBM I, supra,* at 37 (quoting *Monroe County Water Coop. v. City of Waterloo, Ill. App., 107 Ill. App. 3d 477, 63 Ill. Dec. 315, 437 N.E.2d 1237, 1240 (1982)); A.T. Kearney, Inc. v. INCA Int'l, Inc., Ill. App., 477 N.E.2d 1326, 1334 (1985)*. Indeed, demand and refusal have been broadly stated to be component allegations of "[a] proper claim for conversion" under Illinois law. *Mid-America, 468 N.E.2d at 1338.* [*17] Where apposite facts appear, however, it has been noted that when the defendant is without possession, "demand would indeed be futile," *A.T. Kearney, 477 N.E.2d at 1334*. In light of this factual distinction, the Illinois cases are consistent, holding that demand and refusal are required when the defendant is rightfully in possession of the subject chattels. *But cf. Hoffman v. Allstate Ins. Co, Ill. App., 85 Ill. App. 3d 631, 40 Ill. Dec. 925, 407 N.E.2d 156, 158 (1980)* (wherein the court broadly stated, without acknowledging such a distinction, that "in our view, an action for conversion must include a demand for possession, or it cannot be said that there has been a *deprivation")*. Thus, while "demand by plaintiff and refusal to deliver are unnecessary to establish conversion where some other independent act of conversion can be shown," *Jensen,* 419 N.E.2d at 593 (citing *Hobson's Truck Sales, Inc. v Carroll Trucking, Inc., Ill. App., 2 Ill. App. 3d 978, 276 N.E.2d 89, 91 (1971)),* they are at least "evidence of conversion when the defendant is in such a condition that he can deliver the property if he will." *Union Stock-Yard Transit Co. v Mallory, Son & Zimmerman Co., Ill. Supr., 43 N.E. 979, 982 (1895)* [*18] (where the defendant bailee delivered twenty-seven head of cattle to a scoundrel agent of the plaintiff who absconded with the same, and the plaintiff corporation thereafter made a demand upon the defendant for its cattle, the conversion, if any, occurred upon the delivery of the cattle, not upon the plaintiff's demand).

It stands to reason that if a defendant rightfully acquires possession of a chattel, then the defendant's retention of that chattel cannot be inconsistent with the owner's right of possession unless the owner asserts the owner's rights to possess the chattel. *See Nelen v. Cowell, R.I. Supr., 45 R.I. 465, 123 A. 897, 898 (1924), cited in Hobson's Truck Sales,* 276 N.E. at 91. For example, under a simple two-party lease agreement which provides for the repossession of the leased goods upon the lessee's default, the lessee does not become a converter at any and every time the lessee is technically in default under the

contract. The lessor must not only have the technical right to repossess the goods by virtue of the lessee's default, but must attempt to exercise that right, or to repossess the goods, before the lessor [*19] has a right of *immediate* possession, as opposed to the unexercised contractual or abstract legal right to seek repossession. *See Farns Assoc.,* 395 N.E.2d at 1106; *First Nat'l Bank v. Lachenmyer,* Ill. *App.,* 476 N.E.2d 755, 758 (1985); *cf. Vineland Syrup, Inc. v. Papantinas,* C.A. No. 87C-JN-109, Stiftel, J. (Oct. 28, 1988), Letter Op. at 7-8 (holding, under Delaware law, that where the plaintiff failed to "exercise its right to possession" on the event of the defendant purchaser's default under what the Court determined to be a security agreement, "both ownership and possession remained" with the purchaser).

Furthermore, the lessee's retention of the goods must be inconsistent with the lessor's right.

> In some instances, as for example, when [one person] lends a chattel to another, it would be wholly unconscionable to permit the bailor to sue and recover judgment and costs of conversion against the bailee until the court could be convinced that there had been an actual effort to withhold the property. Therefore, in such a case, in the absence of a demand and refusal, the court could not give the plaintiff [*20] judgment in trover.

*See Mastellone v. Argo Oil Corp., Del. Supr.,* 46 Del. 102, 82 A.2d 379, 384 (1951). *See also Nelen,* 123 A. at 898; W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 15, at 92 (5th ed. 1984). An Illinois decision is guided by consistent principles:

> In the instant case, defendant Kackert is in possession of the subject property so that no such futility of demand exists. Correspondingly, an action for conversion under these circumstances must include a demand for possession or it cannot be said that there has been a deprivation.

*A.T. Kearney,* 477 N.E.2d at 1334. *See also* Keeton et al., § 15, at 99; 89 C.J.S. *Trover & Conversion* § 102, at 595 (1955). Thus, both as a practical matter of proof and as a matter of Illinois law, where our hypothetical lessee acquired possession rightfully, the lessor must attempt to repossess the goods and be refused possession before the

lessor may be found to have an immediate right of possession with which the lessee's retention of the goods is inconsistent.

Plaintiffs have not alleged that Comdisco acquired possession [*21] of System No. 70263 wrongfully. [4] *See A.T. Kearney,* 477 N.E.2d at 1334 (placing the burden on plaintiff to show that the alleged converter defendant's possession was wrongfully acquired). But while Plaintiffs never made a demand for the surrender of the goods, they contend that their written notice of default to CAI pursuant to paragraph 37(b) of the TLMA coupled with the failure to cure such default within fifteen days thereof is entirely adequate to show their right of immediate possession:

> Lessee shall be in default under the Lease . . . [if] Lessee . . . violates any of the covenants or representations made by Lessee in the Lease, or Lessee fails to perform any of its obligations under any other Lease entered into pursuant to this Agreement, and such failure or breach shall continue unremedied for a period of 15 days after written notice is received by Lessee from Lessor . . . .

(TLMA para. 37.) Plaintiffs claim that their notice and CAI's failure to cure the alleged breaches within fifteen days entitled Plaintiffs under the TLMA "'to take possession of any and all items of Equipment' subject to the Agreement 'without demand or notice, [*22] without any court order or other process of law' if CAI 'is in default'. [sic]" (Pl. Mem. Supp. Summ. J. at 25 (quoting TLMA para. 38).) Plaintiffs claim that they therefore had the right of immediate possession of System No. 70263.

> 4    The question of whether Comdisco wrongfully disposed of portions of System No. 70263 is considered below.

Alternatively, Plaintiffs argue that another part of the TLMA gave them the right to immediate possession whether or not they complied with the notice and cure provisions of paragraph 37:

> [The] procedural prerequisites [in paragraph 37] only apply, on the face of the TLMA, to those instances in which the lessor is seeking the particular remedies

for default that are set out in paragraph 38 of the TLMA. The TLMA also entitles the lessor to seek "any other remedy available at law or in equity". [sic] That is precisely what plaintiffs are doing in this action by seeking damages under a variety of legal theories. Under these circumstances, the procedural prerequisites of notice [*23] and cure do not come into play.

(Pl. Mem. Supp. Summ. J. at 25-26 (citation to record omitted).) In order to determine whether Plaintiffs did have an immediate right to possession, the Court need not determine whether, as Plaintiffs' argument necessarily implies, "default" under the "REMEDIES" provision of paragraph 38 means something other than what appears to be a definition of "default" in paragraph 37 of the lease. Likewise, the Court need not determine whether default can occur under the terms of paragraph 37(b) without provision of the written notice required therein. Nor must the Court decide whether the last two sentences of paragraph 38, on which Plaintiffs rely for the proposition that they may avail themselves of "any other remedy available at law or in equity," contain "remedies" which are subject to the condition contained in the first sentence of paragraph 38, which states: *"If Lessee is in default under the Lease,* Lessor shall have the right in its sole discretion, to exercise any one or more of the following *remedies* in order to protect its interests, reasonably expected profits and economic benefits"* (emphasis added). [5]

> 5    Plaintiffs also claim that any violation of the E.S.A. constitutes a default thereunder, regardless of whether a default has occurred under the TLMA. Therefore, Plaintiffs purport to have an immediate right of possession under the E.S.A., as these agreements do not provide for any notice or cure requirement. Comdisco contends that these agreements are void for want of consideration, as the TLMA required that Plaintiffs could not unreasonably withhold its consent, and Plaintiffs are therefore attempting to place conditions on what the TLMA already obligates it to do. "Consideration consists of a benefit to the party promising, or a loss or detriment to the party to whom the promise is made." *State Nat'l Bank v. Dick,* Conn. Supr., 164 Conn. 523, 325 A.2d 235, 238 (1973), quoted in *Essex Sav. Bank v.*

*Matthews Group, Inc.,* Conn. Super., No. 63028, Arena, J. (May 6, 1992), 1992 WL 110772, at *3. It is unnecessary at this time to resolve this question, as breach of these agreements could not give Plaintiffs greater rights than they are assumed *arguendo* to have had under the TLMA for the purpose of deciding this Motion.

[*24] Whether or not the fifteen-day prior notice under paragraph 38 of the TLMA is seen as a condition precedent to Plaintiffs' right to repossess the equipment [6] -- and assuming, if so, that the condition was satisfied [7] -- if we return to our previous example of a two-party lease, simply providing the lessee with notice of default is insufficient evidence that the lessor has a right to immediate possession with which the lessee's possession of the goods is inconsistent. *Cf. First Ill. Bank of Evanston v. Servistar Corp.,* N.D. Ill., No. 89 C-2758, Leinenweber, D.J. (Feb. 3, 1992), 1992 WL 22216, at *5 (finding that, under a security agreement secured by collateral in the debtor's possession, the union of default by the debtor and demand by the creditor are required to show conversion). Also, the lessor's continued acceptance of rent without protest or a demand for possession in such a case would indicate that the lessor did not in fact intend to repossess the goods. *Cf. Silver Lane Properties, Inc. v. Tartaglia,* Conn. Super., No. SPWA-9107-9789, Vertefeville, J. (Sept. 16, 1991), 1991 WL 253715, at *1 (where defendant tenant was served with a notice to quit for failure to [*25] pay rent and plaintiff landlord subsequently accepted rent, the landlord thereby renewed the tenancy). Similarly, Plaintiffs' March 26, 1991 letter is alone insufficient evidence of a right to immediate possession which Comdisco thwarted. [8] Plaintiffs also continued to accept each regularly scheduled payment of rent, which indicates that Comdisco's retention of the goods was not inconsistent with any immediate possessory interest of Plaintiffs. It furthermore appears that representatives of Plaintiffs told CAI's representative John Callanan at a meeting on or about April 1, 1991 concerning the letter of March 26, 1991, that CAI would still have the options of extending the lease, returning the system, or purchasing the system at the end of the initial lease term.

> 6    *Cf. Guerin v. Blair,* Cal. Supr., 33 Cal. 2d 744, 204 P.2d 884, 885 (1949)* (in Bank) (finding, under California law, that a notice provision in an agreement for the rental of a tractor "was a condition precedent to the exercise of the right to

retake possession violation of [a lease] provision").

7  In fact, where a lease provides that a lessee is entitled to notice and an opportunity to cure, a lessor who takes possession of the subject matter of the lease without providing the lessee with such notice and opportunity to cure may be liable to the lessee for conversion. *See Magnuson v. Schaider, Ill. App., 183 Ill. App. 3d 344, 131 Ill. Dec. 753, 538 N.E.2d 1309, 1316 (1989).*

[*26]

8  Plaintiffs' letter stated:

As you know, IBM and IBM Credit [ICC] recently commenced litigation against Comdisco in connection with what we believe to be Comdisco's unlawful sales and leases of IBM Credit-owned assets. In the litigation, Comdisco has taken the position that IBM Credit must sue its customers and that IBM Credit must provide each affected customer with a default notice. We do not believe that there is any merit to Comdisco's position. IBM and IBM Credit will oppose Comdisco's effort to bring you into the litigation as a party.

In light of these circumstances we are reminding you that, consistent with our past communications with you on this subject, IBM Credit's position is that, under your Term Lease Master Agreement, material breaches of your leases have taken place with respect to machine serial numbers 71462 and 70263 and this letter serves to reiterate our notice of that condition to you under paragraph 37 of the agreement.

At the present time, we have no desire to pursue our remedies under the TLMA with respect to this breach. IBM Credit will continue to make every effort to resolve satisfactorily the issues relating to your affected leases. We will also continue to pursue our litigation against Comdisco vigorously in an effort to end the unlawful disposition of our assets.

(Letter from Blair to Callanan dated March 26, 1991, Ex. 1 to Def. Mot. Dism.) Approximately one week later, IBM representatives met with the addressee of this letter, CAI's Senior Vice President of Operations John Callanan, to discuss its import. In his

deposition, Callanan stated, "I left [this meeting] with the conclusion that there was no further action to be taken [by Plaintiffs] against CAI. There were no remedial actions that I had to take and it was business as usual." (1 Callanan Dep. at 132.)

[*27]  A party to a contract may avail itself of a number of remedies under law for breach. Plaintiffs allege that the TLMA gave them a number of options to pursue, and which they have in fact pursued, other than seeking to recover System No. 70263 from Comdisco. But as Plaintiffs did not actually seek the return of System No. 70263 before the expiration of the original term under the TLMA, then the fact that Comdisco did not return System No. 70263 until such term expired did not, of itself, constitute "the wrongful deprivation of property from the person entitled to possession" which is "the essence of conversion." *Hobson's Truck Sales, 276 N.E.2d at 90.*

Plaintiffs seek to avail themselves of boilerplate language which purports to give them each and every potential means of redress simultaneously. But many of these remedies are necessarily inconsistent with each other. For example, Plaintiffs would not be entitled both to repossess the Equipment and to seek specific performance by its Lessee, both of which options are explicitly provided for under paragraph 38 of the TLMA. The very fact that Plaintiffs purport to have a number of options, including [*28] a right to repossess the Equipment, necessarily means that, depending on which of the options they choose under the TLMA, the retention of the Equipment notwithstanding the default may be rightful. Therefore, even assuming that Plaintiffs are indeed entitled under paragraph 38 of the TLMA to "take possession of any or all items of Equipment, wherever located, without demand or notice, without any court order or other process of law," Plaintiffs' right to possession is not absolute and unconditional under the Illinois law of conversion absent demand, as Comdisco acquired possession of System No. 70263 rightfully. Therefore, Plaintiffs must show that Comdisco committed an independent act of conversion in order to succeed on Count Three of the Complaint in this Motion.

**B. Independent Act Of Conversion**

**1. The Nature Of An Action For Interference with A Right Of Future Possession**

The Illinois courts have recognized an exception to conversion's requirement that the party claiming conversion must have an immediate right to possession. In *Hobson's Truck Sales, Inc. v. Carroll Trucking, Inc.,* the plaintiff had sold a tractor-trailer to Harold A. Wildhaber pursuant to a retail **[\*29]** installment sales contract. *Ill. App., 276 N.E.2d 89, 90 (1971).* Upon Wildhaber's default in scheduled payments, plaintiff's president, a Mr. Hobson, demanded the return of the truck or the payment of the money then due under the contract. Following a dispute wherein Wildhaber launched some fruit in Hobson's general direction, Hobson contacted a sheriff, but did not have the tractor repossessed. Wildhaber thereafter continued to use the truck and also made some additional payments to plaintiff.

Wildhaber subsequently permitted the defendant, Carroll Trucking, Inc., to use at least the truck tractor in its business operations, and the defendant's name was written on the sides of the truck tractor. *Id. at 90.* While the truck tractor was returning from delivering a shipment of hogs to New Jersey, it was demolished in an accident in Pennsylvania. The plaintiff brought an action for conversion against the defendant, and the Appellate Court of Illinois, Third District, stated as follows:

> While the record is conflicting we will assume for purpose of arguendo that a clear and firm demand was made by the plaintiff upon the **[\*30]** purchaser, Wildhaber, for the return of the truck tractor. Wildhaber refused to comply with that request and instead permitted the vehicle to be used by the defendant. No demand for possession was ever made by the plaintiff upon the defendant[, Carroll Trucking, Inc.,] until after the property was demolished in an accident.
>
> The plaintiff contends that such demand is unnecessary and that the mere use and retention of the truck tractor by the defendant trucking company is sufficient to constitute conversion. It is true that where some other independent act of conversion can be shown there is no necessity for a demand by the person claiming ownership or right to possession and a refusal by the original taker thereof

> to deliver it, in order to show a conversion of the property. However, the plaintiff in the case before us fails to designate some independent act which would constitute conversion and thereby render a demand unnecessary or useless.

*Id. at 91* (citations omitted). Thus, the Court stated that demand and refusal, which are evidence of an immediate right to possession and of the defendant's exercise of dominion inconsistent therewith, **[\*31]** were unnecessary to prove conversion, even though the defendant had rightfully acquired possession, if the plaintiff instead proved "some independent act which would constitute conversion." Thus, an independent act of conversion exists where the nature of dominion exercised over the property of another, such as an unauthorized disposition of the chattels, permits or requires an inference of hostility to the owner's rights in chattels, thereby "rendering a demand unnecessary or useless" as a matter of fact and as matter of law. *See Hobson's Truck Sales, 276 N.E.2d at 91. Cf.* Keeton et al., *supra,* § 15, at 94 (when one wrongfully acquires the chattels of another, "the great weight of authority regards the mere acquisition of the goods under such circumstances as in itself an assertion of an adverse claim, so detrimental to the dominion of the owner that it completes the tort, and no demand is required").

Where it is shown that one has sold the goods belonging to another, an independent act of conversion, or "actual conversion," is proved absent further showing:

> In Hanchett v. Williams, [(1887),) *24 Ill. App. 56, page 57,* **[\*32]** in an opinion by Moran, P.J., the court states:
>
> "Demand and refusal are only evidence of conversion in an action of trover, and if it is shown by the evidence that the goods for which recovery is sought were sold or otherwise disposed of by the person who had the possession of them, then the conversion is proven and it is unnecessary to prove a demand. . . ."
>
> The court held that conversion was proved.
>
> . . . .

In Howitt v. Estelle, [(1879)], 92 Ill. [Supr.] 218, page 220, the court states:

"It is objected that no demand for the machine was proved. None was required, as defendant testified she had sold it. This, then, was an actual conversion of the property, which rendered a demand unnecessary. A demand and refusal are only evidence of a conversion, and are not required where an actual conversion is proved. . . . A wrongful taking or a wrongful sale constitutes an actual conversion, and when shown dispenses with a demand. But where a party comes lawfully into possession and retains the property, to put him in the wrong a demand and refusal are necessary." . . .

. . . It is the settled law that where conversion (not a detention) is alleged and proved [*33] evidence of a demand and refusal is unnecessary . . . . The statement of claim alleges not only conversions of the property in question by both defendants but a sale of the property by both defendants. The motion to strike admits the truth of the facts so pleaded and it therefore appears that a demand for the return of the property would not only be unnecessary but useless.

*Community Acceptance Corp. v. Falzone, Ill. App., 343 Ill. App. 258, 98 N.E.2d 788, 789-790 (1951)* (citations omitted).

In *Jensen v. Chicago & W. Ill. R.R., Ill. App., 94 Ill. App. 3d 915, 50 Ill. Dec. 470, 419 N.E.2d 578 (1981)*, the plaintiff Jensen had stored antique railway cars, tenders, and engines in certain space in an old roundhouse which was owned by the defendant railroad company and leased to plaintiff. The defendant decided to close the premises and demolish the roundhouse and in February of 1969 requested Jensen to remove his property.

Due at least to the physical nature of the property and the regulations involving transport by rail, Jensen experienced some difficulty in complying with the request to remove the goods. Finally, in September of 1969, defendant railway company moved Jensen's [*34] antique railroad pieces to its 83rd Street yard with its own

switching engine, and, on advice of counsel, sold the cars for scrap. Defendant then helped to move the pieces from the 83rd Street yard to the scrapyard, where it was presumably destroyed.

The jury found that the defendant had converted Jensen's property and awarded Jensen $ 707,302 in compensatory damages and $ 1,000,000 in punitive damages. On appeal, the punitive damage award was reversed and vacated, and the case was remanded for a new trial on compensatory damages only. *Id. at 598*. In affirming the finding of liability, the *Jensen* Court found that "demand by plaintiff and refusal to deliver are unnecessary to establish conversion where some other independent act of conversion can be shown. The acknowledged sale of the equipment for cash would appear to constitute such independent act." *Id. at 593*.

The *Jensen* decision does not state that the defendant therein had acquired possession wrongfully, and does not state that the defendant's sale of the railroad equipment interfered with Jensen's immediate right to possession, absolute and unconditional. [*35] Rather, *Jensen* more broadly states that, "to constitute conversion of a chattel, there must be an unauthorized assumption of the right to possession or ownership." *419 N.E.2d at 592-93*. *See also Knight v. Seney, Ill. Supr., 290 Ill. 11, 124 N.E. 813, 815 (1919)* ("Any unauthorized act by which an owner is deprived of his property permanently or indefinitely, or the exercise of dominion inconsistent with the rights of the owner, is a conversion.").

An understanding that Illinois has moved away from the old common law requirement of an immediate right to possession in every case is consistent with the historic development of the law of conversion. *See Restatement (Second) of Torts § 222A cmts. a, b, cited in People v. Sergey, Ill. App., 137 Ill. App. 3d 971, 92 Ill. Dec. 695, 485 N.E.2d 506, 508 (1985)*. Under the old forms of actions, one entitled only to future possession would have to proceed in an action on the case, rather than in trover. Prosser and Keeton have criticized the maintenance of this distinction:

Although the distinction persists today in a good many courts, it is an antique procedural survival, with nothing to recommend [*36] it. The important fact is that the person entitled only to future possession can recover, in whatever form

of action, the full value of his interest in the goods which has been appropriated by the defendant, and no more. If this is not to be called conversion, it is at least the same thing by another name. There are a substantial number of courts which have discarded the procedural distinction, and have called the action one of conversion.

Keeton et al., *supra*, § 15, at 104-05. *See also Restatement (Second) of Torts* § 243 cmt. *b*. ("With the disappearance of the forms of action, it is normally of little consequence, except as a matter of pleading in a few jurisdictions, whether this action is now to be called one for conversion or merely for damage to the future interest, since in either case the amount recovered is the full value of the interest of which the plaintiff has been deprived."). While certain decisions have manifested great obeisance to antiquated pleading requirements, *see General Motors Corp. v. Douglass, Ill. App., 206 Ill. App. 3d 881, 151 Ill. Dec. 822, 565 N.E.2d 93, 96 & n.1 (1990)*, the substance of the Illinois decisions examined above indicates that Illinois [*37] courts would enforce a judicial sale on behalf of an owner of chattels without a showing of a right to immediate possession thereof if a defendant's actions were inconsistent with the owner's right to future possession such as to cause the owner's permanent or indefinite deprivation thereof, such as by sale or other disposition constituting an independent act of conversion.

2. Plaintiffs' Claim For An Independent Act of Conversion

Plaintiffs appear to argue that Comdisco's independent act of conversion gave them a right to immediate possession. Under Illinois law of conversion, an independent act of conversion does not require a showing of a right of immediate possession. Rather, these showings are appropriate for arguments in the alternative.

Plaintiffs' Complaint sufficiently alleges the tort under either theory of conversion under Superior Court Civil Rule 8(a) (1991):

Comdisco has . . . intentionally converted [GLLP]'s property by intentionally exercising unlawful dominion and control over that property, has wrongfully deprived [GLLP] of its

property and, as a result of that conversion, [GLLP] has been damaged.

(Compl. para. 36.) Plaintiffs are entitled to [*38] summary judgment on this claim as a matter of law if they show that Comdisco caused a permanent or indefinite deprivation of Plaintiffs' right to future possession of System No. 70263.

In their briefs, the parties did not address the possibility that conversion of less than all of System No. 70263 might be found. But proceeding with a piece-by-piece analysis does have a certain appeal, if not logic, in this case, and finds some support in the Restatement section considering the analogous case where a chattel is intentionally altered or destroyed:

whether destruction or damage to a part of a chattel is a sufficient change to amount to a conversion of more than the part is ordinarily a question of degree, and of the relation of the part to the whole under the particular circumstances.

*Restatement (Second) of Torts* § 226 cmt. *d*. [9] The Court is of the opinion that, had the Illinois Supreme Court been greeted with a situation where only ten or a dozen of the twenty-seven head of cattle bailed with the defendant in *Union Stock-Yard* had been delivered to a scoundrel agent purporting to act on the plaintiff principal's behalf, it would not have considered an action in trover [*39] for conversion of all twenty-seven appropriate; nor would it consider the matter differently today. *Cf. New York Cent. R.R. v. Buckley Rubber Co., Ind. App., 99 Ind. App. 191, 187 N.E. 353, 353-54 (1933)* (en Banc) (finding, under Indiana law, where the defendant below took five parts of an industrial calender for processing rubber and "each of these parts could have been replaced by purchase of similar parts," that "there is a complete failure to prove the conversion of the entire calender").

[9] A question arises where one has caused "the destruction or removal of a part of a chattel, such as the tire of an automobile: is it conversion only of the part, or of the whole? Probably the answer is that if replacement is quick and easy, only the tire is converted; but if it is slow and difficult, with the car in the middle of a distant desert, there is conversion of the car." *Keeton et al., supra*, § 15, at 101.

The components of System No. 70263 were designed to be modular, and may be combined in literally [*40] thousands of configurations of different speeds and capacities. The vaunted modularity of these components not only enhances their marketability, but also facilitated Comdisco's conduct. The Court therefore finds a piece-by-piece determination of their conversion to be appropriate. Having rejected the argument that any alleged breach of the TLMA gave rise to an immediate right of possession with respect to all of the components, parts and equipment, leased thereunder, the Court must now consider each of the distinct acts complained of to determine which, if any, constitute independent acts of conversion.

**(a) Sale of Parts**

Plaintiffs complain that Comdisco sold sixty-four megabytes of expanded storage and one gate with boards to PacifiCorp Capital, Inc., and one gate with boards to Comdisco Germany. Comdisco claims that it "transferred" the other gate to Comdisco Germany, which was thereafter subleased to Bundesknappschaft die Geschaftsfuhrung in Germany. The Court shall not consider this "transfer" to be a sale for the purposes of ruling on Plaintiffs' motion for summary judgment.

The Court finds the sale of portions of System No. 70263 to PacifiCorp Capital, Inc. to constitute [*41] an unauthorized disposition which permanently deprived Plaintiffs of their right to future possession thereof, rendering demand useless. Comdisco does not allege that any of the written consents to sublease granted by Plaintiffs were intended to specifically encompass the sale of parts, as opposed to the sublease of parts, but only denies that Plaintiffs' "approval is required to . . . sell . . . parts removed during reconfiguration." (Answer at 22.) The Court does not find this reading of the TLMA to be reasonable. *See IBM I, supra*, at 24.

Nor is Comdisco's subsequent return of System No. 70263 essentially intact relevant to whether a conversion has occurred. [10] Comdisco asserts that this return effectively cured any default under the TLMA, but Comdisco's independent act of conversion cannot be cured by return of the converted property. *See Schlosser v. Welk, Ill. App., 193 Ill. App. 3d 448, 140 Ill. Dec. 605, 550 N.E.2d 241, 242-43 (1990); Illinois Educ. Ass'n v. Illinois Fed'n of Teachers, Ill. App., 437 N.E.2d 1265, 1267 (1982)*. Comdisco has not alleged that Plaintiffs' acceptance of System No. 70263 upon the expiration of

the TLMA on February 17, [*42] 1992 constituted a waiver. Therefore, Plaintiffs' acceptance of the goods serves only to diminish the amount of damages which it may recover. *See Restatement (Second) of Torts § 922(1) & cmt. b.*

> 10    Comdisco returned System No. 70263 in its original configuration with its original components, parts and equipment, intact, except for the substitution of one new IBM-manufactured TCM and one new IBM-manufactured 3180 display for functionally identical components which had allegedly malfunctioned.

Comdisco also asserts that their sale of these components was not inconsistent with Plaintiffs' rights of future possession because paragraph 18 of the TLMA gave CAI the right to purchase System No. 70263 before the expiration of the lease upon notice to Plaintiffs. But the exercise of this right was subject to myriad contingencies, including the explicit condition that CAI could not be in default. Additionally, Comdisco assumed that CAI would be extant, solvent, willing, and able to purchase the equipment at the expiration [*43] of the lease. A lessee's contingent right to purchase which has not vested is insufficient to deprive the lessor of all its ownership rights in the leased chattels.

Comdisco claims that there is a triable question of fact as to "whether Comdisco ever intended to permanently or indefinitely deprive plaintiffs of System 70263." (J.C.S. at 42.) With respect to those portions of System No. 70263 which Comdisco admittedly sold, there is no question of fact. Comdisco's sale of System No. 70263 deprived Plaintiffs of any and all of their rights of possession. Such "[a] wrongful assumption of the ownership of property" is an independent act of conversion as a matter of law. *See discussion supra pp. 23-27.*

Comdisco has submitted evidence which it contends shows that Plaintiffs also sold portions of computer systems owned by others. That is, notwithstanding the wrongfulness of Comdisco's sale of Plaintiffs' property as a contractual matter under the TLMA, Comdisco has submitted evidence that plaintiffs consented to this activity. There can be no conversion if Plaintiffs consented to Comdisco's actions. *See Union Stock-Yard, 43 N.E. at 985.*

Consent [*44]  ordinarily bars recovery

for intentional interferences with person or property. It is not, strictly speaking, a privilege, or even a defense, but goes to negative the existence of any tort in the first instance. It is a fundamental principle of the common law that *volenti non fit injuria* -- to one who is willing, no wrong is done. . . . [A plaintiff's] consent negatives the wrongful element of the defendant's act, and prevents the existence of a tort. "The absence of lawful consent," said Mr. Justice Holmes, "is part of the definition of an assault." The same is true of false imprisonment, conversion, and trespass.

Keeton et al., *supra*, § 18, at 112 (footnotes omitted); *see also Restatement (Second) of Torts § 243 cmt. c.*

Whether one person has consented to the actions of another is often a complex factual determination which may involve not only the words but the conduct of the alleged consenter. *See Restatement (Second) of Torts § 892(2).* "Consent is willingness in fact for conduct to occur. It may be manifested by action or inaction and need not be communicated to the actor." *Id. § 892(1).*

The record does show that Plaintiffs subleased an IBM-manufactured [*45] Model 3090 computer system with the serial number 71259 (System No. 71259), which was owned by Comdisco, from Comdisco's lessee; removed therefrom two features, each of 64 megabytes of expanded storage memory; sold these features to two other entities in 1988; and subsequently bought these features from Comdisco in November of 1990. Plaintiffs have characterized this action as a mistake, and the documentary evidence Comdisco submitted confirms this characterization. An isolated mistake does not evidence consent.

But Plaintiffs' motion for summary judgment must be decided on those facts and "all rational inferences [therefrom] which favor the non-moving party." *Merrill, 606 A.2d at 100.* Comdisco has produced deposition testimony which may indicate that Plaintiffs' sale of expanded memory features from Comdisco's System No. 71259 was intentional. But after this 1988 sale and before July of 1990 when Comdisco began to engage in the activities of which Plaintiffs complain, Plaintiffs stated clearly and repeatedly that sale of their property

was not permitted. Thus, even assuming that Plaintiffs at some time did consent, "when notice is given that all [*46] such conduct will no longer be tolerated[,] . . . the defendant is no longer free to assume consent." Keeton et al., *supra*, § 18, at 114.

Comdisco also alleges that, in numerous instances where Plaintiffs upgraded an IBM 3090 computer owned by another party from a model 200 to a model 400, [11] they have taken a component thereof, a 3092 processor controller, and replaced it with a different 3092 processor controller, causing the replacement and not the original to be returned to the owner of the system at the end of the sublease. But Plaintiffs engaged in this conduct only where the original 3092 processor was not compatible with the upgrade, and where the substitution was therefore necessary to achieve the reconfiguration. Comdisco has directly sold components of System No. 70263 solely for profit motives, and in their stead left nothing but its assurance that it would provide replacement components at the expiration of the sublease between Plaintiffs and CAI. This direct substitution of improved parts necessary for a reconfiguration is factually distinct from the Comdisco's actions, and therefore does not evidence Plaintiffs' consent. Furthermore, Comdisco has not alleged [*47] that substitutions, which it contends are permitted under standard industry practice, violated any of the master leases pursuant to which the upgraded IBM 3090s were leased by their owners, from which the Court could infer that Plaintiffs did not breach others' contracts. Plaintiffs' substitutions involving other computers is not even evidence of consent to substitutions for components they own if the other computers' master leases, unlike the TLMA, permit such activity. In any event, the Court rejects Comdisco's contention that Plaintiffs' immediate and circumscribed substitutions of a specific component in others' computers for technical reasons might evidence Plaintiffs' consent to the general sale of their own components.

11    The model designation of an IBM 3090 computer indicates the number of central processors which are included in the processor complex; a model 200 has two processors, and a model 400 has four processors.

Even with all inferences construed in its favor, Comdisco cannot show that Plaintiffs [*48] consented to the 1990 sale of Plaintiffs' property, which the Court

finds to be an independent act of conversion; nor does Comdisco have any viable defense. Therefore, with respect to the portions of System No. 70263 which Comdisco sold, Plaintiffs' Motion on conversion is hereby granted. Super. Ct. Civ. R. 56(c).

### (b) Overlease Of "Equipment" And "Parts"

Plaintiffs complain that Comdisco converted their property by subleasing for "terms extending beyond the original term of the base lease" various portions of the whole System No. 70263 which was the subject of the TLMA. (Compl. para. 21.) Comdisco's overleasing presents a number of questions. First, does the agreement documented by the TLMA prohibit such conduct? Second, if so, does prohibited overleasing constitute an independent act of conversion? Third, did Plaintiffs consent to overleasing?

### (i) Is Overleasing Prohibited By THE TLMA Or E.S.A.?

Under Connecticut law, the construction of an unambiguous lease "presents a question of law for the court." *Robinson v. Weitz, Conn. Supr., 171 Conn. 545, 370 A.2d 1066, 1069 (1976).* Paragraph 32 of the TLMA specifically addresses subleasing:

> Upon **[*49]** Lessor's prior written consent, which will not be unreasonably withheld, Lessee may sublet the Equipment or relocate it from the Equipment Location. No sublease or relocation shall relieve Lessee of its obligations under the Lease. Lessee shall not assign, transfer or otherwise dispose of the Lease or Equipment, or any interest therein, or create or suffer any levy, lien or encumbrance thereof except those created by Lessor.

The TLMA is silent as to the length of the sublease which Plaintiffs may approve.

Plaintiffs claim that a term contained in each of the Equipment Sublease Agreements is dispositive: "This approval is valid through the expiration of the lease specified for this user only." (E.S.A. para. A.) Plaintiffs argue that "user" is CAI. However, "user" may also reasonably be interpreted to be the sublessee. This interpretation is bolstered by the fact that CAI was

elsewhere identified in the sublease agreements by the defined term "Lessee." In fact, the very next sentence in the sublease agreements states: "All [ICC] notices, invoices, and administration shall continue to be with the Lessee." This sentence might be read to distinguish the "Lessee" from the "user," **[*50]** who would not be involved with ICC notices, invoices, and administration. Therefore, the "approval" sentence may be reasonably construed to prohibit the sublessee "user" from again subletting the covered Equipment without again securing Plaintiffs' approval, or to prohibit the Lessee from subletting the Equipment to a different "user" without again securing Plaintiffs' approval. Thus, the E.S.A. may fail to address overleasing altogether. But even if "user" does mean "Lessee," the sentence is ambiguous; "expiration of the lease" might be construed to refer to expiration of the original base term of the lease or to expiration of the all terms of the lease, including renewal or extension terms thereunder. Therefore, the E.S.A. is at best ambiguous as to the length of the sublease which Plaintiffs may approve.

Comdisco argues in the alternative that Plaintiffs were not free to modify the TLMA through the E.S.A., as Plaintiffs were required under the express terms of the TLMA not to withhold their consent unreasonably. Therefore, Comdisco argues, the sublease agreements are void for lack of consideration. Plaintiffs claim that the terms of the sublease agreements are reasonable conditions, **[*51]** and that the TLMA only forbade them from conditioning consent on unreasonable terms.

As the TLMA is silent as to the length of terms of subleases which may be approved thereunder, the agreement evidenced by the TLMA is ambiguous. While explicit, unambiguous provisions of a contract may not be explained by parol evidence, *see Jay Realty, Inc. v. Ahearn Development Corp., Conn. Supr., 189 Conn. 52, 453 A.2d 771, 773-74 (1983),* the court's construction of the ambiguous sublease consent provision should be informed by the course of dealing among the parties and by industry practice, or usage of trade. *See TIE Communications, Inc. v. Kopp, Conn. Supr., 218 Conn. 281, 589 A.2d 329, 333 (1991); see also Harry A. Finman and Son, Inc. v. Connecticut Truck and Trailer Serv. Co., Conn. Supr., 169 Conn. 407, 363 A.2d 86, 89 (1975).* The jury must determine the factual question of what default terms the parties' dealings and trade usage entail.

If the agreement so construed permits overleasing

and the paragraph A of the E.S.A. prohibits overleasing, the Court must then determine the E.S.A. prohibition is consistent with the lease agreement which [*52] the parties entered or an unreasonable modification thereof. See Dornfelt v. Hom, Conn. Super., No. SPH 9101-58760 HD, Berger, J. (Apr. 2, 1991), 1991 WL 86256, at *3-4 (after stating that "contract law and not property law should govern this matter," the court held that, where a lease provided "that the landlord shall not withhold the consent [to assignment thereof] unreasonably," plaintiff landlord breached the lease by conditioning consent upon the prospective assignee's agreement to pay higher rent); cf. Warner v. Konover, Conn. Supr., 210 Conn. 150, 553 A.2d 1138, 1140-41 (1989) (holding that even "a landlord who contractually retains the discretion to withhold its consent to the assignment of a tenant's lease must exercise that discretion in a manner consistent with good faith and fair dealing," and suggesting that consent may not be withheld "for the purpose of recapturing opportunities forgone at the formation of the contract").

(ii)  May  Overleasing  Be  An  Independent  Act  Of Conversion?

Assuming arguendo that Comdisco's overleasing is wrongful as a contractual matter, the trier of fact must determine if such overleasing constitutes an exercise [*53] of dominion which is sufficiently inconsistent with Plaintiffs' rights of future possession as to warrant a forced judicial sale thereof. See Dickson v. Riebling, Ill. App., 30 Ill. App. 3d 965, 333 N.E.2d 646, 648-49 (1975). Whether a conversion has occurred is a question for jury determination unless the evidence only supports one reasonable conclusion. See Jensen, 419 N.E.2d at 593 (citing Boudoures v. Galloway, Ill. App., 258 Ill. App. 30 (1930)).

### (iii) Did Plaintiffs Consent?

Assuming arguendo that Comdisco's overlease of portions of System No. 70263 otherwise constitutes an independent act of conversion, Plaintiffs' consent would defeat such a claim. See discussion supra pp. 32-32. Comdisco claims that industry usage permitted both the subleasing and the overleasing of IBM computer systems beyond the base terms of their original leases; that Plaintiffs were aware of this industry usage or practice; that Plaintiffs acquired by sublease computers owned by others and proceeded to overlease such computers to others; that Plaintiffs acquired by sublease computers

owned by others, further [*54] subleased such computers to other leasing companies, and permitted the leasing companies to overlease such computers; that Plaintiffs represented to potential customers for a period of years that the TLMA permitted overleasing in order to induce them to lease IBM products pursuant to the TLMA; that Plaintiff ICC looked favorably on overleases because they required the extended lease or purchase of the subject computer systems at retail rather than wholesale rates and avoided the inherent transitional costs of releasing of the systems, as well as the risk that the systems would lie fallow; and that Plaintiffs continued to inform potential customers as late as 1991 that the TLMA permits overleasing. These facts permit an inference that Plaintiffs consented to the overleasing of System No. 70263.

Comdisco also has alleged that Plaintiffs have overleased computer systems owned by Comdisco and others. If these computer systems' leases addressed overleasing no more explicitly that the TLMA, then, contrary to Plaintiffs' argument, such evidence is directly relevant to this case, as it indicates "willingness in fact for [overleasing] to occur." Restatement (Second) of Torts § 892(1).  [*55]  The record contains sufficient indicia of consent to raise a question of material fact and thus render summary judgment inappropriate.

For the numerous foregoing reasons, whether Comdisco converted components of System No. 70263 by subleasing them beyond the initial term of the TLMA presents questions for the trier of fact. See De Kalb Bank v. Purdy, Ill. App., 205 Ill. App. 3d 62, 150 Ill. Dec. 420, 562 N.E.2d 1223, 1231-32 (1990). Therefore, with respect to portions of System No. 70263 which Comdisco overleased, Plaintiffs' Motion on the theory of conversion is hereby denied. Super. Ct. Civ. R. 56(c).

### (c) Sublease Of "Parts"

Plaintiffs  complain  that  Comdisco  converted components removed from System No. 70263 by subletting them to other entities for "terms extending beyond the original term of the base lease." At issue are both Comdisco's right to sublease certain components removed from System No. 70263, which Comdisco contends are "parts," without obtaining specific consent to do so; and Comdisco's right to overlease. As the latter issue was addressed immediately above, only the former issue remains.

Paragraph 32 of the TLMA provides: "Upon Lessor's prior written consent, which [*56] will not be unreasonably withheld, Lessee may sublet the Equipment or relocate it from the Equipment Location." Comdisco argues that "Equipment" refers only to those components which are attached to the frame of System No. 70263, and that components removed therefrom are no longer "Equipment" but "parts." To support this contention, Comdisco points to the language in paragraph 23 of the TLMA:

> 23.  **ALTERATIONS; MODIFICATIONS; PARTS.** Lessee may alter or modify the Equipment only upon written notice to Lessor. Any non-IBM alteration is to be removed and the Equipment restored to its normal unaltered condition at Lessee's expense prior to its return to Lessor. At Lessee's option any IBM field installable upgrade, feature addition or accessory added to any item of Equipment (Modification) may be removed. If removed, the Equipment is to be restored at Lessee's expense to its normal, unmodified condition. If not removed, such Modification shall, upon return of the Equipment, become, without charge, the property of Lessor free of all encumbrances. Restoration will include replacement of any parts removed in connection with the installation of an alteration or Modification. Any [*57] part installed in connection with warranty or maintenance service shall be the property of Lessor.

Plaintiffs argue that "replacement of any parts removed" effectively means *"reinstallation of any Equipment* removed." In examining these material distinctions, the Court is required to construe the TLMA "most strongly against" Plaintiffs, its drafters. *Sturman v. Socha, Conn. Supr., 191 Conn. 1, 463 A.2d 527, 532 (1983). See also Restatement (Second) of Contracts § 206* (1981). Also, on this Motion, Comdisco is entitled to all favorable inferences of fact. *Merrill v. Crothall-American, Inc.,* Del. *Supr., 606 A.2d 96, 99-100 (1992).*

Given Plaintiffs' use of the defined term "Equipment" in paragraph 23, their use of "parts" in both the body and the heading of the very same paragraph

indicates that, had Plaintiffs intended to state "Equipment" rather than "parts," they would have done so. The Court finds the meaning of "parts" under the TLMA to be ambiguous. Also, the Court is not prepared to find that "replacement" can only mean "reinstallation" as opposed to "substitution" on this motion for summary judgment. *Cf.* [*58] *Computer Systems of America, Inc. v. Unum Life Ins. Co., 975 F.2d 922, 926 (1st Cir. 1992)* (finding "replacement" to be an ambiguous term in the lease of an IBM 3090 computer); *Capozzi v. Liberty Mut. Fire,* Conn. Super., No. 106650, Barnett, J. (June 2, 1992), 1992 WL 124158, at *6 ("Unless otherwise defined in the [insurance] policy, . . . 'replace' has the ordinary meaning of 'to take the place of, to serve as a substitute or equivalent for or as a successor of a person or thing.'"); *Kawin v. Chrysler Corp., Mo. Supr., 636 S.W.2d 40, 43 (1982)* (en banc) ("The term 'replace', given its plain and ordinary construction, means to supplant with a substitute or equivalent.").

The TLMA's ambiguity, both with respect to the identity of "parts" and to whether approval is required before they may be subleased, presents issues of material fact. *See Essex Savings Bank v. Matthews Group, Inc.,* Conn. Super., No. 63028, Arena, J. (May 6, 1992), 1992 WL 110772, at *2. Such issues are inappropriate for summary judgment. *Merrill, 606 A.2d at 99.* Additionally, the trier of fact could also determine [*59] that Plaintiffs effectively consented to the sublease of components removed from the frame of the computer system. *See* discussion *supra at pp. 39-40.* Therefore, with respect to Comdisco's sublease of portions removed from System No. 70263, Plaintiffs' Motion on the theory of conversion is hereby denied. Super. Ct. Civ. R. 56(c).

**(d) Sublease Under Comdisco's Master Lease Agreement**

Plaintiffs contend that Comdisco converted the reconfigured, downgraded System No. 70263 by subleasing it to FBNO under Comdisco's own Master Lease Agreement (MLA), which Plaintiffs contend is inconsistent with their property rights in the system under the TLMA. Plaintiffs allege that FBNO solicited bids for a 3090 model computer system lease with terms permitting FBNO to remove components from the system, "remarket" such components, and substitute equivalent components at the expiration of the lease term. Plaintiffs state that they submitted a bid under their standard TLMA which did not qualify under FBNO's

solicitation because the TLMA forbids such substitution. Comdisco, however, won the bid by leasing the reconfigured System No. 70263 under Comdisco's own MLA, which permits substitution. [*60] The MLA did not disclose that Plaintiff GLLP rather than Comdisco owned System No. 70263. While this evidence permits the inference that Comdisco purported to convey a greater interest in System No. 70263 than it actually possessed, and the inference that Comdisco intended to appropriate Plaintiffs' property, Plaintiffs are not entitled to have these inferences drawn in their favor on a motion for summary judgment. *Merrill, 606 A.2d at 99-100.*

Plaintiffs have not alleged that FBNO sold any of the components of System No. 70263. Nor have Plaintiffs alleged that Comdisco directly represented to FBNO that it owned System No. 70263. In sum, while a jury could find that Comdisco committed an independent act of conversion by remarketing System No. 70263, Plaintiffs are not entitled to such a ruling as a matter of law, and this aspect of their Motion is hereby **denied.** Super. Ct. Civ. R. 56(c).

**(e) Placement of Components Into Inventory**

Plaintiffs complain that Comdisco placed 64 megabytes of expanded storage memory and two TCMs into its inventories in New Jersey and Illinois. While Comdisco's act of placing these items into its inventory is [*61] some evidence that Comdisco intended to assert dominion or control over these portions of System No. 70263 which was inconsistent with Plaintiffs' rights therein, it is insufficient evidence to warrant summary judgment on their conversion, as it is not necessarily inconsistent with Plaintiffs' rights of future possession, and does not warrant a forced judicial sale as a matter of law. [12] Therefore, Plaintiffs' Motion is denied with respect to these components. Super. Ct. Civ. R. 56(c).

[12] The unauthorized change of the location of the chattel, without other interference with it, may or may not amount to a conversion. If there is no intent to assume any other control over it, or to deprive the owner of it, and the interference is brief in duration and otherwise harmless, it is not so serious a matter as to call for a forced sale to the defendant." Keeton et al., *supra,* § 15, at 95.

**(f) Removal Of Equipment From The U.S.**

While the Court is unable to find on this motion for summary judgment that Comdisco's [*62] "transfer" of a gate with boards to Comdisco Germany constitutes a sale, this question of characterization is not dispositive of the larger question of whether Comdisco converted Plaintiffs' property. Plaintiffs argue that Comdisco caused a breach of the TLMA by transferring the gate with boards to Comdisco Germany. Paragraph 32 of the TLMA states, "In no event shall Lessee remove the Equipment from the United states and Puerto Rico." Again, whether the gate with boards constitutes "Equipment" or "parts" under the TLMA is a disputed question of fact. However, several germane facts are not disputed.

The parties do not dispute that the effect of this "transfer" was to move Plaintiffs' property to Germany without their express authorization, beyond the jurisdiction of domestic courts and beyond the certain application of Connecticut law, by which Plaintiffs' rights are to be governed under the TLMA. A finding that the gate with boards may be "parts" rather that "Equipment" would not support an inference that its relocation to foreign jurisdictions is contemplated by the TLMA. The facts do not support a finding that Plaintiffs consented to this relocation.

Comdisco transferred the [*63] gate with boards to Comdisco Germany, where it was further subleased to Bundesknappschaft die Geschaftsfuhrung, also in Germany. This relocation to a foreign jurisdiction is neither "brief in duration" nor "otherwise harmless," Keeton et al., *supra,* § 15, at 95, as it indubitably impairs Plaintiffs' ability to protect their property interests, including their right to future possession. Therefore, with respect to the unauthorized transfer of components of System No. 70263 outside the United States and Puerto Rico, motion on summary judgement is hereby granted on Count Three in conversion with respect to Plaintiff GLLP, the owner of System No. 70263. Super. Ct. Civ. R. 56(c).

**II. UNFAIR COMPETITION**

Plaintiffs IBM and ICC have moved for summary judgment on their claim that Comdisco engaged in unfair competition by selling portions of System No. 70263 to PacifiCorp and by overleasing portions of System No. 70263 to FBNO under its MLA, both in competition with Plaintiffs. Unfair competition is a form of tortious interference with prospective economic advantage. *See Belden Corp. v. Internorth, Inc., Ill. App., 90 Ill. App. 3d 547, 45 Ill. Dec. 765, 413 N.E.2d 98, 102 (1980)*; Keeton

[**\*64**] et al., *supra*, § 130, at 1013.

The elements of the tort of interference with prospective advantage are similar [to those of the tort of interference with contractual relations], but not identical. The plaintiff must have a reasonable expectancy of entering a valid business relationship, and defendant must purposely interfere and defeat this legitimate expectancy, thereby causing harm to the plaintiff.

*Belden*, 413 N.E.2d at 101, *quoted in Prudential Ins. Co. v. Sipula*, 7th Cir., 776 F.2d 157, 162-63 (1985).

Only wrongful interferences will satisfy the tort, as some interferences are seen as justified or privileged under the aegis of competition. *Candalaus Chicago, Inc. v. Evans Mill Supply Co., Ill. App.*, 51 Ill. App. 3d 38, 9 Ill. Dec. 62, 366 N.E.2d 319, 326-27 (1977). *See also Restatement (Second) of Torts* § 768(1)(b). "Unfair competition, which is not privileged, includes fraud, intimidation, or disparagement." *Belden*, 413 N.E.2d at 103. The Restatement has adopted a standard for determining whether conduct between competitors is wrongful:

In determining whether an [**\*65**] actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:

(a) the nature of the actor's conduct,

(b) the actor's motive,

(c) the interests of the other with which the actor's conduct interferes,

(d) the interests sought to be advanced by the actor,

(e) the social interests in protecting the freedom of the action of the actor and the contractual interests of the other,

(f) the proximity or remoteness of the actor's conduct to the interference and

(g) the relations between the parties.

*Restatement (Second) of Torts* § 767. Another authority states, "Quite apart from any improper motive, unfair competition, or for that matter other interferences with prospects, can be found when the defendant engages in any conduct that amounts to a recognized tort and when that tort deprives the plaintiff of customers or other prospects." Keeton et al., *supra*, § 130, at 1014.

The Court finds Comdisco's appropriation and sale of portions of System No. 70263 to PacifiCorp in competition with Plaintiffs to be wrongful as a matter of law, and therefore these acts are [**\*66**] not shielded by the privilege of competition, *see IBM I, supra*, at 54-55. [13] The Court is unable to find the overlease to FBNO to be wrongful on this motion for summary judgment. *See* discussions *supra pp. 35-41, 43-44*.

13      Again, the Court may not decide on this motion for summary judgment whether Comdisco's "transfer" of a gate with boards to Comdisco Germany constitutes a sale, as Plaintiffs contend.

With respect to Comdisco's sale of Plaintiffs' property to PacifiCorp, however, an element of the tort is unsatisfied. Plaintiffs have not alleged that PacifiCorp was their prospective business relation. Rather, Plaintiffs complain that PacifiCorp, and not Comdisco, sold or leased Plaintiffs' components to one or more other businesses in competition with Plaintiffs. That *PacifiCorp* subsequently sold another computer system containing one of Plaintiffs' System No. 70263 components to Plaintiffs' prospective business relation is, without more, inadequate to show that *Comdisco* tortiously interfered [**\*67**] with Plaintiffs' prospective economic advantage. Otherwise, every conversion which injects goods into the stream of commerce would potentially be a tortious interference with prospective economic advantage, as well, without respect to the converter's intent to interfere with the plaintiff's other business expectancies. Such reasoning is plainly flawed. If Plaintiffs believed that PacifiCorp's subsequent sale of the expanded memory constituted unfair competition, they could have brought suit directly against PacifiCorp for unfair competition, and for conversion. Finally, Plaintiffs concede that it is disputed whether IBM would

1993 Del. Super. LEXIS 183, *67

have made an additional sale but for Comdisco's sale of the 64 megabytes of expanded memory to PacifiCorp, and "whether Comdisco intentionally interfered and caused a breach or termination of IBM's expectation that it would sell a 3092 model 5 processor controller" in connection with the deal which plaintiffs contend was frustrated by the Comdisco's sale to Comdisco. (J.C.S. at 34, 35.)

Plaintiffs have not, with respect to either causation or the element of intent, sustained their burden of showing that, "on unquestioned facts, [they are] entitled to a judgment [*68] as a matter of law" on their unfair competition claim. *Oliver, 312 A.2d at 325.* Therefore, Plaintiffs' Motion on Count Eight is hereby denied in all respects. Super. Ct. Civ. R. 56(c).

### III. UNJUST ENRICHMENT

In Count Nine, Plaintiffs ask for unjust enrichment damages in the amount of Comdisco's profit associated with the sublease and sale of portions of System No. 70263, to the extent that such damages do not constitute double recovery in light of any other damage awards.

> The doctrine of unjust enrichment underlies a number of legal and equitable actions and remedies, including the equitable remedy of constructive trust and the legal actions of *assumpsit* and restitution or quasi-contract. . . . To state a cause of action based on a theory of unjust enrichment, a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience.

*H.P.I. Health Care Serv., Inc. v. Mt. Vernon Hospital, Inc., Ill. Supr., 131 Ill. 2d 145, 137 Ill. Dec. 19, 545 N.E.2d 672, 678-79 (1989)* (citing 1 [*69] George E. Palmer, The Law of Restitution § 1.1, at 2-4 (1978)). The central questions at issue in a claim for unjust enrichment are whether the defendant received a benefit from or arising out of an interest which belongs to the plaintiff, and whether the retention of such benefit should be regarded as an injustice to the plaintiff. *See* Palmer, *supra,* § 1.7, at 41.

In the case at bar, the question of wrongfulness turns on the Plaintiffs' proof of tortious conduct. "The tort . . . is an element of [the plaintiff's] cause of action: it is the ground that makes retention of the benefit unjust. Thus, the plaintiff's action is based upon the tort whether [the plaintiff] sues to recover damages or to obtain restitution. Palmer, § 2.1, at 51 (footnote omitted). *See also* Restatement of Restitution ch. 7, at 525; *cf. Schlosser v. Welk, Ill. App., 193 Ill. App. 3d 448, 140 Ill. Dec. 605, 550 N.E.2d 241, 243-44 (1990)* (Heiple, J, separate opinion) (concurring with the majority's finding of unjust enrichment where the defendant had converted her former employer's property, and dissenting with the majority's ruling on damages).

As the Court has concluded that Comdisco's sale of components [*70] of System No. 70263 and unauthorized relocation or other components to Germany constitute wrongfully conversions, and as Comdisco indisputably realized a benefit from such acts, Plaintiff GLLP is entitled to restitution damages for Comdisco's unjust enrichment arising out of such tortious conduct, and this aspect of Plaintiffs' Motion is hereby granted. As Comdisco's conversion was wrongful only as to Plaintiff GLLP, the owner of System No. 70263, the element of wrongfulness on the unjust enrichment claim is also satisfied only as to Plaintiff GLLP. As to all other acts for summary judgment has been denied to Plaintiff GLLP on Counts Three and Eight, and as to Plaintiff IBM and Plaintiff ICC in all respects, summary judgment on Count Nine is also hereby denied. Super. Ct. Civ. R. 56(c).

### CONCLUSION

As detailed above, the Motion is granted with respect to Plaintiff GLLP's claim in Count Three that Comdisco's sale of certain components of System No. 70263 and Comdisco's unauthorized relocation of other components to Germany are tortious conversions, and with respect to Plaintiff GLLP's claim in Count Nine that Comdisco was unjustly enriched by these conversions. In all [*71] other respects, Plaintiffs' Motion is hereby denied.

IT IS SO ORDERED.

DATE: June 30, 1993

Carl Goldstein, Judge